```
 1                IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

 3

 4   United States of America,

 5                        Plaintiff,

 6   vs.                       Criminal Action No. 3:21-cr-49-2

 7   Diana Toebbe,

 8                        Defendant.

 9

10

11          Proceedings had in the Initial Hearing, Arraignment,

12   and Detention Hearing in the above-styled action on October 20,

13   2021, before the Honorable Robert W. Trumble, Magistrate Judge,

14   at Martinsburg, West Virginia.

15

16                            APPEARANCES

17   On behalf of the United States of America:

18          Jessica Lieber Smolar
            Assistant United States Attorney
19          United States Attorney's Office
            700 Grant Street, Ste. 4000
20          Pittsburgh, Pennsylvania 15219

21          S. Derek Shugert
            U.S. Department of Justice
22          950 Pennsylvania Avenue, NW, Suite 7700
            Washington, DC 20530

23

24   The defendant was present in person.

25   Proceedings reported by means of digital recording; transcript
     produced by official court reporter.
```

```
1                       APPEARANCES  (Continued)

2

3   On behalf of the Defendant:

4           Edward B. MacMahon, Jr., Esq.
            107 East Washington Street
5           P.O. Box 25
            Middleburg, Virginia 20118
6

7           Barry P. Beck, Esq.
            Power, Beck & Matzureff Law Office
8           308 West Burke Street
            Martinsburg, West Virginia  25401
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX TO WITNESSES

2

3                                                      PAGE

4   TESTIMONY OF PETER OLINITS

5       Direct Examination by Ms. Smolar              12

6       Cross Examination by Mr. MacMahon             61

7       Redirect Examination by Ms. Smolar           76

8       Recross Examination by Mr. MacMahon          79

9   TESTIMONY OF MICHAEL DEHAVEN

10      Direct Examination by Ms. Smolar             82

11      Cross Examination by Mr. Beck                86

12      Redirect Examination by Ms. Smolar           98

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        EXHIBIT INDEX

 2

 3    Government

 4    Exhibit No.      Admitted      Description        Page

 5

 6     1                  X          Photograph         22

 7     2                  X          Photograph         24

 8     3                  X          Photograph         26

 9     4                  X          Photograph         27

10     5                  X          Video              28, 37, 49

11     6                  X          Photograph         30

12     7                  X          Photograph         36

13     8                             Photograph         36

14     9                  X          Photograph         40

15    10                  X          Photograph         46

16    11                  X          Photograph         47

17    12                  X          Photograph         48

18    13                  X          Photograph         49

19    14-25               X          Photographs        52

20    26                  X          Excerpt            59

21

22

23

24

25
```

```
 1              (Digitally-recorded proceedings in open court.)

 2                    (October 20, 2021, 1:17 P.M.)

 3                              -  -  -

 4         THE COURT:  Thank you.  Good afternoon, everyone.

 5  Please be seated.

 6      All right.  Tara, would you call the case for me,

 7  please.

 8              THE CLERK:  This is the case of the United States of

 9  America versus Diana Toebbe, Criminal No. 3:21-cr-49, defendant

10  2.

11      Will counsel please note your appearance for the record.

12              MS. SMOLAR:  Jessica Smolar from the U.S. Attorney's

13  Office on behalf of the United States.  And with me today is

14  Derek Shugert from the Department of Justice National Security

15  Division.

16              THE COURT:  Good afternoon.  Thank you.

17              MR. MACMAHON:  Good afternoon, Your Honor.  Edward

18  MacMahon and Barry Beck for the defendant who is present.

19              THE COURT:  Good afternoon, gentlemen.

20      All right.  This is the companion case to the other case.

21  We were originally scheduled for a preliminary hearing in this

22  matter on a complaint and a detention hearing.  And

23  subsequently the government is -- had an -- an indictment has

24  been filed against the defendant in this matter.  So we'll do

25  an initial appearance, we'll do an arraignment, and then turn
```

```
 1    to the detention hearing as the final component of today's
 2    hearings.
 3        So turning to the initial appearance first, Ms. Toebbe, do
 4    you understand English?
 5                    THE DEFENDANT:  Yes.
 6                    THE COURT:  All right.  My name is Robert Trumble.
 7    I'm the United States Magistrate Judge.  Would you stand and be
 8    sworn by the clerk, please.
 9        (The defendant was sworn in.)
10                    THE DEFENDANT:  I do.
11                    THE COURT:  Thank you.  Please be seated.
12        Ms. Toebbe, you are a citizen of the United States?
13                    THE DEFENDANT:  Yes, Your Honor.
14                    THE COURT:  Would you state your full name for the
15    record, please.
16                    THE DEFENDANT:  Diana Smay Toebbe.
17                    THE COURT:  Ms. Toebbe, what is your date of birth?
18                    THE DEFENDANT:  12/23/1975.
19                    THE COURT:  And what is your physical address should
20    you be released?
21                    THE DEFENDANT:  125 Boyd Drive, Annapolis, Maryland
22    21403.
23                    THE COURT:  And a telephone number where you can be
24    reached should you be released?
25                    THE DEFENDANT:  303-475-6859.
```

1          THE COURT:  All right.  Thank you.

2      Ms. Toebbe, this is an initial appearance today.  All

3  persons who are charged with a crime are to be brought before a

4  judge as soon as possible after their arrest.  The purpose for

5  the initial appearance is to allow me to tell you the charges

6  that are pending against you, to let you know you have a right

7  to an attorney and determine whether you'll be released pending

8  your trial or whether we have to set a detention hearing.  This

9  is not a trial so there's no determination of guilt or

10 innocence at this stage of the proceedings.

11     You are charged in a multi-count indictment here in the

12 Northern District of West Virginia.  Specifically, you were

13 charged in Count 1 of that indictment with conspiracy to

14 communicate restricted data, and you're charged in Counts 2

15 and 3 of that indictment with communication of restricted

16 data.

17     The penalty if you are convicted of the charge contained in

18 Count 1 is up to life imprisonment, a fine of $100,000, and

19 five years of supervised release.  As to the counts -- charges

20 in Counts 2 and 3, the communication of restricted data, both

21 of those each also carry a potential penalty of up to life

22 imprisonment, a fine of $100,000, and five years of supervised

23 release.  So that constitutes the charges and their penalties.

24     Let's move to your constitutional rights.  I've provided

25 you with a copy of your constitutional rights on the table in

1   front of you.  Do you have them there?

2                    THE DEFENDANT:  Yes, sir.

3                    THE COURT:  I'm going to read your constitutional

4   rights to you and ask that you follow along with me, please.

5       You have a constitutional right to remain silent.  If you

6   give up your right to remain silent, anything you say can and

7   will be used against you in this or any other court of law.

8   Even if you may have given a statement to the police or others,

9   you have a constitutional right to make no further statement to

10  the authorities.  If you start to make a statement, you have a

11  constitutional right to stop in mid-word or sentence and say no

12  more.  You have a right to counsel to assist you in this

13  matter.  If you cannot afford an attorney, you may qualify to

14  have an attorney appointed to represent you.  And whether

15  appointed or retained, you have the right to the assistance of

16  counsel at every stage of the proceedings against you and

17  during any questioning by the authorities.

18      Do you understand your constitutional rights as I've read

19  them to you?

20                    THE DEFENDANT:  Yes, I do.

21                    THE COURT:  You have a right to retain counsel or ask

22  that counsel be appointed for you if you do not have the funds

23  to hire an attorney.  Now, previously, when the complaint was

24  filed, you sought court-appointed counsel, and I appointed the

25  attorneys who are with you and present in the courtroom with

1  you today.  They will continue to represent you in this matter

2  as it relates to the indictment.

3     Is the government moving to detain the defendant?

4          MS. SMOLAR:  Yes, Your Honor.  The government has

5  filed a motion for detention.

6          THE COURT:  All right.  If that's the case, we will

7  conduct that detention hearing, but first I want to take up the

8  arraignment in this matter.

9     So I'll turn to Mr. MacMahon or Mr. Beck.  Who will be

10 speaking on behalf of the defendant?

11         MR. MACMAHON:  I can, Your Honor.

12         THE COURT:  All right.  Very well.  Has the defendant

13 had an opportunity to review the original indictment with

14 counsel?

15         MR. MACMAHON:  She has.

16         THE COURT:  Does the defendant waive the reading of

17 the original indictment in open court?

18         MR. MACMAHON:  She does waive reading.

19         THE COURT:  How does the defendant plead to the

20 charges contained in the original indictment?

21         MR. MACMAHON:  Not guilty.

22         THE COURT:  And is the defendant seeking pretrial

23 discovery and inspection, sir?

24         MR. MACMAHON:  Yes.

25         THE COURT:  All right.  Thank you.

1        All right.  Counsel, these will be the dates and times

2   utilized for trial and pretrial with regard to this matter.

3   Government disclosures are due October 27, 2021.  Reciprocal

4   discovery is due November 3, 2021.  Exculpatory evidence is to

5   be disclosed by October 27, 2021.  All motions that need to be

6   filed, need to be filed by November 10, 2021, and responses are

7   due November 17, 2021.  If a hearing is required on any motion,

8   we'll conduct that hearing on December 1, 2021, at 1:30 P.M.

9   Your Rule 404(b), Jencks, Roviaro, and Giglio disclosures are

10  due November 22, 2021.  Your voir-dire instructions and motions

11  in limine are due November 24, 2021.  Your witness and exhibit

12  lists are due November 22, 2021.  All plea agreements to be

13  submitted to the Court by November 30, 2021.  Your final

14  pretrial conference before Judge Groh is set for December 9,

15  2021, at 9:30 A.M. with jury selection and trial to commence

16  before Judge Groh on December 14, 2021, at 9:00 A.M.

17       As required by Rule 5(f), the United States is ordered to

18  produce all exculpatory evidence to the defendant pursuant to

19  *Brady v. Maryland* and its progeny.  Not doing so in a timely

20  manner may result in sanctions, including exclusion of

21  evidence, adverse jury instructions, dismissal of charges, and

22  contempt proceedings.  An order pursuant to the Due Process

23  Protection Act will be entered simultaneously herewith.

24       All right.  Any questions as it relates to the

25  arraignment?

1          MS. SMOLAR:  No, Your Honor.

2          MR. MACMAHON:  No, Your Honor.

3          THE COURT:  All right.  Then we're ready to move to

4    the detention hearing.  Are the parties ready to proceed?

5          MS. SMOLAR:  Yes, Your Honor.

6          MR. MACMAHON:  Yes.

7          THE COURT:  All right.  Thank you.

8       All right, Counsel.  Ms. Smolar, will you be conducting the

9    examination?

10          MS. SMOLAR:  I will, Your Honor.

11          THE COURT:  All right.  Would you proceed for me,

12   please.

13          MS. SMOLAR:  Your Honor, at the outset, the

14   government wishes to proffer the criminal complaint executed in

15   this case on October 8th of 2021 before Your Honor just for

16   additional facts so as to try to streamline the process a bit

17   today.

18          THE COURT:  All right.  Thank you.

19          MS. SMOLAR:  The government has filed a motion for

20   detention on the basis of risk of flight, risk of

21   nonappearance, as well as obstruction of justice.

22       At this time, the government calls FBI Special Agent Peter

23   Olinits.

24       (The witness was sworn in.)

25          THE WITNESS:  I do.

PETER OLINITS - DIRECT EXAMINATION

1          THE CLERK:  You may have a seat, please.

2                    DIRECT EXAMINATION

3   BY MS. SMOLAR:

4   Q.  Can you please state your full name for the record.

5   A.  Peter Olinits.

6   Q.  How do you spell your last name?

7   A.  O-L-I-N-I-T-S.

8   Q.  And where are you currently employed?

9   A.  Employed as a special agent with the FBI from the -- out of

10  the Pittsburgh Division.

11  Q.  How long have you been a special agent with the FBI?

12  A.  Approximately 11 1/2 years.

13  Q.  And within the Pittsburgh Division of the FBI, where are

14  you assigned?

15  A.  I'm assigned to a counterintelligence division.

16  Q.  Could you explain to us what that means?  What type of

17  cases do you work on?

18  A.  So counterintelligence is basically the FBI's defensive

19  posture against a foreign adversary's offensive efforts to

20  collect national intelligence information.  So espionage cases,

21  for example, are some of the types of cases we work on our

22  squad.

23  Q.  Prior to joining the FBI 11 1/2 years ago, what did you do

24  for employment?

25  A.  I was a biochemist at a pharmaceutical company in

PETER OLINITS - DIRECT EXAMINATION

1  Swiftwater, Pennsylvania.

2  Q.  Do you have training and experience in working on espionage

3  cases?

4  A.  Yes.  Over my 11 1/2 years as a special agent in the FBI,

5  I've worked several espionage investigations.

6  Q.  Were you involved in the investigation involving Jonathan

7  and Diana Toebbe?

8  A.  Yes.  I was involved with both of their investigations.

9  Q.  Were you one of the primary case agents on that

10 investigation?

11 A.  Yes.  I was considered a co-case agent.

12 Q.  How old is Diana Toebbe?

13 A.  She is 45 years old.

14 Q.  Is she employed?

15 A.  She is.  She's employed at the Key School in Annapolis,

16 Maryland.

17 Q.  And do you know anything about the status of her current

18 employment?

19 A.  I believe she's potentially going to be suspended if she's

20 not already.

21 Q.  What's her marital status?

22 A.  She's married to Jonathan Toebbe.  They've been married for

23 18 years.

24 Q.  And what's her educational background?

25 A.  She has a Ph.D. in anthropology.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  Where is Mr. Toebbe employed?

2  A.  He is a nuclear engineer for Naval Reactors out of the Navy

3  Yard in Washington D.C.

4  Q.  How long has he been in that position?

5  A.  Since 2012.

6  Q.  And can you explain to us what GS level his position has?

7  A.  He is a GS-15 which is the highest GS level you can get in

8  the government without becoming an SES level which is a senior

9  executive level in the government.  So he's the highest

10  government employee as a GS-15.

11  Q.  And does he hold any special clearances for the government?

12  A.  He holds a top secret clearance as well as a Q clearance.

13  Q.  Explain to us what a Q clearance is.

14  A.  A Q clearance is basically the Department of Energy's

15  equivalent to a top secret clearance.

16  Q.  Could you explain Mr. Toebbe -- just briefly --

17  Mr. Toebbe's career trajectory within the United States Navy.

18  A.  So in 2012 he became active duty, and he worked in active

19  duty until 2017 where he became a civilian and also was in

20  reserves at that point.

21  Q.  And does he work within a special section of the United

22  States Navy?

23  A.  He works within Naval Reactors.  Naval Reactors is

24  responsible for the design implementation of the Navy's nuclear

25  fleet, specifically the Virginia-class submarines.

PETER OLINITS - DIRECT EXAMINATION

1   Q.   How much does a Virginia-class submarine cost to build?

2   A.   Approximately three billion dollars, not including the R&D

3   that goes into it or the maintenance.

4   Q.   And are Virginia-class submarines currently being used by

5   our United States Navy?

6   A.   They are.

7   Q.   And are they expected to be used in the future?

8   A.   I believe until 2060.

9   Q.   What's Mr. Toebbe's educational background?

10  A.   He has a bachelor's degree in physics, a master's degree in

11  physics, and a master's degree in nuclear engineering.

12  Q.   Did your investigation reveal that Jonathan Toebbe had

13  access to Restricted Data as defined both in the complaint

14  affidavit and in the indictment recently filed in this case?

15  A.   He did.

16  Q.   And was that Restricted Data relating to the Virginia-class

17  submarine?

18  A.   It was.

19  Q.   And did he obtain that information during the course of his

20  employment with the United States Navy to your -- the best of

21  your knowledge?

22  A.   To the best of my knowledge, he did.

23  Q.   Did your investigation also reveal whether Mr. Toebbe was

24  trained on counterintelligence measures?

25  A.   Yes, he was.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  Can you tell us what started the FBI's investigation into

2  Diana and Jonathan Toebbe?

3  A.  So in December 2020, the FBI received from a legal attaché

4  named COUNTRY1 a volunteer letter that was addressed to

5  COUNTRY1's military intelligence services.  On the letter, the

6  postmark was dated April 1, 2020, and the return address was a

7  Dr. Alice Hill in Pittsburgh, Pennsylvania.

8  Q.  And did the letter also contain something else in it?

9  A.  So it contained 17 hard copy pages of confidential

10 Restricted Data as defined by the government.  It also

11 contained an SD card which contained an additional

12 electronic -- in an electronic format an additional 76 pages of

13 confidential Restricted Data related to the Virginia-class

14 submarines.

15 Q.  And to be clear, when we talk about Restricted Data here

16 today, did the FBI provide that data to the Navy to ascertain

17 whether it was, in fact, classified or Restricted Data?

18 A.  Absolutely.  It was provided to a Navy subject matter

19 expert who did confirm that that was authentic and classified

20 information.

21 Q.  And did the pages that you just referred to that were in

22 the letter, did they have a legend on them indicating that they

23 were in some way confidential?

24 A.  Yes.  There was banner markings on them which clearly said

25 "confidential information."

PETER OLINITS – DIRECT EXAMINATION

1  Q.  Can you read to us a portion of the text from that letter

2  relevant to today's proceeding?

3  A.  I can.  So the letter that was sent to COUNTRY1, a

4  volunteer letter, dated April 1, 2020:  "I have in my

5  possession several thousand pages of classified documents

6  describing the [REDACTED].  A small random sample of them is

7  included in this envelope to convince you of the truth of my

8  claim.  A 76-page summary of the documents, tables of contents,

9  drawings, schematic lists, et cetera, is loaded on the memory

10  card taped to this letter.  Also on this memory card are the

11  instructions and keys necessary to decrypt the documents using

12  the publicly available GPG software.  Please have your experts

13  examine the documents.  I think they will agree that your

14  country's effort to develop a [REDACTED] would be greatly

15  aided.  This information is extremely valuable, and I am

16  risking my life to offer it to you.  I expect to be very well

17  paid in cryptocurrency.  Please do not delay in contacting me

18  to agree on a sale price.  If you do not contact me by

19  December 31, 2020, I will conclude you're uninterested and will

20  approach other possible buyers."

21      There was also a second part of that where there was a

22  portion that was translated to COUNTRY1's language, and it was

23  also written in English.  And it says, "I apologize for this

24  poor translation into your language.  Please forward this

25  letter to your military intelligence agency.  I believe this

PETER OLINITS – DIRECT EXAMINATION

1   information will be of great value to your nation.  This is not

2   a hoax."

3   Q.   Thank you.  So to be clear, this case began when a letter

4   was actually received by COUNTRY1; correct?

5   A.   Yes.

6   Q.   And then COUNTRY1 provided that letter to the FBI legal

7   attaché; correct?

8   A.   That's correct.

9   Q.   And the letter contains specific instructions for the

10  foreign military intelligence agent to follow?

11  A.   Absolutely.  And it talks about how to encrypt this

12  information.

13  Q.   And does it refer to something called ProtonMail?

14  A.   Yes, it does.

15  Q.   And what is ProtonMail?

16  A.   ProtonMail is an encrypted email server based out of

17  Switzerland, and it is a very secure way to communicate email

18  messages.

19  Q.   When the FBI received this letter from its legal attaché in

20  COUNTRY1, what then did the FBI do with regard to this

21  investigation?

22  A.   So because obviously we realized that this was real -- the

23  information in there was authenticated by the Navy as

24  classified information -- we had a deadline of December 31,

25  2020, to meet because we were afraid that this was going to be

PETER OLINITS - DIRECT EXAMINATION

1  shopped around to other possible buyers.  So on December 26,

2  2020, the FBI commenced an undercover operation to try to

3  identify the sender or senders of this letter.

4  Q.  And were there numerous messages sent back and forth

5  between the sender of the letter and the FBI undercover

6  agents?

7  A.  Yes, via ProtonMail.

8  Q.  And did the FBI pay any money to the sender of the letter?

9  A.  We paid $10,000 as a sign of good faith.

10  Q.  How was that paid?

11  A.  It was paid in cryptocurrency as he suggested and

12  specifically it was Monero.

13  Q.  What is Monero?

14  A.  Monero is an untraceable form of cryptocurrency.

15  Q.  And based on your experience in espionage cases, why would

16  an individual request Monero payment?

17  A.  Because it would be very difficult for law enforcement to

18  track.

19  Q.  What was the intent of the FBI in the communications with

20  the sender of that letter?

21  A.  To try to gain bona fides in an effort to develop our

22  relationship where we could start passing information that

23  wasn't in an electronic form; i.e., some kind of dead drop or

24  some kind of in-person meeting.

25  Q.  Can you explain what a dead drop is?

PETER OLINITS - DIRECT EXAMINATION

1  A.  So a dead drop is a very common tradecraft maneuver that

2  the counterintelligence -- it's using counterintelligence.

3  Basically, it's a covert exchange of information where there's

4  no need to have a face-to-face information -- face-to-face

5  meeting.  One party will put something in a location -- and

6  obviously both parties know where it's at -- and then the other

7  party will likely also leave something.  And, therefore, the

8  information could be exchanged at the convenience of either

9  side.  But it reduces the need to have a face-to-face meeting.

10  Q.  But it still allows the FBI to identify and ultimately

11  arrest the person who is sharing the Restricted Data; correct?

12  A.  That is correct.

13  Q.  What happened next on the investigation?  Was there

14  actually a dead drop that took place?

15  A.  Yes.  On June 26th in Jefferson County at approximately

16  10:41 A.M., the FBI observed Jonathan and Diana, with the

17  assistance of Diana, fill a dead drop location.

18  Q.  Were you present on June 26th in Jefferson County,

19  West Virginia?

20  A.  I was.

21  Q.  And you observed the dead drop operation?

22  A.  I did.

23  Q.  Did the FBI memorialize the dead drop in both still images

24  and video surveillance?

25  A.  We did.

PETER OLINITS – DIRECT EXAMINATION

1   Q.  Could you explain to us how Diana and Jonathan Toebbe

2   arrived at the dead drop location and where they parked?

3   A.  So we weren't able to identify them until after they had

4   returned to their vehicle and we were able to get their license

5   plate.  But subsequent investigation revealed that they both

6   drove together in their BMW Mini Cooper and parked in a

7   visitors parking lot approximately a mile and a half away from

8   the dead drop location.  It's important to note, I believe,

9   that there are several parking lots that were much closer to

10  the dead drop location, however, they parked at one that was a

11  mile and a half away.  They both exited the vehicle and walked

12  to the dead drop location, approximately a mile and a half.

13  That is indicative of normal tradecraft of espionage subjects.

14  What we would call a surveillance detection route or an SDR.

15  During that time, for a mile and a half, you're able to

16  determine if you're being followed or if there's anybody

17  suspicious where you might be able to kind of get out of that

18  situation before you actually exchange the information.  So I

19  will talk about it later, but they conducted many SDRs

20  throughout this investigation.

21  Q.  Okay.

22          MS. SMOLAR:  Your Honor, permission to approach the

23  witness with an exhibit?

24          THE COURT:  You may.  Has the exhibit been marked?

25          MS. SMOLAR:  Yes.

PETER OLINITS - DIRECT EXAMINATION

1          THE COURT:  Okay.  Thank you.  And what exhibit --

2          MS. SMOLAR:  They've all been marked, and I'll

3    provide them to counsel as well.

4          THE COURT:  All right.  Thank you.

5    BY MS. SMOLAR:

6    Q.  Special Agent, can you tell us and identify for us

7    Government's Exhibit 1, please.

8    A.  So this is a picture of the -- it's a silver BMW Mini

9    Cooper that was parked in the parking lot in Jefferson County a

10   mile and a half away from the dead drop location.

11   Q.  And is that the car that Diana and Jonathan Toebbe arrived

12   at the dead drop location in?

13   A.  Yes.

14   Q.  And do you know who the car is registered to?

15   A.  Diana.

16          MS. SMOLAR:  Your Honor, I'd ask that Government's

17   Exhibit 1 be admitted.

18          THE COURT:  Mr. MacMahon, any objection to the

19   admission of defendant's -- Government's Exhibit No. 1?

20          MR. MACMAHON:  No, Your Honor.

21          THE COURT:  It'll be so admitted.

22      (Government's Exhibit No. 1 was admitted.)

23   BY MS. SMOLAR:

24   Q.  Once they arrived at the park and did the mile-and-a-half

25   drive, what did you observe them doing next?

PETER OLINITS - DIRECT EXAMINATION

1   A.  So they walked to the location and paused for some time in

2   and around the dead drop location itself posing as tourists.

3   Again, typical tradecraft of espionage subjects.  Dressed like

4   hikers.  And so we -- Diana had a camera and was taking

5   photographs of the scenery.  They were both -- Jonathan had a

6   backpack on.  She had a large pack around her waist.  And they

7   kind of hung out in that area until basically there was no one

8   around.

9   Q.  They were together the entire time?

10  A.  Yes.

11          MS. SMOLAR:  Your Honor, at this time, I'd like to

12  show the witness Government's Exhibit 2.

13          THE COURT:  Yes, you may.

14  BY MS. SMOLAR:

15  Q.  Agent, can you identify Government's Exhibit 2 for us,

16  please.

17  A.  Yes.  This is a picture of Jonathan Toebbe and Diana Toebbe

18  walking from their vehicle to the dead drop location.

19  Q.  And they're both wearing hats; correct?

20  A.  Yes.

21  Q.  And sunglasses?

22  A.  Sunglasses, hats, typical wear that you would have in the

23  specific area of Jefferson County to blend in.

24  Q.  And just to be clear, all of these photos that I'm about to

25  show you were photos taken by FBI surveillance; correct?

PETER OLINITS - DIRECT EXAMINATION

1   A.   Yes.

2           MS. SMOLAR:   I'd ask that Government's Exhibit 2 be

3   admitted.

4           THE COURT:   Any objection?

5           MR. MACMAHON:   No, Your Honor.

6           THE COURT:   It'll be so admitted.

7       (Government's Exhibit No. 2 was admitted.)

8   BY MS. SMOLAR:

9   Q.   Let's discuss a little bit about what Diana Toebbe was

10  doing during the course of the dead drop.   What did you observe

11  her doing?

12  A.   So, again, Diana and Jonathan were near each other the

13  whole time.   There was a couple other people in the area, and

14  they waited until they cleared out.   They approached the dead

15  drop location where Jonathan clearly identified and Diana

16  clearly identified where they needed to walk to.   As the dead

17  drop was serviced by Jonathan, Diana was right behind him

18  within a meter away -- she can probably almost touch him --

19  basically keeping a lookout to make sure that no one was coming

20  up on either of them during that operation.

21          MS. SMOLAR:   I'd like to show the witness

22  Government's Exhibit 3.

23          THE COURT:   All right.

24  BY MS. SMOLAR:

25  Q.   Agent, can you describe for us what we're seeing in

PETER OLINITS - DIRECT EXAMINATION

1  Government's Exhibit 3, please.

2  A.  This is a photo of Diana acting as a lookout for Jonathan

3  as he's servicing the dead drop.  Again, looking all around at

4  different directions for anybody that may approach --

5           MR. MACMAHON:  Your Honor, I object.  It's a still

6  picture.  She's not looking around in all directions.  The

7  agent is obviously well prepared to testify today, but that is

8  well beyond the scope of the question -- the picture would even

9  call for.  That's his conclusion.

10          MS. SMOLAR:  Your Honor, she's clearly looking away

11  from the defendant, but we also have video that we're happy to

12  share with the Court that will show --

13          THE COURT:  Given that this is a detention hearing,

14  and the Rules of Evidence are not necessarily applicable to

15  that, we're going to overrule your objection and allow the

16  testimony to continue.

17     Go ahead, please.

18  A.  At the end of the dead drop when Jonathan clearly finished

19  serving -- servicing it, Diana provided a very distinctive head

20  nod as if they needed to get out of the area, and I observed

21  that.

22  BY MS. SMOLAR:

23  Q.  And to be clear, in the picture is Jonathan on the ground

24  right below Diana?

25  A.  Yes.

PETER OLINITS - DIRECT EXAMINATION

1        MS. SMOLAR:  I'd ask that Government's Exhibit 3 be

2   admitted.

3        THE COURT:  Mr. MacMahon, any objection?

4        MR. MACMAHON:  No objection, Your Honor.

5        THE COURT:  It will be so admitted.

6    (Government's Exhibit No. 3 was admitted.)

7        MS. SMOLAR:  Permission to approach the witness, Your

8   Honor?

9        THE COURT:  You may.

10  BY MS. SMOLAR:

11  Q.  Agent, can you tell us what we're seeing in Government's

12  Exhibit 4, please.

13  A.  It's, again, a picture of Diana directly looking at the

14  dead drop and Jonathan servicing it.

15  Q.  How far away from each other, based on your observation at

16  the time, were they?

17  A.  Two to three feet maybe.  No more.

18  Q.  What's around Diana's waist?

19  A.  It's a -- I believe it's a camera bag but -- kind of just a

20  waist bag.

21        MS. SMOLAR:  Government moves to admit Government's

22  Exhibit 4, please.

23        THE COURT:  Any objection, sir?

24        MR. MACMAHON:  No, Your Honor.

25        THE COURT:  It'll be so admitted as Government's

PETER OLINITS - DIRECT EXAMINATION

1    Exhibit 4.

2         (Government's Exhibit No. 4 was admitted.)

3    BY MS. SMOLAR:

4    Q.  Did the FBI also capture video of -- video surveillance of

5    Diana and Jonathan Toebbe on June 26th of 2021 at -- in

6    Jefferson County, West Virginia, at this dead drop?

7    A.  Yes, ma'am.

8              MS. SMOLAR:  Your Honor, we would request permission

9    to show the Court and defense counsel an excerpt of that

10   video.

11             THE COURT:  You may.  Now, we're going to make sure

12   that this is not on the Zoom video feed or published to the

13   rest of the participants here in the courtroom other than the

14   parties themselves.  So are we ready to do that?

15        All right.  You may proceed.

16   BY MS. SMOLAR:

17   Q.  And, Agent, we're about to show Government's Exhibit 5

18   which is a composite exhibit of three videos.  And this is from

19   June 26, 2021; correct?

20        (Play video.)

21   A.  Am I supposed to watch down here?  Yes, this is correct.

22   Q.  Okay.  We'll just watch, and then I'll ask you questions.

23        (Play video.)

24   BY MS. SMOLAR:

25   Q.  Agent, can you tell us, based on your observation of the

PETER OLINITS - DIRECT EXAMINATION

1  video, what matters of relevance does it raise for you as an

2  espionage agent?

3  A.  So, again, the drop was completed fairly quickly which is

4  very good tradecraft.  They weren't sitting on the "X," per se,

5  very long.  He was able to do it with the cover of Diana

6  helping as a lookout.  They conducted an SDR by walking a mile

7  and a half to that location.  Thereafter, they walked quite a

8  long distance again, probably around a half a mile more,

9  conducting additional SDRs to make sure they're not being

10 followed.

11 Q.  And what specifically did you notice about Diana's

12 behavior?

13 A.  She was intent on watching both the location of where

14 Jonathan was and around their surroundings to ensure nobody

15 else was coming up on them while that was being serviced.

16         MS. SMOLAR:  The government moves to admit Exhibit 5

17 with regard to this video.

18         THE COURT:  Any objection, sir?

19         MR. MACMAHON:  No objection.

20         THE COURT:  You may turn it back on.

21    Yes, it will be admitted.  Thank you.

22    (Government's Exhibit No. 5, excerpt, was admitted.)

23         THE COURT:  You may proceed.

24 BY MS. SMOLAR:

25 Q.  Did the FBI retrieve the item that was left by Diana and

PETER OLINITS - DIRECT EXAMINATION

1   Jonathan Toebbe from the dead drop?

2   A.  We did.

3   Q.  And what was it?

4   A.  Basically, it was an additional -- it was an additional

5   sample of classified information regarding the Virginia-class

6   submarines.  And what it was, was on an SD card that was

7   wrapped in Saran Wrap, placed between two pieces of bread on a

8   peanut butter sandwich, which was in a bag.  That was what was

9   left in the dead drop.

10          MS. SMOLAR:  Your Honor, I'd ask to approach the

11  witness?

12          THE COURT:  You may.

13  BY MS. SMOLAR:

14  Q.  We're looking at Government's Exhibit 6.  Can you identify

15  that for us, please.

16  A.  Yes.  Again, that's the SD card that was put in the dead

17  drop location serviced by Jonathan with the assistance of

18  Diana.

19  Q.  And the blue thing that we're seeing on -- in the midst of

20  the sandwich that's the SD card?

21  A.  Yes, ma'am.

22          MS. SMOLAR:  Move to admit Government's Exhibit 6,

23  please.

24          THE COURT:  Any objection, sir?

25          MR. MACMAHON:  No, Your Honor.

PETER OLINITS - DIRECT EXAMINATION

1    THE COURT:  It'll be so admitted.

2    (Government's Exhibit No. 6 was admitted.)

3  BY MS. SMOLAR:

4  Q.  Did the FBI then pay for the password to that SD card?

5  A.  Yes.  So the information that was contained on the SD card

6  was encrypted.  So in order for us to decrypt it, we paid

7  $20,000 in Monero for that decryption code.

8  Q.  So you paid cryptocurrency of $20,000 at that time?

9  A.  Yes.

10  Q.  And you'd previously paid $10,000 in cryptocurrency as

11  well; correct?

12  A.  Correct.

13  Q.  And were you able to decrypt the SD card?

14  A.  Yes.

15  Q.  What did it contain?

16  A.  So, again, it did contain additional information that was

17  classified Confidential Restricted Data to the United States

18  Navy.  It also contained a typed message.  It was in electronic

19  format but a message from this individual.

20  Q.  And did the SD card contain specific Restricted Data

21  relating to the Virginia-class submarine reactors?

22  A.  Yes, it did.

23  Q.  And that was determined by a subject matter expert for the

24  United States Navy?

25  A.  Yes.  By a subject matter expert.

PETER OLINITS – DIRECT EXAMINATION

1   Q.   You said there was also a letter?

2   A.   Yes.  There was a letter, and I have an excerpt here.

3   Q.   Can you read us an excerpt of that letter, please.

4   A.   So the letter reads, "I hope your experts are very happy

5   with the sample provided, and I understand the importance of a

6   small exchange to grow trust.  Most of the material I possess

7   is similar in format.  Multiple pages per sheet.  Drafted

8   drawings are split over several regular sheets to preserve good

9   detail.  And I used color where it seemed important like graphs

10  and several lines.

11      "For now I propose we continue with weekend exchanges at

12  suitable parks and trails similar to this one.  Details of my

13  daily routine may narrow an investigator's search too much if

14  your organization is infiltrated by an adversary one day.

15  Hiking and visiting historical sites is easier to explain than

16  unexpected stops during rush hour if they ever take a special

17  interest in me.

18      "I hope you will forgive my excess caution.  I want our

19  relationship to be very successful for both of us -- for us

20  both and that means that I must be careful at every step."

21  Q.   Did the FBI investigate the metadata of that SD card?

22  A.   Yes.  So the information on the SD card that was sent to

23  COUNTRY1 in April 2020 was -- we could tell it was a Macintosh

24  operating system.  That same operating system was the metadata

25  that was on this card as well.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  And we'll get to the search of the Toebbe home, but let's

2  just briefly touch on that now.  At the time of the arrest of

3  the defendants in this case, was there a search of their

4  residence?

5  A.  Yes.  In Annapolis, Maryland.

6  Q.  And were Macintosh items found in that home --

7  A.  Yes.

8  Q.  -- electronic items?

9  A.  Yes.

10 Q.  Was there another dead drop that took place in this case

11 after the June 26, 2021, dead drop?

12 A.  There was.  There was another dead drop on July 31, 2021,

13 in South Central Pennsylvania.

14 Q.  Were you present for that dead drop as well?

15 A.  Yes.

16 Q.  And was Diana Toebbe also present at that dead drop?

17 A.  Yes.  That morning they drove -- they left their residence

18 and drove in the BMW Mini Cooper to the South Central

19 Pennsylvania location.  We also know from geolocational data of

20 their cellular devices that Jonathan left his cell phone on and

21 at his residence.

22 Q.  As an investigator, what does that mean to you?

23 A.  It's an obvious way to try to obfuscate surveillance and

24 FBI potentially tracking geolocational data with their cellular

25 device.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  And where was Diana's phone that day?

2  A.  She had it on in the vehicle until they arrived to the

3  location where she either turned it off or put it in WiFi mode

4  because the location --

5          MR. MACMAHON:  Your Honor, I object.  If he doesn't

6  know, he doesn't know.  He's speculating now as to what she did

7  with her phone.

8          THE COURT:  I understand.  Go ahead with your --

9  what's your response to the objection?

10          MS. SMOLAR:  I can ask a few more questions to get to

11  that.

12          THE COURT:  Let's go ahead and ask a few more

13  questions, please.

14  BY MS. SMOLAR:

15  Q.  At the time of Ms. Diana Toebbe's arrest, what did she tell

16  you -- what -- what did she tell you about the location of her

17  phone?

18  A.  She had her phone on and it was in WiFi mode.

19  Q.  You mean airplane mode?

20  A.  I'm sorry.  Apology.  Airplane mode.

21  Q.  What is airplane mode?

22  A.  It's a way to put your phone on so it's not communicating

23  with cellular towers.

24  Q.  So if, for example, the FBI is tracking your cell phone and

25  it's in airplane mode, you can't tell where it is; correct?

PETER OLINITS - DIRECT EXAMINATION

1      MR. MACMAHON:  Your Honor, I object --

2  A.  Correct.

3      MR. MACMAHON:  -- to the leading question.  There's

4  no way to link that to this case.

5      MS. SMOLAR:  It's a detention hearing, Your Honor.

6      THE COURT:  This is a deten -- thank you.  It's a

7  detention hearing.  I'm going to allow it.  I think the Court

8  has an understanding of what leading questions are and what

9  information can be gleaned from this information so I'm going

10 to allow it.

11 BY MS. SMOLAR:

12 Q.  Now, you said that Diana was present with Jonathan at this

13 dead drop location.  What did you observe her doing

14 specifically on that day?

15 A.  Again, they meandered around that area for approximately

16 one hour before servicing the dead drop together.  As they

17 approached the location of the dead drop, the location was set

18 so that the geographic terrain was kind of on a hill, and the

19 location of the drop was behind a large boulder.  And so Diana

20 strategically placed herself at a higher level to continue the

21 lookout position while he serviced the dead drop because where

22 she was, she was able to see a parking lot and basically behind

23 where Jonathan was was nothing but trees.

24     MS. SMOLAR:  I'd like to show the witness

25 Government's Exhibit 7.

PETER OLINITS - DIRECT EXAMINATION

1    THE COURT:  You may.

2    BY MS. SMOLAR:

3    Q.  Like the other dead drops, the FBI had both still images

4    and video surveillance of this dead drop; correct?

5    A.  Yes.

6    Q.  And is this one of the still images?

7    A.  It is.

8    Q.  Can you identify what we're seeing in this Government's

9    Exhibit 7?

10   A.  So Jonathan Toebbe is servicing the dead drop and actually

11   in this particular picture, he's taking out a letter left by

12   the FBI.

13   Q.  So let's talk about that for a minute.  This dead drop was

14   a little bit different.  There was not going to be -- well,

15   tell us why it was different.

16   A.  So this was more of an information exchange.  As part of

17   the undercover operation, we didn't ask for classified

18   information.  We more or less wanted to know what this

19   individual had access to.  How much of it they had access to.

20   Try to gain some bone fides between us as the undercovers and

21   the targets.

22   Q.  And in this picture, it appears that Mr. Toebbe is looking

23   up.  Do you know, based on your observation that day, what was

24   above him?

25   A.  It was Diana.

PETER OLINITS - DIRECT EXAMINATION

1        MS. SMOLAR:  Move to admit Government's Exhibit 7.

2        THE COURT:  Any objection, sir?

3        MR. MACMAHON:  No objection, Your Honor.

4        THE COURT:  Be so admitted as Government's

5    Exhibit 7.

6        (Government's Exhibit No. 7 was admitted.)

7    BY MS. SMOLAR:

8    Q.  I'd like to show you Government's Exhibit 8.

9        Special Agent, can you tell us what we see on Government's

10   Exhibit 8?

11   A.  So right prior to that, the FBI observed Jonathan not only

12   take out that envelope but also place in something which was

13   later discovered to be a Band-Aid.  And, again, contained

14   within the Band-Aid, which was sealed, was an SD card and

15   that was wrapped within a plastic bag.  So right after he

16   serviced this, they rendezvoused together and walked away

17   together out of the area, got into their BMW Mini Cooper, and

18   drove away.

19       MS. SMOLAR:  Your Honor, at this time, I'd request

20   permission to play for the Court and defense counsel the video

21   from Exhibit 5 on July 31, 2021.

22       THE COURT:  That's fine.  We'll go ahead and turn off

23   the Zoom feed as it relates to Exhibit 5.

24       All right.  You may proceed.

25       (Play video.)

PETER OLINITS - DIRECT EXAMINATION

1   BY MS. SMOLAR:

2   Q.  Special Agent, based on your --

3          THE COURT:  Hold on.  All right.  You may proceed.

4   BY MS. SMOLAR:

5   Q.  Special Agent, based on your training and experience, what

6   did you take away from that video?

7   A.  Again, the time on the "X" and the time at the dead drop

8   was very limited which is a very good tradecraft technique by

9   espionage subjects.  Jonathan clearly had Diana watching as a

10  lookout.  You can clearly see Jonathan take something out of

11  his left pocket and place it into the location and also clearly

12  take out a letter.  Right after it was serviced, there was a

13  nonverbal signal given by Jonathan to Diana where they met up

14  on the trail and walked away and again drove out of the area.

15         MS. SMOLAR:  Government moves to admit the video on

16  Exhibit 5 from July 31st.

17         THE COURT:  Any objection, sir?

18         MR. MACMAHON:  No objection, Your Honor.

19         THE COURT:  It'll be so admitted.

20     (Government's Exhibit No. 5, excerpt, was admitted.)

21  BY MS. SMOLAR:

22  Q.  I'm going to show you what's been marked as Government's

23  Exhibit 9.

24     Special Agent, can you identify what we're seeing in

25  Government's Exhibit 9?

PETER OLINITS - DIRECT EXAMINATION

1    A.   This is a picture after the FBI opened the Band-Aid.  So,

2    again, what was happening was Jonathan took this out of his

3    left pocket and left it in the dead drop.  The FBI later

4    recovered it.  The Band-Aid was sealed potentially with some

5    adhesive or something, but it was as if it was not opened at

6    all.  When we opened it, it's just a typical Band-Aid, and

7    inside of it was a 32 gigabyte SD card that was hidden.

8    Q.   Is 32 gigabytes a large size?

9    A.   I'm not sure.

10   Q.   Okay.  And on the SD card, was there -- did you -- were you

11   able to access the SD card?

12   A.   Yes.  So we exchanged information again to decrypt it

13   because it was encrypted, but there was no money exchange.  But

14   we were able to open it up.

15   Q.   And did it contain the Navy's Restricted Data?

16   A.   No.

17   Q.   What did it contain?

18   A.   It contained basically a letter to us explaining what this

19   individual had access to.

20   Q.   And what did the individual say that he or she had access

21   to?

22   A.   Basically --

23   Q.   You're welcome to read it.

24   A.   Okay.  Basically if you add it all up, it's a little more

25   than 11,000 pages of classified material that they're willing

PETER OLINITS - DIRECT EXAMINATION

1  to send to us in exchange for additional money.

2  Q.  And does the letter indicate how this data was taken from

3  the United States Navy?

4  A.  Yes.  So let me just read this little excerpt.  It will

5  clarify that question.

6     "I hope your experts are very happy with the sample

7  provided."  Which he was referring to the Jefferson County

8  drop.

9     "This information was slowly and carefully collected over

10 several years in the normal course of my job to avoid

11 attracting attention and smuggled past security checkpoints a

12 few pages at a time.  I can answer your expert's questions

13 using my knowledge.  I've divided the [REDACTED] into 51

14 packages.  All but the last have 100 sheets each.  The first

15 contains the [REDACTED] and the first of the drawings.  If I

16 understand your letter correctly, you offer an additional

17 $70,000 in Monero for the [REDACTED].  I propose the same

18 payment schedule for the remaining files:  100,000 U.S. dollars

19 in Monero for each of the 49 packets -- there's nothing -- not

20 additional for 51.  In total, $5 million in U.S. -- U.S.

21 dollars in Monero."

22    And then he concludes -- and concludes, "My friend, we have

23 both taken considerable risks to reach this point and with good

24 luck we will have -- will soon have much to celebrate."

25 Q.  So to --

PETER OLINITS – DIRECT EXAMINATION

1          MS. SMOLAR:  Your Honor, at this time, I'd ask that
2   Government's Exhibit 9 be admitted.
3          THE COURT:  Any objection, sir?
4          MR. MACMAHON:  No objection, Your Honor.
5          THE COURT:  It will be so admitted.
6      (Government's Exhibit No. 9 was admitted.)
7   BY MS. SMOLAR:
8   Q.  So to summarize, based on what you just read to us, the
9   writer of that letter was offering 51 packages of Restricted
10  Data for a total of $5 million in cryptocurrency?
11  A.  That's correct.
12  Q.  Did the FBI agree to the demands set out in the letter?
13  A.  Yes.
14  Q.  And was another dead drop then set up?
15  A.  Yes.
16  Q.  And where was that one set up for?
17  A.  So that one was set up for August 28th in eastern Virginia.
18  Q.  What did the FBI observe on August 28, 2021, with regard to
19  this dead drop?
20  A.  So the FBI observed Jonathan Toebbe arrive at this dead
21  drop alone where he serviced it.
22  Q.  And location information for Diana's whereabouts, what did
23  that tell you?
24  A.  She was at their residence in Annapolis, Maryland.
25  Q.  And based on your investigation, do you have an

PETER OLINITS - DIRECT EXAMINATION

1   understanding of why she was not with him?

2   A.   So prior to that, the FBI learned through investigation and

3   through observation that Diana had ankle surgery, and she was

4   wearing a walking boot.  And the location of the eastern

5   Virginia dead drop was a rough terrain, and it would likely be

6   difficult for her to walk into that.

7   Q.   You were present on the August 28, 2021, dead drop?

8   A.   Yes.

9   Q.   And what did you observe of Jonathan's demeanor on that

10  day?

11  A.   Jonathan was extremely nervous.  More nervous than we've

12  seen him on the previous ones and just very cautious of what

13  was going on around him.

14  Q.   Based on your training and experience, what did you

15  attribute that nervousness to?

16  A.   Because Diana was not there to act as a lookout.

17  Q.   Did Jonathan leave something for -- in the dead drop?

18  A.   Yes.  Again, he had left -- and it was exchange of

19  information.  He took our information and left information.

20  Q.   And did the FBI retrieve another SD card from this dead

21  drop?

22  A.   Yes.  It was housed within a package of gum.

23  Q.   And did the SD card contain Restricted Data relating to the

24  United States Navy?

25  A.   It contained 1 of the 51 packets of the Restricted Data.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  And the FBI paid how much Monero cryptocurrency for this

2  data?

3  A.  $70,000.

4  Q.  Was there also a letter in with this SD card?

5  A.  Yes.

6  Q.  Can you please read the relevant portions of that letter?

7  A.  "I have considered the possibility -- the possible need to

8  leave on short notice.  Should that ever become necessary, I

9  will be forever grateful for your help extracting me and my

10  family.  I surmise the first step would be unannounced travel

11  to a safe third country with plans to meet your colleagues.  We

12  have passports and cash set aside for this purpose.  I pray

13  such a drastic plan will never be needed, but you are right.

14  It is a comfort to know you are ready and willing to aid us.

15  Please let me know what I should do to prepare for this last

16  resort.

17      "You asked if I am working alone.  There's only one other

18  person I know is aware of our special relationship, and I trust

19  that person absolutely.  I was extremely careful to gather the

20  files I possess slowly and naturally in the routine of my job

21  so no one would suspect my plan.  We received training on

22  warning signs to spot insider threats.  We made very sure not

23  to display even one -- even a single one.  I do not believe any

24  of my former colleagues would suspect me if there is a future

25  investigation.

PETER OLINITS - DIRECT EXAMINATION

1      "Thank you for your partnership as well as my -- as well,

2  my friend.  One day when it is safe, perhaps two old friends

3  will have a chance to stumble into each other at a cafe, share

4  a bottle of wine, and laugh over stories of their shared

5  exploits.  A fine thought but I agree that our mutual need for

6  security may make that impossible.  Whether we meet or not, I

7  will always remember your bravery in serving your country and

8  your commitment to helping me."

9      Signed, "Alice."

10 Q.  Special Agent, you just read that there was -- the letter

11 states, "There was only one other person I know is aware of our

12 special relationship, and I trust that person absolutely."

13     And then it also says, "We received training on warning

14 signals to spot insider threats.  We made sure -- we made very

15 sure not to display even a single one."

16     Based on your training and experience in espionage cases,

17 what stands out to you about those statements?

18 A.  It's the first time that a letter was passed to the FBI

19 where the pronoun "we" was used multiple times.  It clearly

20 states that there was somebody else that was aware of this

21 relationship, and the FBI is only aware of Diana assisting him

22 in this investigation.

23 Q.  How many of the dead drops -- there were four dead drops

24 total; correct?

25 A.  Yes.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  How many of those four dead drops did Diana assist Jonathan

2  with?

3  A.  Three.

4  Q.  So there was another dead drop that was planned after the

5  August 28th one; correct?

6  A.  Correct.  That was, again, in Jefferson County in

7  West Virginia on October 9th.

8  Q.  What was the FBI expecting to receive at that dead drop?

9  A.  So in the exchange of information in the Eastern

10  District -- in the eastern Virginia dead drop, the FBI

11  requested five additional 100-page package -- packets for a

12  total of $500,000.  So there will be potentially 500 pages of

13  additional classified information.

14  Q.  You were present on October 9, 2021, in Jefferson County,

15  West Virginia?

16  A.  Yes.

17  Q.  And who else was present at that dead drop location --

18  A.  Diana.

19  Q.  -- of the defendants?  Was it both Jonathan --

20  A.  Jonathan and Diana.

21  Q.  -- and Diana?

22  A.  Yes.

23  Q.  Did the FBI document this dead drop with still images and

24  video surveillance?

25  A.  Yes.

PETER OLINITS - DIRECT EXAMINATION

1   Q.  And what -- tell us about the status of both of their

2   phones on that day.

3   A.  Again, geolocational information on Jonathan's phone showed

4   that it was on and at home.  Diana's phone was in airplane

5   mode, and it was working fine all morning not in airplane mode

6   until she got in the vehicle to drive to Jefferson County where

7   at that point, the geolocational information failed to register

8   so the airplane mode was turned on.

9   Q.  And when she was arrested, what did she tell you about the

10  status of her cell phone?

11  A.  She said it was in airplane mode.

12  Q.  How long was the drive from their home in Annapolis,

13  Maryland, to the dead drop location?

14  A.  I think it was like an hour and a half.

15  Q.  Each way; correct?

16  A.  Yes.

17  Q.  And did they leave anyone at home during their drive to

18  West Virginia?

19  A.  They left their 11-year-old minor child at home alone.

20  Q.  And how do you know that?

21  A.  Through surveillance and a subsequent search warrant at

22  their residence revealed that that individual was the only

23  person at home.

24  Q.  If a phone was on airplane mode and another phone was in

25  the house, based on your experience, how would that 11-year-old

PETER OLINITS - DIRECT EXAMINATION

1   child be able to contact his parents by phone?

2   A.  They would not be able to.

3   Q.  Going to show you what's been marked as Government's

4   Exhibit 10.

5       Can you please identify what we are seeing on Government's

6   Exhibit 10?

7   A.  So this was a drop location in Jefferson County,

8   West Virginia, on October 9, 2021.  Jonathan is servicing the

9   dead drop.  Again, with Diana acting as a lookout.

10  Q.  How close would you say Diana is to Jonathan in this

11  picture?

12  A.  A couple feet away.

13          MS. SMOLAR:  Move to admit Government's Exhibit 10.

14          THE COURT:  Any objection, sir?

15          MR. MACMAHON:  No, Your Honor.

16          THE COURT:  It will be so admitted as Government's

17  Exhibit 10.

18      (Government's Exhibit No. 10 was admitted.)

19  BY MS. SMOLAR:

20  Q.  I want to show you what's been marked as Government's

21  Exhibit 11.

22          MS. SMOLAR:  And I'd move to admit Government's --

23  oh, I did that.  Sorry.

24  BY MS. SMOLAR:

25  Q.  Can you please identify Government's Exhibit 11?  Is this

PETER OLINITS - DIRECT EXAMINATION

1  one of the photos that the FBI took from the October 9th dead

2  drop?

3  A.  Yes.

4  Q.  What's happening in this photo?

5  A.  Again, they're arriving at the location of the dead drop

6  together.  They are clearly looking around for potentially

7  people that could see them doing it.  And when it was serviced,

8  there was no one in the area.

9          MS. SMOLAR:  Move to admit Government's Exhibit

10  11.

11          MR. MACMAHON:  No objection, Your Honor.

12          THE COURT:  It'll be so admitted.

13     (Government's Exhibit No. 11 was admitted.)

14  BY MS. SMOLAR:

15  Q.  I'm going to show you what's been marked as Government's

16  Exhibit 12.

17     Agent, is this another angle of the same dead drop?

18  A.  It is.

19  Q.  What are we seeing here?

20  A.  So actually in the previous picture, you can see that

21  Jonathan was holding a water bottle.  In this picture, she is

22  holding Jonathan's water bottle as she's acting as a lookout

23  while he services the drop.

24          MS. SMOLAR:  Move to admit Government's Exhibit 12.

25          MR. MACMAHON:  No objection, Your Honor.

PETER OLINITS - DIRECT EXAMINATION

1              THE COURT:  It'll be so admitted.

2         (Government's Exhibit No. 12 was admitted.)

3    BY MS. SMOLAR:

4    Q.  Did the FBI also have video surveillance of this dead

5    drop?

6    A.  Yes.

7              MS. SMOLAR:  Your Honor, at this time, I'd ask that

8    we show Government's Exhibit 5, the last video, to the Court

9    and to defense counsel.

10             THE COURT:  Are we ready to proceed with that?

11             THE CLERK:  Yes.

12             THE COURT:  All good?

13        All right.  You may proceed.

14        (Play video.)

15             THE CLERK:  Go ahead and turn it on (indiscernible).

16             THE COURT:  You may proceed.

17             MS. SMOLAR:  Turn it back on.  Just give me a second,

18   please.

19             THE COURT:  All right.

20   BY MS. SMOLAR:

21   Q.  Agent, based on your training and experience, can you tell

22   us what you observed of relevance in that video?

23   A.  Again, walking down to the trail together.  Looking around.

24   Specifically, Diana making sure she was watching the

25   surroundings as a dead drop was being serviced.  A very quick

PETER OLINITS - DIRECT EXAMINATION

1   service which is very typical of tradecraft of espionage

2   subjects.  They don't want to be on the "X" too long.  And,

3   again, walking away together.  Dressed as you would if you were

4   taking a hike in the woods.

5            MS. SMOLAR:  Move to admit the last video on

6   Government's Exhibit 5.

7            MR. MACMAHON:  No objection, Your Honor.

8            THE COURT:  It'll be so admitted.

9      (Government's Exhibit No. 5, excerpt, was admitted.)

10  BY MS. SMOLAR:

11  Q.  What was left at the dead drop by Diana and Jonathan Toebbe

12  that day?

13  A.  So it was an additional SD card.  Again, in a gum wrapper.

14  A gum package.

15  Q.  I'm going to show you what's been marked as Government's

16  Exhibit 13.

17      Could you please identify Government's Exhibit 13?

18  A.  So it's a Dentyne Ice gum packet where one of the pieces of

19  gum is pushed through the foil, and replaced is a small SD card

20  that fits in that specific spot.  And that's what was left at

21  the drop location.

22            MS. SMOLAR:  Move to admit Government's Exhibit 13.

23            MR. MACMAHON:  No objection, Your Honor.

24            THE COURT:  It will be so admitted.

25      (Government's Exhibit No. 13 was admitted.)

PETER OLINITS - DIRECT EXAMINATION

1  BY MS. SMOLAR:

2  Q.  The defendants were arrested on October 9th after making

3  this drop; correct?

4  A.  Yes.  Both.

5  Q.  And was the FBI able to access this SD card?

6  A.  No.

7  Q.  Was the FBI able to determine what was on the SD card in

8  general?

9  A.  Yes.  So, again, we asked for 500 pages.  Five 100-page

10  documents of classified Navy information.  When we looked at

11  the SD card, we saw five large PDF files.  We saw -- and they

12  were encrypted.  We saw one text file which was encrypted which

13  we believe is likely a letter because that's what's been

14  happening in all these other subsequent ones or previous ones.

15  And there was one unencrypted Monero address so which we would

16  be able to pay them, and they would be able to give us the

17  decryption code to access these packets of information.

18  Q.  Was a search conducted at the Toebbe residence on

19  October 9th after their arrest?

20  A.  Yes.

21  Q.  By the FBI?

22  A.  Yes.

23  Q.  And what was that address?

24  A.  125 Boyd Drive in Annapolis, Maryland.

25  Q.  Just generally can you tell us the types of things that

PETER OLINITS - DIRECT EXAMINATION

1   were located in that home?

2   A.   So the FBI recovered a crypto-wallet, shredded documents,

3   $11,300 in cash, children's valid passports, information

4   contained about their passports.   There was a go-bag in their

5   bedroom that contained a Macintosh computer, a USB drive, and

6   some latex gloves in the backpack.   We also were able to

7   identify Jonathan's iPhone in the on position, plugged in,

8   charging in their bedroom among other things that we were able

9   to identify.

10          MS. SMOLAR:   Your Honor, at this time, I'd like to

11   show the witness Government's Exhibit 14 to 25 just to speed

12   things up a bit.   I'll provide a packet to everyone of those

13   exhibits.

14          THE COURT:   That's fine.   Go ahead.

15   BY MS. SMOLAR:

16   Q.   Special Agent, I'm going to take -- ask you to take a look

17   at Government Exhibits 14 to 25.   We will go through each one

18   individually, but can you tell us generally what this packet of

19   exhibits includes?

20   A.   It includes photographs that the FBI took of some of the

21   items I just described.

22   Q.   Okay.   Great.   Let's look at Government's Exhibit 14

23   specifically.   And can you tell us what some of the items that

24   we see in that photograph are and the location of that

25   photograph?

PETER OLINITS - DIRECT EXAMINATION

1   A.   Yeah.   The location of this photograph is in Jonathan and

2   Diana's bedroom.   Item number 4 is Jonathan's iPhone.   Item

3   number 9 is some type of box but within that box was $11,300 in

4   cash.   It appears to be a cardboard box.   Items number -- item

5   number 8 were the two minor children's passports that are

6   valid.   And item number 6 was the location of the

7   crypto-wallet.   It was in a container.   That was what that

8   picture shows.

9   Q.   Okay.

10           MS. SMOLAR:   Move to admit Government's Exhibit 14.

11           THE COURT:   Any objection, sir?

12           MR. MACMAHON:   No objection to any of these exhibits,

13   Your Honor, if that helps.

14           THE COURT:   All right.

15           MS. SMOLAR:   That will speed things up.

16           THE COURT:   That will speed things up quite a bit.

17   Thank you.

18      They'll all be admitted.   And you're referring to Exhibits

19   14 through --

20           MS. SMOLAR:   Through 25.

21           THE COURT:   Through 25.

22      (Government's Exhibit Nos. 14 through 25 were admitted.)

23   BY MS. SMOLAR:

24   Q.   If you could draw your attention to Government's Exhibit 15

25   and just tell us what that is.

PETER OLINITS - DIRECT EXAMINATION

1  A.   It's Jonathan Toebbe's iPhone that's plugged in in the on

2  position.

3  Q.   Turned on you mean?

4  A.   Turned on.

5  Q.   And Government's Exhibit 16?

6  A.   That's the cardboard box that the $11,300 was found in in

7  cash.

8  Q.   And Government's Exhibit 17.  Is that the cash you're

9  referring to?

10 A.   Yes.  It was $100 bills wrapped up in rubber bands.

11 Q.   All $100 bills?

12 A.   Yes.

13 Q.   Government's Exhibit 18.  Is that the go-bag that you

14 referred to?

15 A.   Yes.

16 Q.   Tell us what a go-bag is.

17 A.   It's a bag that you can utilize to get out of a situation

18 or leave very quickly.

19 Q.   And let's look at Government's Exhibit 19.  What was in the

20 go-bag?

21 A.   A Macintosh computer which is number 15 in this photograph.

22 Evidence item number 15.

23 Q.   And I'm going to ask you to turn your attention to

24 Government's Exhibit 20.  Is that the Macintosh with something

25 on top of it?

PETER OLINITS – DIRECT EXAMINATION

1    A.   Yes.   Latex gloves.

2    Q.   And were the latex gloves also found in the go-bag?

3    A.   Yes.

4    Q.   And just to go back to the Macintosh for a minute, did you

5    tell us earlier that the metadata from the SD cards that you

6    examined were from a Macintosh?

7    A.   Macintosh operating system, yes.

8    Q.   Government's Exhibit 21.   What's that?

9    A.   This is the USB drive that was also found in that go-bag.

10   Q.   Let's look at Government's Exhibit 22 and 23 together.

11   What is -- where was this item found and what is it?

12   A.   So this item was found in a different room of the house.

13   This appears to be in a laundry room.   They are -- it's a large

14   bag.   A trash bag full of shredded documents.

15   Q.   Just going to point out it looks like a lot of these

16   documents are in color.   Did any of the letters refer to color

17   photographs?

18   A.   Yes.   The writer of those letters that we were receiving as

19   part of the undercover operation indicated that they had

20   created color documents and graphs to make it easier for

21   COUNTRY1 to understand what they were looking at.

22   Q.   Let's look at Government's Exhibit 24 and 25.   Can you

23   explain what these two exhibits show?

24   A.   Sure.   Item 25 actually may be better to start with.   So

25   they're photographs of Diana and Jonathan.   Their passport

PETER OLINITS - DIRECT EXAMINATION

1    photographs.  On the top right of that -- of this exhibit, you

2    see only two photographs.  And there actually should be four so

3    two were missing.  In this same area, which was on their

4    kitchen table, we also found a United States Postal Service

5    receipt with a tracking number that was dated September 18,

6    2021, and it was directed towards Philadelphia, Pennsylvania.

7    Q.  And did your investigation reveal what was happening with

8    Diana and Jonathan's passports?

9    A.  So -- yes.  They had expired in February 2021.  And this

10   happened on a Saturday that we did this search.  On Monday the

11   FBI followed up with the Department of State, and they did

12   confirm that they had in their possession both of their

13   passports, and they were being processed in an expedited

14   fashion.

15   Q.  So they had requested expedited passports; correct?

16   A.  Yes.

17   Q.  Did you have an opportunity to examine as part of your

18   investigation whether Diana and Jonathan share a bank account?

19   A.  Yes.  And they do.

20   Q.  And did that bank account have a sufficient balance to

21   allow them to leave the United States?

22   A.  Yes.

23   Q.  We've talked about some of the things that you did find in

24   the house.  Let's talk about what you didn't find in the house.

25   Did you find the $100,000 in cryptocurrency Monero that was

PETER OLINITS – DIRECT EXAMINATION

1  paid by the FBI to the Toebbes?

2  A.  No.

3  Q.  Did you find the extra 50 packets of Restricted Data that

4  were offered to the FBI for $5 million in the home?

5  A.  We did not.

6  Q.  And you still haven't located those packets; correct?

7  A.  That's correct.

8  Q.  Based on your training and experience, you've discussed a

9  few things about tradecraft and what the Toebbes did to

10  disguise their identities and not get caught; correct?

11  A.  Yes.

12  Q.  We talked about airplane mode.  We talked about her acting

13  as a lookout.  Was there anything else that you have since

14  their arrest located on a search of any of their devices?

15  A.  Yes.  So a subsequent search of Jonathan's cell phone and

16  prior investigation revealed that Diana also had a Signal

17  account.  So there's a Signal account registered to Diana as

18  well as Jonathan.  And a Signal account is an encrypted

19  application to communicate.

20  Q.  Was there also a Telegram application on her phone?

21  A.  Yes.

22  Q.  What's that?

23  A.  It's also an encrypted application to communicate between

24  two parties.

25  Q.  Okay.  And during your review of that Signal application,

PETER OLINITS - DIRECT EXAMINATION

1    did you find any communications by Diana Toebbe that reflected

2    an interest in leaving the country?

3    A.   Yes.  We found quite a bit.

4    Q.   And did you prepare an exhibit for purposes of today's

5    hearing to read to the Court concerning these statements?

6    A.   Yes.

7    Q.   I'm going to show you Government's Exhibit 26.  Do you have

8    a copy?

9    A.   Yes.

10   Q.   So this is not all the communications that you have;

11   correct?

12   A.   No.

13   Q.   This is just an excerpt that you prepared for today's

14   hearing?

15   A.   Right.

16   Q.   Correct?  And it's from the Signal application?

17   A.   Yes.  That was found on Jonathan's phone.

18   Q.   Can you please read the date, the person stating the

19   statement, and the message for us, please.

20   A.   So there was four messages on March 4, 2019.  Jonathan

21   says, "I am also thinking about Plan A.  It's not morally

22   defensible either.  We convinced ourselves it was fine, but it

23   really isn't either, is it?"

24        Diana responded, "I have no problems at all with it.  I

25   feel no loyalty to abstractions."

PETER OLINITS – DIRECT EXAMINATION

1    Diana writes, "This was totally and completely different."

2    John writes, "Let's forget entirely about Plan B.  Wrong to

3 have even considered it.  I'm checking on A now."

4    On March 7, 2019, Jonathan writes, "We've got passports and

5 some savings.  In a real pinch, we can flee quickly."

6    Diana writes, "Right.  Let's go sooner than later."

7    Jonathan writes, "I really don't want to go back to making

8 $50,000 a year, especially not in a country where we don't know

9 the language."

10    Diana writes, "That wouldn't necessarily be how it would

11 be."

12    Jonathan says, "Realistically, my engineering degree is

13 basically worthless overseas."

14    Diana says, "You keep saying that, but I don't see the

15 evidence.  I cannot believe that the two of us wouldn't be

16 welcomed and rewarded by a foreign government."

17    Jonathan writes, "I'm not a PE, and my specialized

18 knowledge makes it hard to get anything in commercial nuclear

19 which is just as dead in Europe as here."

20    Jonathan writes again, "Let's talk when I get home."

21    Diana says, "I'm done talking about it right now.  I'm

22 getting angry."

23    On October 5, 2020, Diana writes, "I think we need to be

24 actively making plans to leave the country."

25         MS. SMOLAR:  Your Honor, this is a demonstrative

PETER OLINITS - DIRECT EXAMINATION

1  exhibit for purposes of today's hearing.  We can move its

2  admission if there's no objection.

3            THE COURT:  Is there an objection to the admission?

4            MR. MACMAHON:  No objection, Your Honor.

5            THE COURT:  Be so admitted.

6            MS. SMOLAR:  Admitted.

7      (Government's Exhibit No. 26 was admitted.)

8  BY MS. SMOLAR:

9  Q.  So we talked about the fact that the $100,000 in Monero has

10 not been located; correct?

11 A.  Yes.

12 Q.  All the classified documents have not yet been recovered;

13 correct?

14 A.  Yes.

15 Q.  And the FBI also has not yet obtained full access to the

16 ProtonMail accounts of the defendants; correct?

17 A.  That's correct.

18 Q.  And during the course of your investigation, did you

19 discover whether or not Jonathan Toebbe had a ProtonMail

20 account?

21 A.  Yes, he did.

22 Q.  And at some point in your investigation, did you learn

23 whether he had upgraded that account?

24 A.  Yes.  So in November -- so Jonathan Toebbe had a Proton

25 account since at least 2012 because he used it on his SF-86.

PETER OLINITS - DIRECT EXAMINATION

1  However, in 2018 -- in November of 2018, Jonathan purchased

2  what's called a Visionary Proton Plan.  It costs $479 and it's

3  a two-year plan.

4      That plan gives you access to the ability to resonate out

5  of -- of your choice of 55 countries, a VPN network as well as

6  a Tor which is The Onion Router.  So it's a way to deeply

7  encrypt and disguise any communications on ProtonMail.  It's

8  their highest level of protection that they offer.  After that

9  expired in November 2020, he renewed it for another two years

10 for $479, and I was able to see that in their joint checking

11 account.

12 Q.  And is there any -- based on your training and experience,

13 what concerns do you have about -- for example, if Mrs. Toebbe

14 was to go home today and access the internet, what could she

15 do?

16 A.  She could further hide the $100,000 where the government

17 would not be able to find that.  She could use that money to

18 flee the country.  She could access that money from any country

19 as long as she had access to the internet.  She could alter any

20 type of electronic accounts that we're unaware of or unable to

21 get into, including ProtonMail accounts.  She could alter or

22 destroy any type of cloud-based accounts that the two of them

23 may have.

24 Q.  And did you learn during the course of your investigation

25 that there was a drop box account that has yet to be accessed

PETER OLINITS - CROSS EXAMINATION

1  as well?

2  A.  Yes.  And, lastly, she could potentially sell this to other

3  buyers as was described which was already part of potentially

4  their plan.

5  Q.  And at this point in time, you don't know whether other

6  countries have been solicited by these defendants?

7  A.  Not at this time.

8          MS. SMOLAR:  No further questions, Your Honor.

9          THE COURT:  Mr. MacMahon, cross examination, sir?

10          MR. MACMAHON:  Thank you, Your Honor.

11                    CROSS EXAMINATION

12  BY MR. MACMAHON:

13  Q.  Agent, I'm sorry.  It's been a while.  I forgot your

14  name.

15  A.  Peter Olinits.

16  Q.  How do you say that again?

17  A.  Olinits.

18  Q.  Let's try to go backwards.  These Telegram messages that

19  you just read --

20  A.  Yeah.

21  Q.  -- those are from a couple of years ago; right?

22  A.  That's correct.

23  Q.  And they all predate anything that happened in this case,

24  don't they?

25  A.  No.  So there is metadata on the original --

PETER OLINITS - CROSS EXAMINATION

1  Q.  Sir, these -- what you just read to the Court predates what
2  happened in this case.  I'll ask you --
3  A.  Now --
4  Q.  -- about the metadata in a second.
5  A.  Okay.
6        MS. SMOLAR:  Objection, Your Honor.  He was trying to
7  answer the question.
8        THE COURT:  I'm going to allow him to answer the
9  question, but I think Mr. MacMahon's question was "Do they
10 predate?"  I'd like to hear the defendant -- the witness's
11 answer to that.
12 A.  So the metadata showed that the SD card that was sent to
13 COUNTRY1 on April 1, 2020, was taken around the timeframe or
14 was put on that card around the timeframe of 2018.  So this is
15 after that.
16 BY MR. MACMAHON:
17 Q.  Okay.  Well, let's -- you know from all of your
18 surveillance of the Toebbe residence that Mrs. Toebbe was not a
19 fan of President Trump; correct?
20 A.  I suppose.
21 Q.  Yeah.  And there was talk in other documents that you saw
22 about her wanting to leave the country if Trump got reelected.
23 You saw that too, didn't you?
24 A.  Yes.
25 Q.  She's not the only liberal that's wanted to leave the

PETER OLINITS - CROSS EXAMINATION

1  country over politics; right, sir?

2         MS. SMOLAR:  Objection, Your Honor.  That's not a

3  relevant question for this agent.

4         THE COURT:  It's not, but I'm going to allow him to

5  ask his questions.  I allowed you to ask your questions.  This

6  is a detention hearing so go right ahead.

7  BY MR. MACMAHON:

8  Q.  That's correct, isn't it, sir?

9  A.  Yes.

10  Q.  Now, the computer that you accessed, the Macintosh

11  computer, you've of course had a chance to look at that

12  computer, haven't you?

13  A.  Not at this time.

14  Q.  That was Mr. Toebbe's computer, wasn't it?

15  A.  Yes.

16  Q.  Mrs. Toebbe's computer was given to her by her work.  Have

17  you seized that too?

18  A.  I believe so.

19  Q.  Okay.  And did you find any evidence on Ms. Toebbe's

20  computer at all that she drafted a single one of these notes

21  that you sat here and read in court today?

22  A.  We haven't been able to examine all the evidence at this

23  time.

24  Q.  But the Macintosh computer that you were -- you seized from

25  the residence, you're saying you haven't been able to look at;

PETER OLINITS - CROSS EXAMINATION

1  correct?

2  A.  It's still an ongoing investigation.

3  Q.  Okay.  But that's the kind of computer that the notes that

4  you read here on and on in court today would have been composed

5  on, isn't that correct?

6  A.  Yes.

7  Q.  Okay.  And so you don't have any evidence sitting here

8  today that Mrs. Toebbe drafted a single one of those notes that

9  you read today in court; correct?

10  A.  Again, not at this time.

11  Q.  And you've been working on this for a while, haven't you,

12  sir?

13  A.  Yes.

14  Q.  Okay.  Did you put wiretaps inside of their house?

15  A.  No.

16  Q.  So you don't have any -- did you put wiretaps inside of

17  their car?

18  A.  No.

19  Q.  Any listening devices at all?

20  A.  No.

21  Q.  So did you record any of the cell phone calls between

22  Mr. and Mrs. Toebbe?

23  A.  No.

24  Q.  That's part of your investigate -- you didn't do any of

25  that as part of your investigation?

PETER OLINITS - CROSS EXAMINATION

1  A.  We've done quite a bit of search warrants but not any kind

2  of listening devices.

3  Q.  You didn't do anything proactive while any of the events

4  you've talked about today were happening; correct?

5  A.  We did search warrants on historical cell site data,

6  geolocational data of their phones, their email accounts,

7  things like that.

8  Q.  Right.  And the FBI can go to a judge and get permission to

9  put a listening device in somebody's car, can't they?

10  A.  Yes.

11  Q.  And you didn't do it?

12  A.  Right.

13  Q.  Right?

14  A.  That's correct.

15  Q.  Okay.  So you don't have any recordings of what Mr. Toebbe

16  may have told Mrs. Toebbe as they drove to any of these sites;

17  correct?

18  A.  That is correct.

19  Q.  And you don't have any listening device warrants for the

20  house; you can't give me any -- you don't have any recordings

21  whatsoever of what Mr. Toebbe may have told her he was up to in

22  this timeframe; right?

23  A.  No.  But, again, in the letter, he had stated that there

24  was one person that knew about this relationship, and the only

25  person --

PETER OLINITS - CROSS EXAMINATION

1   Q.   Agent, this will go a lot faster if you answer my
2   questions.   You don't have any -- you don't have any recordings
3   whatsoever of what Jonathan Toebbe told his wife he was up to
4   in the time that you were working on this case?
5   A.   Correct.
6   Q.   That's correct.   And when you read the email, you have no
7   evidence that Mrs. Toebbe ever saw that email, drafted it, or
8   had anything to do with it; correct?
9   A.   Not at this time, but we still have a lot of evidence to
10  review.
11  Q.   And when it says that there's only one person -- you don't
12  even know if that's a true statement, do you?
13  A.   What I do know is that she was there for three of the four
14  dead drops where classified information was exchanged.
15  Q.   And, again, you don't have any idea what Mr. Toebbe told
16  her he was up to at all.   You just assumed she was a
17  conspirator in his plans; correct?
18          MS. SMOLAR:   Objection, Your Honor.   He's asked and
19  answered the same question many times already.
20          THE COURT:   Go ahead with your line of questioning.
21  I'm going to overrule your objection.
22      Go ahead, Mr. MacMahon.
23  BY MR. MACMAHON:
24  Q.   Do you need me to ask that question again?
25  A.   Yes, please.

PETER OLINITS - CROSS EXAMINATION

1   Q.  Other than your suspicion, based upon your training and

2   experience, that she was present when these three dead drops

3   took place and that she had a phone on airplane mode, you don't

4   have any evidence whatsoever that she knew what Mr. Toebbe was

5   doing with any of these plans that he took with him from the

6   Navy Yard, do you?

7   A.  No -- no listening -- recorded plans.

8   Q.  No anything.  You don't have anything, do you?

9   A.  Again, we have a lot of digital evidence to review at this

10  time.

11  Q.  Did it occur to you as part of your investigation that

12  maybe Mr. Toebbe was telling her he was up to something other

13  than espionage against the United States?

14  A.  I think that would be a difficult thing to sell but maybe.

15  Q.  But maybe.  Mrs. Toebbe never had access to any classified

16  information at all, did she?

17  A.  She did not.

18  Q.  Right.  She wasn't stealing information from the Navy Yard

19  and taking it out and bringing it home, was she?

20  A.  No.

21  Q.  Right.  You don't have any evidence she ever even went to

22  the Navy Yard or any other facility where these documents for

23  the $3 billion submarine might have come from; correct?

24  A.  Correct.

25  Q.  Never, never in her life did this woman have access to any

PETER OLINITS - CROSS EXAMINATION

1  classified information whatsoever?

2  A.  She never had a clearance, no.

3  Q.  Okay.  And you don't know of any discussions that she may

4  have had with her husband about whether he stole classified

5  information from the federal government; right?

6  A.  I don't believe so.

7  Q.  Now, you testified a lot about Mrs. Toebbe and her SDRs.

8  That's a great word in counterespionage, isn't it, Agent?

9  A.  It's a tradecraft term, sir.

10  Q.  Right.  And the tradecraft in this case was not good.  It

11  was terrible, wasn't it?

12  A.  I mean they went above and beyond to disguise things in

13  different -- you know, as we saw in a Band-Aid, in gum

14  wrappers, dressing the part for the locations they were at,

15  walking significant, you know, distances to try to -- when

16  there was areas that they could have parked a lot closer.

17  Q.  Sir, you knew what they were doing the whole time.  Its SDR

18  and tradecraft was terrible, wasn't it?  He fell right for your

19  trap and handed you all these documents in exchange for a

20  little bit of money.  That's correct, isn't it?

21  A.  I don't think it was terrible.

22  Q.  Okay.  Well, they're certainly here now, aren't they?

23  A.  Yes.

24  Q.  Okay.  And Mrs. Toebbe was never trained whatsoever in

25  anything like an SDR or tradecraft or anything like that, was

PETER OLINITS - CROSS EXAMINATION

1   she?

2   A.  It said in one of the letters that "We" -- the pronoun we

3   -- "have been very careful in not to present any of the insider

4   threats."  That was a quote.

5   Q.  Right.  And you don't even know if that's true, whoever

6   wrote that; right?

7   A.  Whoever wrote it was trying to be honest with the

8   undercover operation.

9   Q.  And it says actually in the letter -- I think your own

10  counsel -- it says, "We received training on warning signs."

11  Right?  "We received training."

12      You said, "Oh, Judge, here's a place where they said we

13  again."  Right?

14  A.  That's right.

15  Q.  You remember that?

16  A.  Yes.

17  Q.  She never received any training.  She's a school teacher.

18  A.  He had training, and he could have trained her.

19  Q.  But you don't know that that ever happened.  That's another

20  one of your suppositions in this case; right?

21  A.  We have to review more evidence.

22  Q.  And you want her detained while you review more evidence to

23  find out maybe this woman is innocent; correct?

24  A.  I would like her detained because I believe she's a flight

25  risk.

PETER OLINITS - CROSS EXAMINATION

1  Q.  Okay.  Well, she doesn't even have a passport, does she?

2  A.  The passport is currently with the Department of State.

3  Q.  Sir, she doesn't have a passport; right?

4  A.  That's correct.

5  Q.  Okay.  And in your review of the evidence you seized in her

6  house, didn't you find out that the family was planning a trip

7  in early February and that's why they were getting their

8  passports renewed?

9  A.  They were planning a trip, but that still doesn't preclude

10 her from potentially leaving the country.

11 Q.  Okay.  You told the judge that she was ordering passports

12 on an expedited basis, and you wanted to suggest to the Court

13 that she was getting ready to flee the United States; right?

14 A.  Yes.

15 Q.  But she was going on a trip in February.  Why didn't you

16 tell the judge that?  It wasn't on the list of questions, sir?

17 A.  I did know about the trip that they were potentially

18 planning.  I think it was in the spring of 2022.

19 Q.  Right.  And you don't have any information that Mrs. Toebbe

20 knows where any of this crypto-money is, how to access it, or

21 how to do anything with cryptocurrency, do you?

22 A.  At this time, no, but we did find a crypto-wallet in their

23 house.

24 Q.  Right.  Did you take fingerprints off of that?

25 A.  At this time, we have to analyze that.

PETER OLINITS - CROSS EXAMINATION

1  Q.  But you didn't -- you're not going to tell the judge you
2  found her fingerprints on a crypto-wallet; right?
3  A.  I don't -- we did not at this point.
4  Q.  Okay.  You didn't find her fingerprints on any of the
5  documents or anything that was left at any of the dead drops;
6  right?
7  A.  Some of that is still being processed.
8  Q.  Oh.  They're still working on that too, sir?  You have any
9  video of her packing a sandwich with an SD card in it?
10 A.  We do not, sir.
11 Q.  Do you have any video of Mrs. Toebbe putting a Band-Aid
12 together with an SD card in it?
13 A.  No.
14 Q.  You didn't put any cameras inside their house as part of
15 this investigation to see what they were up to?
16 A.  We did not.
17 Q.  You think Mrs. Toebbe knows the first thing about nuclear
18 submarines?
19 A.  I don't have any reason to believe she would.
20 Q.  What do you know about Mrs. Toebbe's background?  She has
21 no prior record at all; correct?
22 A.  That is correct.
23 Q.  All right.  She has a husband who has apparently been
24 running around trying to sell secrets that the FBI is chasing
25 around; correct?

PETER OLINITS - CROSS EXAMINATION

1  A.  With her there.

2  Q.  Right.  With her there.  But you've already told us you

3  don't know that she knew everything that was going on; correct?

4  A.  At this time, we still have a lot to review.  We have a ton

5  of digital evidence we need to look at.

6  Q.  Well, in the affidavit that was -- the arrest warrant

7  was -- Ms. Toebbe's name is about three times in a 25-page

8  document, isn't it?

9  A.  Yes because she was at three locations.

10  Q.  Right.  But in terms of drafting things, stealing things,

11  trying to sell things, you don't have her identified as doing

12  any of that, do you?

13  A.  No.

14  Q.  Do you know how Mr. Toebbe was able to steal these

15  documents from classified American facilities?

16  A.  The only thing I know is that he -- that the letter

17  indicated that he was taking out the information several pages

18  at a time as to avoid scrutiny by security officers.

19  Q.  Okay.  Did you go to the Navy Yard and do a

20  counterintelligence operation to see if you could catch him

21  there doing it?

22  A.  No.

23  Q.  Didn't that occur to you, sir?

24  A.  So how he was getting those documents out of the Navy is

25  yet to be determined.

PETER OLINITS - CROSS EXAMINATION

1  Q.  Right.  And, again, she's never even been there, has no

2  access to any of this information; right?

3  A.  I don't believe so.

4  Q.  Right.  And she couldn't give -- whoever COUNTRY1 is, she

5  couldn't give anything to COUNTRY1 or anybody else if she got

6  out; right?

7  A.  She did not have access to classified information.

8  Q.  Right.  And she couldn't flee the United States without a

9  passport; right?

10  A.  That's incorrect.  So --

11  Q.  With an ankle monitor on?

12  A.  So I've worked other espionage cases that you may be

13  familiar with, and I know this Court is familiar with, where

14  the defendant left the country multiple times without a

15  passport.

16  Q.  Okay.  Not after they'd been arrested and were on bond;

17  correct?

18  A.  That's correct.

19  Q.  Right.  And with an ankle monitor on which the pretrial

20  tells the judge is a very good way.  Or how about if their

21  father came and stayed with them who is a retired naval

22  officer --

23          MR. MACMAHON:  Excuse me, Your Honor.

24  BY MR. MACMAHON:

25  Q.  -- that would -- could help as well, wouldn't it?

PETER OLINITS – CROSS EXAMINATION

1   A.  I just read various things about her trying to leave the
2   country, and she was at several of these drops.  So, you know,
3   I think she'll try to leave the country if she's let out.
4   Q.  But you have no proof that she ever tried to leave the
5   country and flee these charges at all; right?
6   A.  No, but she has traveled outside the country before.
7   Q.  Well, so have you, haven't you?
8   A.  I have, sir.
9   Q.  Is that evidence of a crime?
10  A.  No.
11  Q.  Is having a Signal account evidence of a crime?
12  A.  No.  It's just tradecraft behavior of espionage subjects.
13  Q.  Right.
14  A.  It's one of many things.
15  Q.  So I have a Signal account.  Does that make me a spy too,
16  sir?
17  A.  No, sir.
18  Q.  How about a Telegram account?
19  A.  It does not.
20  Q.  But you want to tell the judge she had one; right?  Make it
21  look like she was a spy because she had a Signal account?  Is
22  that right, sir?
23  A.  No, sir.  I don't want that.
24          MR. MACMAHON:  Can I consult with counsel for a
25  second, Your Honor?

PETER OLINITS - CROSS EXAMINATION

1          THE COURT:  You may, sir.

2   BY MR. MACMAHON:

3   Q.  Sir, I'm sorry.  One last thing.

4          MR. MACMAHON:  I'm sorry, Your Honor.

5   BY MR. MACMAHON:

6   Q.  There's two children in the house, aren't there?

7   A.  Yes.

8   Q.  And you know from the surveillance of the house that

9   Mrs. Toebbe loves and takes care of her children; correct?

10  A.  I do know -- I do know she's there quite a bit.

11  Q.  Right.  And she's a school teacher at a private school in

12  Annapolis?

13  A.  Yes, sir.

14  Q.  You believe that her kids might need their mother at home?

15  A.  I believe that if they needed to get in touch with their

16  mother when she was committing an espionage activity with her

17  husband that she shouldn't have had her phone off that day.

18  Q.  Okay.  Sir, that's a good argument.  You don't have any

19  proof that she was committing espionage that day, do you?

20  A.  She was witness to it, and she was assisting with it.

21  Q.  She was a witness to it.  Okay.

22          MR. MACMAHON:  Thank you, Your Honor.  That's all I

23  have.

24          THE COURT:  Any redirect?

25          MS. SMOLAR:  Yes, Your Honor.

PETER OLINITS - REDIRECT EXAMINATION

1               <u>REDIRECT EXAMINATION</u>

2   BY MS. SMOLAR:

3   Q.  Special Agent, are you aware of an indictment that was

4   returned yesterday that charged Diana Toebbe with three very

5   serious federal crimes?

6   A.  Yes.

7   Q.  Espionage crimes under the Atomic Energy Act; correct?

8   A.  Yes.

9   Q.  For aiding and abetting Jonathan Toebbe at these particular

10  drops of Restricted Data; correct?

11  A.  Yes.

12  Q.  And the Toebbes have been married for 18 years; correct?

13  A.  Eighteen years.

14  Q.  And during that time, Mr. Toebbe worked for the Navy;

15  correct?

16  A.  He did.

17  Q.  And the MacBook that you found as well as the cash, the

18  $11,300 in cash, as well as the latex gloves, they were all

19  found in their shared bedroom; correct?

20  A.  Shared bedroom, yes.

21  Q.  And you don't know if Mr. Toebbe provided Ms. Toebbe with

22  the passwords to the ProtonMail account, to the

23  cryptocurrency -- we don't know any of that yet, do we?

24  A.  No.

25  Q.  But we're going to find out; right?

PETER OLINITS - REDIRECT EXAMINATION

1   A.  We will.

2   Q.  The documents that were taken from the Navy pursuant to

3   Mr. Toebbe's messages, they were taken several years ago;

4   correct?

5   A.  Yes.  At least around the 2018 -- 2018 timeframe.

6   Q.  And you learned that from looking at the metadata on the SD

7   card; correct?

8   A.  Yes.

9   Q.  That had the date of 2018?

10  A.  That was the time that information was put on the SD card.

11  Q.  Let's just talk about the passports briefly.  I know you

12  stated that you worked on a case where someone was able to

13  leave the country without a passport.  Can you explain that?

14  A.  So espionage subject wanted to basically defect to Russia

15  to sell classified information.  As part of that plan that

16  individual conducted a scouting trip to ensure their safe

17  passage to and from Mexico.  And I think it was May of 2019

18  where that person was able to cross over into Mexico without a

19  passport and cross back into the United States.  Thereafter --

20  I think it was August of that month -- of that year -- she

21  kidnapped her six-year-old child and took her down to Texas

22  where they took a taxi into Mexico without a valid passport.

23  And they also had class -- she also had classified information

24  with her during that trip.

25  Q.  And isn't it possible that if there was a country that

PETER OLINITS – REDIRECT EXAMINATION

1   wanted to obtain the 50 packets of Restricted Data from

2   Mrs. Toebbe, they could provide her with safe passage to

3   another country with or without her current passport?

4           MR. MACMAHON:  Objection to the form of the question

5   about possibility.  The government hasn't even bothered to talk

6   about what embassy was reached out to.  Whether it's a friendly

7   country or otherwise.  I think it's very speculative for the

8   agent to say what might be possible in this regard.

9           MS. SMOLAR:  Counsel just asked all kinds of

10  possibility and speculation questions.

11          THE COURT:  There's a lot of speculation and

12  possibility going on in this room right now.  Let's move along

13  with the questioning, please.

14  BY MS. SMOLAR:

15  Q.  The three drops that Diana Toebbe was present for and aided

16  and abetted her husband with in this case on the July 26th --

17  I'm sorry -- June 26th, July 31, and October 9th, she left her

18  children for those drops; correct?

19  A.  Yes.

20  Q.  And then finally with regard to the Signal messages that we

21  referred to, there's a discussion in here about more than one

22  plan; correct?  Plan A and Plan B?

23  A.  Correct.

24  Q.  Do any of those plans refer to President Trump?

25  A.  No.  Not that I know of.

PETER OLINITS – RECROSS EXAMINATION

1          MS. SMOLAR:  No further questions.

2          THE COURT:  Any recross?

3                    RECROSS EXAMINATION

4    BY MR. MACMAHON:

5    Q.  Sir, you just told us before that this isn't even all the

6    messages.  These are the ones you picked out.

7    A.  That's correct.

8    Q.  Correct.  So on the exhibit that you picked out, there's

9    nothing about Donald Trump?

10   A.  It has to do with them fleeing the country.

11   Q.  Well, that's the way you read it; right?  And there are --

12   A.  That's what it says.

13   Q.  -- other messages that deal with leaving the country

14   because of President Trump; right?

15   A.  I don't remember specifically but maybe.

16         MR. MACMAHON:  That's all, Your Honor.

17         THE COURT:  Any redirect?

18         MS. SMOLAR:  Nothing further, Your Honor.

19         THE COURT:  All right, sir.  Thank you.  You may step

20   down.  Thank you.

21      (Witness excused).

22         THE COURT:  All right.  Before we proceed, let's

23   take about a five-minute break.  Give everybody a chance

24   to get a drink of water and take an urgency break if

25   necessary.

1     So we'll be back in five minutes.  We'll take a brief

2  recess.

3     (Recess 2:57 P.M. - 3:04 P.M.)

4         THE COURT:  All right.  Counsel, any additional

5  evidence or witnesses that you'd like to present?

6         MS. SMOLAR:  Just argument, Your Honor.  No further

7  witnesses.

8         THE COURT:  All right.  Very well.  Does the

9  defendant have any witnesses or evidence that you would like to

10 present, sir?

11        MR. MACMAHON:  No, Your Honor.  Thank you.

12        THE COURT:  All right.  I'll hear argument from the

13 parties.

14        MS. SMOLAR:  Your Honor, I'd first just refer the

15 Court to the pretrial services recommendation which is in favor

16 of detention in this case.  Clearly, electronic monitoring,

17 home detention are insufficient to address --

18        THE COURT:  Let me just interrupt you.  We may do

19 things a little bit differently in this court, but you do --

20 both parties have been given access to the pretrial services

21 report.

22        MS. SMOLAR:  Correct.

23        THE COURT:  As part of the evidentiary aspects of

24 this case, you're proffering the pretrial services report to

25 the Court for consideration?

```
 1              MS. SMOLAR:  Yes, Your Honor.

 2              THE COURT:  All right.

 3              MS. SMOLAR:  Thank you.  And I apologize for

 4    that.

 5              THE COURT:  And if you -- and what we tend to do

 6    here is that if you proffer that, there may be portions of

 7    your pretrial services report that you'd like to point out to

 8    the Court.  And what I do is then I give defense counsel the

 9    opportunity to respond to that proffer and acknowledge that

10    our pretrial services officer is also present in the

11    courtroom for examination if they'd like.  So I'll give you

12    that same option.  If you want to call the pretrial services

13    officer, you may.  If you want to proffer that, I'm also

14    going to give the defense counsel the opportunity to respond

15    to the proffer or call the pretrial services officer.  So that

16    is entirely up to you, but I just wanted to alert you as to my

17    procedure.

18              MS. SMOLAR:  In that case, Your Honor, I very much

19    appreciate that, and I apologize for not being familiar with

20    that.

21       I would like to call very briefly the pretrial services

22    officer in this matter.

23              THE COURT:  All right.  Very well.

24       (The witness was sworn in.)

25              THE WITNESS:  I do.
```

MICHAEL DEHAVEN – DIRECT EXAMINATION

<u>DIRECT EXAMINATION</u>

BY MS. SMOLAR:

Q.  Good afternoon, sir.  Can you please state your name.

A.  Yes.  It's Michael DeHaven.

Q.  And what's your title?

A.  I'm a United States probation officer in the Northern District of West Virginia assigned to the Martinsburg office.

Q.  And did you prepare this pretrial services report regarding Diana Toebbe?

A.  I did.

Q.  And what was your recommendation in this report?

A.  I recommended the defendant be detained.

Q.  And what were the reasons, just generally if you could, that you recommended detention?

A.  We consider primarily two categories:  Risk of nonappearance and risk of danger.  I made recommendations for detention based on both -- aspects of both those categories.

Q.  And what were your concerns regarding risk of nonappearance?

A.  Risk of nonappearance, if I can refer to the report, Your Honor, would be the nature of the instant offense.  That would include the circumstances of the conduct, the allegations against her, the potential penalty of the offenses with which she's charged, substance abuse history, mental health -- oh, I'm sorry.  I believe I'm reading the -- reviewing the risk of

MICHAEL DEHAVEN - DIRECT EXAMINATION

1   danger here.  Nature of the instant offense, substance abuse

2   history, mental health history, and unexplained or potentially

3   undisclosed assets.

4   Q.  With regard to the unexplained assets, what do you mean by

5   that?

6   A.  During my interview with the defendant, she claimed almost

7   no knowledge of the financial assets of her household.  She'd

8   give very little information regarding, you know, income and

9   outcome, expenses of the house, assets, liabilities,

10  obligations.  Even simple things like checking account

11  balances, savings account balances.

12  Q.  And you also indicate a substance abuse history?

13  A.  Yes.  During the interview with the defendant, she

14  acknowledged basically social consumption of alcohol but also

15  persistent use of -- occasional use of marijuana for a number

16  of years.

17  Q.  And on page 8 of your report, you indicate under the

18  assessment of danger that the charge involved using a computer

19  to facilitate the offense.  Explain that to us, please.

20  A.  Yes.  Just the ready availability of technology to

21  potentially expand upon the alleged offense conduct to use it

22  to facilitate flight or, you know, disclose additional

23  restricted information.

24  Q.  Just practically speaking, if the defendant was barred --

25  was released but barred from using the internet, would that

MICHAEL DEHAVEN - DIRECT EXAMINATION

1  necessarily solve all the risk?

2  A.  It wouldn't.  It's definitely a strategy to take to attempt

3  to mitigate that specific identified risk, but it would be very

4  simple for the defendant to, say, borrow a smart phone from

5  somebody and circumvent that.

6  Q.  Well, she has two children; right?

7  A.  Yes, ma'am.

8  Q.  And they're teenage age; correct?

9  A.  Yes, ma'am.

10 Q.  I assume they have cell phones that would have to be taken

11 away; correct?

12 A.  I believe they do.  If they were in the home with her, I

13 would recommend that certainly.

14 Q.  So you'd recommend that no one in the home have any access

15 to the internet?

16 A.  That would be my recommendation.  You know, prohibition on

17 devices capable of accessing the internet in the home with the

18 added stipulation that the defendant be restricted to the

19 residence and monitored via location monitoring.

20 Q.  And in these days with Zoom and school sometimes remote

21 that could be very difficult for children not to have internet;

22 correct?

23 A.  Yes, ma'am.  I imagine it would be.

24 Q.  And then if the defendant is on home detention with

25 electronic monitoring, and she decides to cut that monitor off

MICHAEL DEHAVEN – DIRECT EXAMINATION

1  and leave the home, how quickly can you get there to stop

2  her?

3  A.  Because of her place of residence, if we're talking about

4  her releasing back to the address in Annapolis, her supervision

5  would be transferred to the U.S. Probation Office in the

6  District of Maryland.  Their probation office locations are

7  actually in Baltimore and Greenbelt, Maryland.  I would say

8  probably the quickest possible response time would involve the

9  monitoring center receiving the alert, sending that alert to

10  the officer assigned to supervise the defendant, the officer

11  assessing the specific nature of that alert, and then if it

12  was something like, you know, obviously equipment was tampered

13  with or he was, you know, after a time unable to get a hold of

14  the defendant or had some other information, you know,

15  contacting local law enforcement and having them respond to

16  the residence.

17  Q.  So that's a number of steps; correct --

18  A.  Correct.

19  Q.  -- once that monitor is cut?

20  A.  Yes, ma'am.

21  Q.  Likewise, if the defendant was permitted to leave the home,

22  for example, for a doctor's appointment or to meet with her

23  counsel, and decided to drop some restricted data somewhere

24  along the way, would you have any knowledge of that?

25  A.  No, ma'am.

MICHAEL DEHAVEN – CROSS EXAMINATION

1          MS. SMOLAR:  No further questions.

2          THE COURT:  Any cross examination?

3          MR. BECK:  Yes.  Thank you, Your Honor.  I'm going to

4    do this.

5                        CROSS EXAMINATION

6    BY MR. BECK:

7    Q.  Mr. DeHaven, am I correct that Ms. Toebbe indicated to you

8    that her husband handled all the financial affairs of the

9    family?

10   A.  Yes.  She said in large part, he made the payments on

11   student loans, car payments, those sort of things, yes.

12   Q.  And did you confirm that with her husband?

13   A.  I did not, no.

14   Q.  Did someone in your office?

15   A.  I believe during Officer Bartholomay -- who was assigned to

16   interview him.  He did -- was able to provide much greater

17   detail with regard to the finances.

18   Q.  My question was, "Did he confirm though that he was the

19   person responsible in their household for handling the

20   financial affairs?"

21   A.  I'm not a hundred percent if he was asked that question and

22   answered "yes."

23   Q.  Would it be important for us to know that since Mrs. Toebbe

24   said she had no knowledge of the accounts because she didn't

25   handle the affairs of her family -- financial affairs?

MICHAEL DEHAVEN - CROSS EXAMINATION

1  A.  I think it's a legitimate question, yes.  My recollection

2  was her representation was she had limited knowledge.  Not that

3  she was completely uninvolved.

4  Q.  So the fact that she had limited knowledge of her financial

5  affairs, is that of any significance here today?

6  A.  It speaks to or it piques my assessment of the risk as a

7  risk factor being that she's a, you know, obviously in speaking

8  with her, highly intelligent, capable adult with a Ph.D. and

9  couldn't even give an estimation of basic financial

10  information.

11  Q.  Would it shock you if I told you that my wife handles all

12  our financial affairs?

13  A.  I guess it would.

14  Q.  Okay.  Are you aware of couples that do that?  That one

15  spouse handles the affairs and the other one just kind of makes

16  the money or provides income and the other one pays it?

17  A.  Yeah, I certainly don't think that's an arrangement that

18  doesn't exist.  I'm just saying in the context of my assessment

19  of the defendant's risk in this particular circumstance, it was

20  a line item I considered.

21  Q.  Well, I guess one -- are you saying that you think she's

22  not telling the truth, and she knows where all the money is or

23  that because she doesn't know where all the money is, it's a

24  risk?  Which one are you saying?

25  A.  Well, I'm not saying it's black or white one way or the

MICHAEL DEHAVEN - CROSS EXAMINATION

1  other.  I'm saying it's possible that there are assets that she

2  knows about she's not disclosing, particularly in a case where,

3  you know, $100,000 was alleged to be distributed to the

4  defendant.  You know, when she has a salary coming in that

5  she's not able to estimate her own salary -- I mean --

6  Q.  She told you what her salary was from her school; correct?

7  A.  Yes, she estimated her salary.

8  Q.  Okay.

9  A.  I'm talking about I guess in more specific terms.

10 Q.  Well, I guess what I'm -- are you saying that it's possible

11 she's lying to you about not knowing where the assets are?  Is

12 that what you're saying?

13 A.  I do believe it's a possibility, yes.

14 Q.  It's also possible she's telling the truth; right?

15 A.  Yes, sir.

16 Q.  And you don't know one way or the other whether she --

17 whether one is true versus the other; correct?

18 A.  Not with any certainty.

19 Q.  Okay.  So that shouldn't play any role in the Court's

20 determination of whether to release her or not; correct?

21 A.  In my opinion, it's a factor that the Court could

22 consider.

23 Q.  Well, if you don't know, how does the scale lean one way

24 or the other?

25 A.  That's a determination for the Court to make.

MICHAEL DEHAVEN - CROSS EXAMINATION

1   Q.  Well, you made the recommendation.  So I'm just asking you

2   to admit that for purposes of now that we know more about it,

3   it shouldn't play any role whatsoever in the detention

4   decision; correct?

5   A.  I'm not sure what I -- what more I know about it.

6   Q.  All right.  I think I understand your answer.

7       So there's also a mention in your report regarding foreign

8   travel that the Toebbes had engaged in in the past; is that

9   correct?

10  A.  Yes.

11  Q.  Okay.

12  A.  We discussed travel.

13  Q.  And one of the indications was that Ms. Toebbe forgot to

14  mention to you a 2018 vacation to the Bahamas; correct?

15  A.  Yes.  She did not report that.

16  Q.  Okay.  And we -- I was present for that interview; correct?

17  A.  Yes, sir.

18  Q.  At the time, I think that might have been -- was either

19  Wednesday or Thursday of last week.  I can't recall.  Do you

20  recall what day?

21  A.  It was the 14th.  I believe it was Thursday.

22  Q.  Okay.  Thursday.  At the time, she had been in the custody

23  of the Eastern Regional Jail for -- since Saturday when she was

24  arrested; correct?

25  A.  Yes, sir.  That's my understanding.

MICHAEL DEHAVEN – CROSS EXAMINATION

1  Q.  At that time, did she report to being in severe

2  psychological distress?

3  A.  She described her mental state as delicate and felt it was

4  declining I believe.

5  Q.  And the reason she said it was is because for the entire

6  period of time up to that date that she had been in custody,

7  despite having been on medication for years to treat a mental

8  health issue, she had not received any of those drugs; correct?

9  A.  That is my understanding.  I don't know specifically.  I

10  believe there was an exchange you had with the defendant where

11  some of the medical issues were rectified or she got one

12  medication but not another, but I don't know specifically

13  which.

14  Q.  Well, you recall though she had not received her mental

15  health medications; correct?

16  A.  That's my recollection, yes, sir.

17  Q.  She did get some blood pressure medication or something

18  like that?

19  A.  I believe that to be true.

20  Q.  And she indicated her mental health was declining for that

21  reason; correct?

22  A.  Yes, sir.

23  Q.  Okay.  So the fact that she may have forgotten a trip to

24  the Bahamas under those circumstances that's not something

25  you're asking the Court to consider in its decision whether or

MICHAEL DEHAVEN – CROSS EXAMINATION

1   not to detain her; correct?

2   A.  I think it is one element in the totality of circumstances

3   for the Court to consider.  I don't think it is the overriding

4   factor much like the money.

5   Q.  Well, are you saying that she purposely failed to disclose

6   that?

7   A.  It is a possibility that she did.

8   Q.  Is it also a possibility that she was in extreme mental

9   distress for lack of medication and in the stress of the

10  situation, she just forgot?

11  A.  Yes, sir.

12  Q.  Okay.  So, again, you can't say one way or the other which

13  one of those is the case; correct?

14  A.  Correct.

15  Q.  But you're asking the Court to consider that in determining

16  whether she should be detained?

17  A.  Yes, I think it is an element the Court should consider.

18  Q.  You also mentioned there's a history of drug use?

19  A.  Yes, sir.

20  Q.  Okay.  To be specific, isn't it a fact that Ms. Toebbe

21  indicated to you that she had occasionally used marijuana for

22  purposes of helping her sleep?

23  A.  Yes, sir.

24  Q.  Okay.

25  A.  And I believe that's what the report reflects.

MICHAEL DEHAVEN – CROSS EXAMINATION

1  Q.  Are you aware that in the state of Maryland where she

2  resides that the personal use of marijuana under those

3  circumstances is not illegal?

4  A.  I'm not a hundred percent on the details of the law.  I

5  know in a lot of jurisdictions, it's based on a quantity of

6  substance or a number of plants.  But I do know generally that

7  a lot of jurisdictions have relaxed laws on recreational use of

8  marijuana.

9  Q.  And we release people in this court all the time that have

10  drug and substance abuse issues; correct?

11  A.  Yes, sir.

12  Q.  Some with heroin or crack.  Severe narcotics.  We release

13  them all the time, don't we?

14  A.  Yes, sir.  On occasion.

15  Q.  And we monitor them; correct?

16  A.  Yes, sir.

17  Q.  And is there any reason why if the Court felt like

18  Mrs. Toebbe's occasional marijuana use in a state where it's

19  legal should be stopped that she couldn't be tested to make

20  sure she was complying?

21  A.  She could, yes.

22  Q.  Okay.  Now, you mentioned that there is a risk that --

23  well, in your PSR, you also talk about her mental health

24  history; correct?

25  A.  Yes, sir.

MICHAEL DEHAVEN - CROSS EXAMINATION

1  Q.  Okay.  And I just indicated to you that she has been in the

2  ERJ or was in the ERJ for at least five or six days and not

3  having received any treatment for her mental health; is that

4  right?  You remember saying that a few minutes --

5  A.  That is my understanding.  I have not reviewed jail medical

6  records, but it is my understanding.

7  Q.  Okay.  And are you aware that even to this day, they still

8  have only given her one of her mental health medications?

9  A.  I do not have any knowledge of that, but I would believe

10 it's credible if you say that.

11 Q.  Are you suggesting that her mental health is better or will

12 be better -- that her treatment of her mental health issues

13 will be better if she were in the ERJ?

14 A.  I can't speak to that.

15 Q.  So are you asking the Court to give her mental health a

16 consideration in its decision to detain or not?

17 A.  As a risk factor, yes, but I'm not qualified to say the

18 quality of treatment she's receiving at the jail or what the

19 circumstances of her release, how they would impact or affect

20 her mental stability or well-being.

21 Q.  Well, don't you think -- I mean you know as much as I do

22 about how the ERJ is.  Don't you think she would be better off

23 mentally if she had access to her medications on a regular

24 basis, access to her therapist, the doctor she's been treating

25 with for years?  Don't you think she'd be better off?  Can we

MICHAEL DEHAVEN - CROSS EXAMINATION

1    agree on that?

2    A.  We can agree on that.  That would --

3    Q.  Okay.

4    A.  -- be a reasonable assumption.

5    Q.  All right.  Thank you.  And as far as these assets that

6    Mrs. Toebbe said she doesn't know -- I don't know if she said

7    she didn't know about assets.  She just didn't know exactly

8    what was in her bank account at any given time because her

9    husband paid the bills.  Is that right?

10   A.  My recollection is she could not provide an estimate of any

11   account balance.

12   Q.  Okay.

13   A.  Retirement accounts --

14   Q.  All right.

15   A.  -- checking accounts, savings account.

16   Q.  Do you have any information to indicate there are assets,

17   even if she knew about them, that she could take and somehow

18   run away?

19   A.  Well, I would assume if she were released, she would have

20   access to bank accounts and whatever finances would be

21   available there.

22   Q.  I understand.  But my question is if you get access to a

23   bank account that doesn't have any money in it, it's not going

24   to do you any good; right?

25   A.  I'm not familiar with the balances of her bank account.

MICHAEL DEHAVEN – CROSS EXAMINATION

1   Q.  Okay.  So you can't say one way or another whether her

2   access to whatever bank accounts they have would be of any

3   assistance in her leaving the jurisdiction or fleeing?

4   A.  No, sir.

5   Q.  Okay.  Am I correct that as part of her pretrial services

6   release, she could be required to provide information about her

7   bank accounts?

8   A.  Yes, sir.

9   Q.  Okay.  So if she were released today and your colleague

10  in Baltimore said come to my office tomorrow and bring all

11  your banking work and so forth, she would have to do that;

12  right?

13  A.  If the Court directed those conditions, yes, sir.

14  Q.  Okay.  Are you aware that Ms. Toebbe has two teenage

15  children?

16  A.  Yes.  I believe a 15 and 11 year old.

17  Q.  Okay.  Are you aware that they have issues that I'll just

18  describe as physical or mental?

19  A.  Yes, sir.

20  Q.  And are you aware that if Ms. Toebbe were released, she

21  would return to her home and take care of her children?  Is

22  that what she told you she wanted to do?

23  A.  Yes.  She indicated that would be her preferred release

24  plan.  To return to her residential address and to have the

25  children brought back into the home.

MICHAEL DEHAVEN - CROSS EXAMINATION

1  Q.  And are you aware -- did you -- you spoke to her father;

2  correct?

3  A.  Yes, sir.

4  Q.  Okay.  Are you aware that he's a decorated Navy veteran?

5  A.  We did not discuss that, no.

6  Q.  If I -- well, assuming he was -- and I'll represent to the

7  Court he is -- and he were to agree to reside with her during

8  her pretrial detention or pretrial home confinement, that would

9  provide an extra layer of security that she would not do

10  anything that would constitute fleeing or somehow injure

11  someone else.  Wouldn't that make you feel comfortable that he

12  -- that her retired Navy -- decorated veteran Navy father was

13  in the same household?

14  A.  I think there could be positive aspects to it for her.  In

15  terms of security, my understanding is that Mr. Smay is 80

16  years old.  I don't know that he would be a physical security

17  but --

18  Q.  Well, I'm just talking about someone you could trust as --

19  you would generally think would be honest assuming that history

20  that I just told you about.

21  A.  Yeah.  I had nothing but a favorable impression from my

22  conversation with him.

23  Q.  Right.  So if he were someone that the Court said, hey, you

24  are charged with letting us know if she leaves this house

25  without permission or without the proper clearance with her

MICHAEL DEHAVEN - CROSS EXAMINATION

1  pretrial services officer that's the kind of person you would

2  want to have in the house; correct?

3  A.  Based on my limited knowledge, I would say he would present

4  with what I know as a decent third-party custodian.

5  Q.  And, lastly, regarding the charges against Ms. Toebbe, you

6  were present during the FBI agent's testimony?

7  A.  Yes, sir.

8  Q.  Are you aware of any evidence indicating that she knew what

9  her husband was doing other than what was conveyed by the FBI

10  agent?

11  A.  The -- other than the documented evidence, the video and

12  photo evidence in the court, and the agent's testimony, no,

13  sir.

14  Q.  Right.  You aren't -- you have no evidence yourself that

15  she was aware that he was selling or attempting to sell

16  American submarine secrets when he made -- went to those drops;

17  correct?

18  A.  No, sir.

19  Q.  Okay.  So all you know is she's been charged with that;

20  right?

21  A.  Yes, sir.  That's correct.

22  Q.  Okay.

23          MR. BECK:  Thank you, Your Honor.

24          THE COURT:  Any redirect?

25          MS. SMOLAR:  Just very briefly, Your Honor.

MICHAEL DEHAVEN – REDIRECT EXAMINATION

1                    REDIRECT EXAMINATION

2   BY MS. SMOLAR:

3   Q.   You indicated that Diana Toebbe's father is 80 years old?

4   A.   Yes, ma'am.  That's my understanding.

5   Q.   And is it your understanding that he -- do you know if he

6   has any health problems?

7   A.   He was cogent and alert when we spoke.  He seemed -- I

8   don't know about his physical health or anything.

9   Q.   Referring back to electronic monitoring, if she were to cut

10  off the electronic monitor in the middle of the night when her

11  father is asleep, for example, he cannot be tasked with chasing

12  her down and stopping her, can he?

13  A.   I would not expect him to do that.

14  Q.   Likewise, he cannot be tasked with being a 24/7 babysitter

15  for Diana Toebbe either, can he?

16  A.   I don't think that's possible, no.

17  Q.   With regard to your report, you indicate also that the

18  defendant's brother came in from California and was willing to

19  assist with the children?

20  A.   Yes.

21  Q.   You also note on page three that the defendant acknowledged

22  having a United States passport but was unable to account for

23  the document's whereabouts.  The defendant reported that she

24  believed her passport is expired.  She advised that she

25  recently made application for a new passport but could not tell

MICHAEL DEHAVEN - REDIRECT EXAMINATION

1  if she had mailed off the old one with her renewal or not.  Is

2  that accurate?

3  A.  Yes.

4  Q.  So she said she didn't know whether she had applied for a

5  new passport?

6  A.  Yes.  She said she didn't know -- she knew she had applied

7  for the passport.  She didn't know if they had retained

8  possession of the -- what she believed to be expired passport

9  or if it was submitted with the renewal paperwork.

10         MS. SMOLAR:  Thank you.  No further questions.

11         THE COURT:  Mr. Beck, any redirect --

12         MR. BECK:  No thank you, Your Honor.

13         THE COURT:  -- or any recross?  Excuse me.

14         MR. BECK:  No thank you, Your Honor.

15         THE COURT:  All right.  Anything further with this

16  witness?

17         MS. SMOLAR:  Nothing further, Your Honor.  Thank you.

18         THE COURT:  You may step down, sir.  Thank you.

19         THE WITNESS:  Thank you.

20     (Witness excused.)

21         THE COURT:  All right.  Any additional witnesses or

22  evidence from the government at this time?

23         MS. SMOLAR:  Not at this time, Your Honor.

24         THE COURT:  Mr. MacMahon, any additional witnesses or

25  evidence from the defendant?

1          MR. MACMAHON:  No, Your Honor.

2          THE COURT:  All right.  I'll hear argument from the

3    parties.  Go right ahead.

4          MS. SMOLAR:  Your Honor, I think the evidence that

5    you've heard today -- heard and seen today shows how serious of

6    an offense this is.  The offense -- the defendants were charged

7    in a three-count indictment all of which -- all of the counts

8    carry life imprisonment as the maximum penalty.

9        Specifically, with regard to Diana Toebbe, her guideline

10   range is 210 to 262 months.  Approximately 17.5 to 22 years.

11   So it could be an actual life sentence for this soon-to-be 46

12   year old.

13       This defendant had encrypted messaging applications of

14   Signal and Telegram on her phone.  She had tradecraft that she

15   utilized when accompanying her husband on these drops.  Three

16   of the four drops she's present.  In three of the four drops, I

17   think we've seen that she's looking around.  She's a lookout

18   for him.  She's standing very close to him.  She is watching

19   what he's doing.

20       They've been married for 18 years.  During that time, he's

21   worked for the Navy.  They've discussed leaving the country on

22   multiple occasions and specifically in the messages that we saw

23   here today.  The motivation for that is irrelevant, but I will

24   say those messages refer to a Plan A and a Plan B as early as

25   2018, the same time that the metadata shows that this

1   information was sent to COUNTRY1.

2       Most alarming to the government is the substantial evidence

3   of her ability to flee prosecution and not appear should this

4   case -- when this case goes forward.  There's a message that

5   you heard from August 28th -- from the August 28th dead drop in

6   which the person that left the message says, "I've considered

7   the possible need to leave on short notice.  Should that ever

8   become necessary, I will be forever grateful for your help in

9   extracting me and my family.  I surmise the first step would be

10  unannounced travel to a safe third country with plans to meet

11  your colleagues.  We have passports and cash set aside for this

12  purpose.  I pray such a drastic plan will never be needed, but

13  you are right.  It's a comfort to know you are ready and

14  willing to aid us.  Please let me know what I should do to

15  prepare for this last resort."

16      The search of their house on October 9th revealed in the

17  bedroom that Diana and Jonathan Toebbe shared $11,300 in

18  hundred dollar bills wrapped up and concealed in a box.  It

19  also had -- it also showed a go-bag with electronics, latex

20  gloves, a thumb drive.  The house also had shredded documents,

21  and they had their children's passports ready to go and theirs

22  were being expedited.  Any trip that they were planning was not

23  until the spring of 2022.  Certainly no need to expedite that

24  in order to have that by that time.

25      You heard testimony from Agent Olinits that he did review

1  the balances in their joint bank account, and it was certainly

2  sufficient to flee the country.

3      The money that the FBI paid Jonathan and Diana Toebbe,

4  $100,000 in Monero cryptocurrency, has not been located.  All

5  that is required is somebody to log onto the internet, to move

6  that money, put it in an oversees bank account, get rid of it.

7  In addition, the 51 packets of restricted data, we only have 1.

8  We're still looking for the additional 50 packets.  That is

9  extremely sensitive data.  That's the reason for this very

10  serious indictment and these very serious federal charges that

11  have been brought against Diana Toebbe for aiding and abetting

12  her husband.

13      She was present for two -- for three of the four dead drops

14  in which all of this restricted data was provided to the FBI.

15  And in the messages that you heard today, Jonathan Toebbe

16  refers to his wife implicitly as his co-conspirator.

17      He says, "You asked if I am working alone.  There is only

18  one other person I know is aware of our special relationship,

19  and I trust that person absolutely."

20      The only other person seen with Jonathan Toebbe at these

21  dead drops was his wife, Diana, and she was seen three of the

22  four times.  She has no ties to the Northern District of

23  West Virginia.  She has no documented criminal history, but

24  it's clear that she and her husband have been discussing

25  leaving the country as far back as 2018.  She is not expected

1  to have employment prospects if released.  My understanding is

2  that she's been suspended indefinitely from her job and he is

3  incarcerated.

4      Whatever triggered her to aid and abet her husband with

5  this very serious federal crime hasn't gone away.  There is no

6  reason to believe that given the -- facing life imprisonment at

7  this point in time that she would not potentially flee the

8  country and has the resources to do that.  As the agent stated,

9  there have been cases where people have been able to leave the

10  country, as the Court is well aware, without a passport.

11  Certainly if a hostile country was interested in obtaining

12  these 50 packets of information from Ms. Toebbe, they could

13  provide safe passage for her.

14      In addition, if she were to have access to the internet,

15  she could obstruct justice by accessing the restricted data, by

16  accessing the missing cryptocurrency, and by altering the

17  ProtonMail accounts in which the communications were made.  All

18  of that information is still being investigated and looked for

19  by the FBI quite actively.

20      Finally, the testimony of the pretrial officer is quite

21  compelling.  Her 80-year-old father cannot be forced to be a

22  babysitter for Diana Toebbe should she be released and also to

23  be able to care for her two children.

24      In addition, there were several statements made to the

25  probation officer that were questionable at best.  The fact

1   that she didn't know where her passport was.  The fact that she

2   didn't know any of her finances despite her advanced education.

3       So the recommendation here is compelling.  It is not one

4   that is often given.  And in this case, given the seriousness

5   of this offense, the extreme damage to the Navy should this

6   information get out, it's quite significant.

7       In addition, as we heard, the probation office can't stop

8   her if she chooses to leave her house and cut off her

9   electronic monitor.  We don't have GPS monitoring in the

10  District of Maryland I don't believe; but even if they did,

11  they can't track her every move in order to make sure that she

12  appears for court in the Northern District of West Virginia.

13  Thank you.

14          THE COURT:  All right.  Thank you.

15      Mr. Beck, Mr. MacMahon, who is going to make the argument?

16          MR. MACMAHON:  Yes, Your Honor.  Thank you very much.

17  Please the Court.  First of all, under the Bail Reform Act and

18  under the constitution of the United States, the defendant is

19  entitled to bail, and bail cannot be withheld.  An unreasonable

20  bail.  And the reason for that is because lawyers often need

21  their clients to help them with a case as well.  And sitting in

22  the ERJ is no way to prepare a case, prepare a defense.  I've

23  done it before.  And it's just no way that we can review all

24  this evidence.  She has a constitutional right to get out if

25  the Court finds that she's entitled to get out.  And in this

1  case, you should find exactly that.  And that is that there are

2  a combination of conditions that can ensure the safety of the

3  community and that she will reappear in court.

4      This is not a rebuttable presumption case.  You would think

5  with these espionage charges -- with all respect to the

6  pretrial, they see an espionage case, and they think detention.

7  They look at it and they decide that it's got to be a detention

8  case.  Well, not under the law it's not.  Under the law, you

9  have -- the government bears the burden of proof of proving no

10 set of combinations or conditions will ensure the safety of the

11 community or Ms. Toebee's appearance.

12     And, Judge, in this case, I think it's obvious to you

13 sitting through this hearing, which was more like a preliminary

14 hearing against Mr. Toebbe than one against Mrs. Toebbe, that

15 she has a very substantial defense to this case and one that

16 Mr. Beck and I will put forward before a jury in this district.

17 And the -- well, then the prosecutor stands up and starts

18 talking about Signal and Telegraph and encryption -- and she

19 didn't have -- they admitted they don't have any evidence of

20 any of this stuff, of her knowing what her husband was up to.

21 You know, why they were going places.  You know, there's no

22 evidence at all really.  If you want to consider the quality of

23 the government's evidence against Mrs. Toebbe, it's purely

24 speculative at this point.

25     They go to emails -- and I'll bet you dollars to doughnuts,

1   Your Honor, when they get into the Mac computer that they found

2   next to Mr. Toebbe's grab bag -- which the agent called

3   something that people used to flee which that would apply to

4   every bag people have in their bedroom -- that that's -- you're

5   going to find that the metadata on that computer is going to

6   show that it was Mr. Toebbe that wrote all these notes, and it

7   was Mr. Toebbe that stole all the documents.

8       And the issue for the Court and the jury to find in this

9   case is did she know anything about it?  And right now the

10  government can't do anything but say she was on the hiking

11  trail with him, and she looked both ways.  They didn't even

12  bother to put a listening device out there where they could

13  have heard some of these things.  They didn't put a listening

14  device in their car.  The National Security Division doesn't

15  even bug a house.  And now they want to say they know what

16  every -- well, it must be that they were talking about these

17  things.  It can't be.  You have to weigh this as you make this

18  decision.

19      There's a substantial claim of innocence that we can put

20  forward in this case.  And the fact that it's such a serious

21  charge makes it even more important that you weigh that, Your

22  Honor.

23      Ms. Toebbe wants to defend this case, and she wants to be

24  able to help her lawyers do it.  Now, what are we going to --

25  all this evidence of the passport.  She doesn't have a

1    passport.  You know, I don't know -- the District of Maryland

2    has monitoring.  I don't even know where that came from, Your

3    Honor.  The District of Maryland is a very sophisticated

4    office.  It deals with crime in Baltimore.  I can guarantee

5    they are able to monitor somebody who is on -- who is wearing

6    an ankle bracelet.  I've had clients wearing an ankle bracelet.

7    I've never heard of one person that's been supervised with an

8    ankle bracelet on that fled.  Usually the government says they

9    want the ankle bracelet because it's so effective.  Until they

10   think you might release somebody on an ankle monitor, then they

11   say that a five year old could cut it off and flee the United

12   States without a passport.  You know that's not true, Judge.

13       So here's what I have to say.  A combination of conditions

14   is that we can come up with some kind of a reasonable bond.

15   Hopefully a PR bond.  This is not a rich family, Your Honor.

16   You know they have court-appointed lawyers, but they may be

17   able to come up with some money for a reasonable bond for the

18   Court.

19       She could be released back to her house to take care of her

20   children which is her primary concern sitting here.  And you

21   know that as a mother -- as a father or mother that's what she

22   really, really wants to do.  That's what she told this

23   gentleman she wanted to do.  And she's not going to flee the

24   United States and leave her children who need her here.  That's

25   not going to happen.  So if she goes back to her house in

1  Maryland and her father who is 80 years old -- but he loves his

2  daughter.  The family is willing to do anything, Judge, that

3  you order to help get her out.  And if it means the brother has

4  to come back, if it means that she can't have any internet -- I

5  mean how many cases of child pornography have you heard here

6  where the government says the defendant can't have access to

7  the internet?  They don't say, oh, well, he could steal a

8  phone.  They don't -- he could steal phones.  He could go next

9  door.  He could do all these things.  I mean this desire to

10  lock her up has gotten to the point where they're twisting

11  arguments they use in cases before you all the time.  The Court

12  can monitor and the pretrial services people do monitor whether

13  people don't have the internet.  And she can't have the

14  internet.  If the government thinks she's going to try to

15  monitor anything, they can block the internet from getting in

16  the house and that's easily done.  The children can go next

17  door if they have a Zoom call.  There's no reason to think

18  Ms. Toebbe would not want her children to go to school because

19  she didn't have the internet while she fought these charges.

20      So, you know, the combination of conditions are mainly that

21  she's -- she, as you can tell today, is insisting that she's

22  innocent to these charges and wants to clear her name.  And the

23  government really doesn't have much of a case against her,

24  Judge.  The FBI agent thinks he knows everything that's going

25  on but he doesn't.  He doesn't have any evidence other than

1  they were walking together.  You've seen the conspiracy charge

2  about mere presence is not enough.  You know, she didn't have

3  access to this stuff.  She doesn't have any access to any

4  classified information.  She never had access to classified

5  information.  You don't need to protect the people of the

6  United States from Diana Toebbe releasing plans that her

7  husband may have stolen from the Navy yard.  The government can

8  -- if they had evidence that she stole something or that it was

9  found on one of her computers, they would have given it to you.

10 It would have been up here in a video for you to look at.

11      But I'm going to go back.  The right to bail is a

12 constitutional matter in this country.  It's right in our

13 constitution.  The Court has to grant reasonable bail.  And

14 there is a combination of conditions; and whatever they are,

15 she'll comply with them, Judge.  And with that, I'll rest my

16 argument.  Thank you, Your Honor.

17           THE COURT:  Thank you, sir.

18      All right, Counsel, I appreciate the argument today and the

19 evidence that's been presented.  And unfortunately I hate to be

20 anti-climatic, but the Court is going to take the argument and

21 the evidence under consideration and issue a written ruling as

22 to that.

23      Anything further we need to address before we adjourn this

24 afternoon?

25           MS. SMOLAR:  Nothing further, Your Honor.

1          MR. BECK:  Not from --

2          MR. MACMAHON:  I'm --

3          MR. BECK:  -- the defendant, Your Honor.

4          MR. MACMAHON:  I'm sorry, Your Honor.

5          THE COURT:  That's fine.

6          MR. MACMAHON:  Excuse me.

7          THE COURT:  That's fine.  With that in mind, the

8   defendant is remanded to the custody of the U.S. Marshals

9   Service, and we stand adjourned.  Thank you.

10

11              (Hearing concluded at 3:42 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2

 3          I, Kate A. Slayden, Registered Professional Reporter

 4   and Official Court Reporter of the United States District Court

 5   for the Northern District of West Virginia, do hereby certify

 6   that the foregoing is a true and correct transcript to the best

 7   of my ability of the digitally-recorded proceedings had in the

 8   above-styled action on October 20, 2021, as transcribed by me.

 9          I certify that the transcript fees and format comply

10   with those prescribed by the Court and Judicial Conference of

11   the United States.

12          Given under my hand this 1st day of December, 2021.

13

14

15                          /s/Kate A. Slayden

16                          Kate A. Slayden, RPR, CCR
                            Official Reporter, United States
17                          District Court for the Northern
                            District of West Virginia
18

19

20

21

22

23

24

25
```