**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**UNITED STATES OF AMERICA,**

v.                                                     **Criminal Action No. 3:21-CR-49-002
(GROH)**

**DIANA TOEBBE,**

                Defendant.

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO REOPEN DETENTION HEARING**

Comes now the United States of America and William J. Ihlenfeld, II, United States Attorney for the Northern District of West Virginia, by Jarod J. Douglas, Assistant United States Attorney for said District, Jessica Lieber Smolar, Special Assistant United States Attorney for said District, and S. Derek Shugert and Matthew J. McKenzie, Trial Attorneys, U.S. Department of Justice, National Security Division, and respond in opposition to the defendant's Motion to Reopen Detention Hearing [Doc. 75], filed December 8, 2021, asking this Court to reopen the detention hearing and reconsider its Detention Order [Doc. 57], entered October 21, 2021.

**I.**         **BACKGROUND**

On October 19, 2021, a Federal grand jury sitting in Elkins returned the instant Indictment [Doc. 37], charging the defendant with one count of Conspiracy to Communicate Restricted Data and two counts of Communication of Restricted Data, in violation of 42 U.S.C. §§ 2274(a) and 2014 and 18 U.S.C. § 2(a).  As relevant here, the Indictment alleges that the defendant assisted her husband in a potentially multi-million-dollar scheme to communicate militarily sensitive design elements, operating parameters, and performance characteristics of U.S. Navy nuclear

1

warships to a foreign government ("COUNTRY1") by acting as a lookout during three of the four dead drops involved in the FBI's undercover operation. Id. at p. 7, ¶ 29; p. 8, ¶ 34, and p. 9, ¶ 41.

On October 20, 2021, this Court conducted an approximately two-hour-long detention hearing [Doc. 51]. The Court heard testimony from one of the FBI case agents, who presented video clips and photographs documenting the dead drops and a summary of Signal messages between the defendants, among other exhibits.[1] The Court heard testimony from the pretrial services officer, who recommended that the defendant be detained. The defendant did not call a witness on her behalf. Instead, as particularly relevant here, counsel for the defendant proffered and argued that the Signal messages between the defendants, which discussed moving away from the United States, were politically motivated and not related to the charged offenses.

On October 21, 2021, this Court entered the subject Detention Order [Doc. 57], directing that the defendant be detained pending trial. The Court based its decision on a finding that the government had established by a preponderance of the evidence that the defendant is a flight risk and clear and convincing evidence had been presented that the defendant is a danger to the community. Furthermore, the court found that no bond conditions could be set to reasonably ensure the appearance of the defendant and the safety of the community. The Court provided a thorough and detailed explanation of the not fewer than **six** reasons in support of this decision.

---

[1] On December 2, 2021, the Clerk of Court entered a Notice of Docket Correction [Doc. 72] regarding the Clerk's Witness and Exhibit List [Doc. 55] from the hearing. Specifically, the Clerk noted that the Court had not admitted Government's Exhibit No. 8 during the hearing. Government's Exhibit No. 8 is a photograph of Jonathan Toebbe and the defendant near the dead drop location on July 31, 2021. The undersigned does not recall the Court finding that this exhibit was inadmissible. Instead, the undersigned assumes that the government inadvertently failed to move for its admission. The government now moves the Court to admit Government's Exhibit No. 8.

First, the Court determined that the nature and circumstances of the offense weighed in favor of detention. In this regard, the Court first summarized the allegations of the Indictment:

> Defendant's husband, co-Defendant Jonathan Toebbe, held an active "Top Secret" security clearance through the United States Department of Defense and an active "Q" clearance through the United States Department of Energy, which granted him access to information involving or incorporating "Restricted Data" within the meaning of the Atomic Energy Act of 1954, 42 U.S.C.§ 2011 et seq. ECF No. 37. From on or about April 1, 2020, through October 9, 2021, Defendants Jonathan and Diana Toebbe allegedly conspired to sell this restricted information to a foreign nation with the intent to injure the United States and secure advantage to a foreign nation. Id. After the foreign government, hereinafter COUNTRY1, received the sample of Restricted Data and instructions for establishing a covert relationship to purchase additional Restricted Data, COUNTRY1 informed the FBI and the FBI contacted the supplier to establish an undercover covert relationship. During this undercover operation, the FBI arranged four dead drops with Defendants. Defendant Diana Toebbe was present at three of the four dead drops.

([Doc. 57] at pp. 2-3, ¶ 2). Next, the Court referenced items of evidence presented at the detention hearing:

- Video from the dead drops show that Diana Toebbe is a willing participant in the activity.
- Additionally, messages between the Defendants from as early as March 2019 through October 5, 2020, demonstrate that Defendants were contemplating an activity that may require them to leave the country quickly. Specifically, on March 4, 2019, Jonathan Toebbe wrote: "I am also thinking about Plan A…it's not morally defensible either. We convinced ourselves it was fine, but it really isn't either, is it?" Diana Toebbe wrote in response to Jonathan on the same date. "I have no problems at all with it. I feel no loyalty to abstractions." On March 7, 2019, Jonathan Toebbe wrote, "We've got passports, and some savings. In a real pinch we can flee quickly. Diana responded on the same date, "Right. Let's go sooner than later."
- The FBI has not recovered the thousands of "Top Secret" documents that Defendant offered to sell to the FBI and the money paid to Defendants prior to their arrests on October 9, 2021.

Id. at pp. 3-4, ¶ 2 (bullet points added) (internal citations omitted).

Second, the Court found that "[t]he weight of the evidence against Defendant Diana Toebbe is strong." ([Doc. 57] at p. 4, ¶ 3). In this regard, the Court found of particular

3

significance the defendant's "participation at three of the four dead drops" and Jonathan Toebbe's message to an individual whom he believed to be a representative of COUNTRY1, in which he stated that "[t]here is only one other person I know is aware of our special relationship, and I trust that person absolutely . . . ."  Id.

Third, the Court noted that "[i]f convicted, Defendant is subject to a lengthy sentence, a maximum of life in prison."  Id. at p. 4, ¶ 4.

Fourth, the Court determined, by clear and convincing evidence, that, "[a]lthough Defendant has no prior criminal history, the nature and circumstances of the charges against her and her actions demonstrate that Defendant is a danger to every community and to our national security . . . ."  Id. at p. 4, ¶ 5.

Fifth, the Court determined, by a preponderance of the evidence, that the defendant is a flight risk "and should be detained on those grounds alone."  Id. at p. 4, ¶ 6.

Sixth, the Court found that "[n]o conditions can be set to reasonably ensure the appearance of Defendant and the safety of the community."  Id. at p. 5, ¶ 8.  In this regard, the Court was "unconvinced" that "electronic monitoring, a third-party custodian, and no computer or internet access would suffice to prevent Defendant from fleeing."  Id. at p. 5, ¶ 7.

On December 8, 2021, the defendant filed the instant motion, asking the Court to reconsider its decision based on "new evidence."

## II.     APPLICABLE STANDARD

Title 18, United States Code, § 3142(g) provides the specific factors that are to be considered to determine whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. Those

factors are:

1. The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
2. The weight of the evidence against the person;
3. The history and characteristics of the person, including but not limited to community ties, employment, criminal history, record of court appearance or whether the person was on probation or parole at the time the current offense was committed; and
4. The seriousness of the danger to any person or the community that would be posed by the person's release.

Title 18, United States Code, § 3142(f)(2) authorizes the Court to reopen a detention hearing at any time before trial "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."

### III.     ARGUMENT

The defendant offers three grounds for reconsideration. The first two grounds are based on a theory of "new evidence," namely: (1) Signal messages, which the defense claims show that the defendant's desire to leave the country was not related to a scheme to sell classified information to a foreign government; and (2) a letter dated November 9, 2021 from Mr. Toebbe to the defendant's father, stating his hope that the defendant "will ultimately be exonerated." The third ground is the willingness and ability of the defendant's father to post a $100,000 cash bond to

5

secure her release. For the reasons outlined below, none of these bases alone, nor in combination, warrants a reconsideration of this Court's detention decision.

### A. The Signal Messages Do Not Constitute "New Evidence."

As an initial matter, the government questions the defendant's characterization of the Signal messages as "new evidence" for at least two reasons. First, counsel for the defendant has already proffered and argued that the Signal messages between the defendants, which discussed moving away from the United States, were politically motivated and not related to the charged offenses. Second, the Signal messages are not "new" to the defendant because she was a party to the conversations with her husband of 18 years. This already existing familiarity with the messages is reflected in the fact that, again, her counsel proffered and argued about what the defense claimed was a broader context to the conversations.

### B. The "New Evidence" Does Not Warrant Reconsideration.

The "new evidence" does not warrant reconsideration, for the reasons outlined below. Before addressing each item, in turn, the government first notes that none of the "new evidence" changes the following.

- The defendant "participated," as the Court found, in three of the four dead drops, on June 26, 2021, July 31, 2021, and October 9, 2021. In other words, the Court has already rejected the argument that the defendant was merely present, as she now reasserts. The Court rejected the argument because the video evidence shows the defendant acting as a lookout while her husband, within arm's reach, knelt and placed an item inside a container and removed an item from the container, which was secreted in the middle of a wooded area hours away from the defendants' residence.

6

- The defendant attempted to conceal her participation in the dead drops. During two of these three dead drops, the defendant disabled her phone by either turning it off or placing it in Airplane Mode. Because the defendant's husband left his phone at home, nearly a two-hour drive away on each occasion, her two minor children were unable to contact her or their father for an extended period. On one of these occasions, the defendant's 11-year-old child was home alone. From this, the Court can reasonably conclude that the defendant placed great importance in both her personal participation in these trips and a concealment thereof.

- The defendant did not attend the dead drop on August 28, 2021, because she was at home nursing an injury. Apparently having no one he trusted as absolutely as his wife to act as a lookout, the defendant's husband serviced this dead drop alone. Video evidence shows that he was noticeably more nervous servicing the dead drop without the assistance of the defendant. In addition, as with the other dead drops, he had left his cell phone at home, where the defendant had stayed behind.

- At the August 28, 2021, dead drop, Mr. Toebbe left behind a written message to an individual whom he believed was a representative of COUNTRY1. The message included the statements: "You asked if I am working alone. There is only one other person I know is aware of our special relationship, and I trust that person absolutely." The Court cited these statements as a reason the weight of the evidence against the defendant is "strong." This demonstrates the Court's conclusion that Mr. Toebbe was referring to the defendant as the "only other person" who was "aware" of the "special relationship" with COUNTRY1.

7

- In the same message left behind on August 28, 2021, Mr. Toebbe also talked about the possibility that he and his "family" might need to leave the country "on short notice."  The Court cited this statement as a reason the defendant is a flight risk.  This shows the Court's conclusion that Mr. Toebbe's reference to his "family" included the defendant.  As relevant here, a post-arrest search of the defendants' residence found approximately $11,300 in U.S. currency located in a box in the defendants' shared bedroom.[2]
- On March 4, 2019, Mr. Toebbe and the defendant exchanged the following messages on an end-to-end encrypted application called Signal:
    - Mr. Toebbe:   I'm also thinking about Plan A…it's not morally defensible either.  We convinced ourselves it was fine, but it really isn't either, is it?
    - Defendant:   I have no problems at all with it.  I feel no loyalty to abstractions.
    - Defendant:   This was totally and completely different.
    - Mr. Toebbe:   Let's forget entirely about Plan B.  Wrong to have even considered it.  I'm checking on A now.
- In November 2018, a debit for the purchase of a high-level subscription to ProtonMail appears on the monthly statement for a bank account jointly held by Mr. Toebbe and the defendant.  In November 2020, a similar debit appears on a monthly statement for the same account for a renewal of the subscription.

---

[2] The FBI also found evidence in the residence that the defendants had pending applications for the expedited approval of new U.S. passports.  On October 29, 2021 the U.S. Department of State denied the defendant's application based on this case.

- In other messages to a putative representative of COUNTRY1, Mr. Toebbe stated that he had been removing the Restricted Data from his place of employment over an extended period.

    1. **Signal Messages**

The defendant claims that Signal messages, surrounding those the government offered at the detention hearing, show that her desire to leave the country was not related to a scheme to sell classified information to a foreign government. Instead, the defendant argues, the messages reflect a dissatisfaction with politics that underpinned the comments about leaving the country. Because she is no longer dissatisfied, she has no intent to leave the country and is not a flight risk, she argues.

First, the Court's decision to detain to the defendant did not rise and fall on the 14 Signal messages the government offered, all but one sent in March 2019. The Court's reasoning was carefully deliberated and multi-faceted, as reflected by its organized and thorough Order.

Second, while also very strong evidence of a risk of flight, the government's primary purpose in offering the Signal messages was for the weight of the evidence against the defendant. This purpose remains unchanged and intact. The government intended to highlight the defendants' discussion of Plan A and Plan B, particularly how the defendants described those plans using terms and phrases such as "not morally defensible," "loyalty," and "wrong." In the context of other close-in-time discussions of leaving the country, one can reasonably conclude that the defendants considered these plans as alternative *vehicles* by which they intended to leave the country, whatever the motivation. The government has never denied that messages between the defendants in 2019 reflected a dissatisfaction with the state of politics. The government, however,

9

is more concerned with the how than the why. These are not mutually exclusive concepts, though. Of course, one can be motivated by politics to leave one country for another, while, at the same time, deciding to use illegal means to accomplish the move. In any event, the defendant remains a flight risk for the many other reasons articulated by the Court, without regard to additional Signal messages that illustrate her dislike of the political landscape at the time.[3]

### 2. Jonathan Toebbe Letter

The statement of the defendant's husband in a letter to her father that he has "high hopes" that she "will ultimately be exonerated" is merely evidence that her husband of 18 years and the father of their two minor children "hopes" that she will not be convicted of the charges. This statement, included in a letter written one month after arrest and only after the Court ordered the defendant detained, does not affect the weight of the evidence against the defendant or the fact that she is a flight risk "and should be detained on those grounds alone," as the Court noted. ([Doc. 57] at p. 4, ¶ 6).

### C. A Bond of $100,000 Posted by Defendant's Father is Inadequate to Reasonably Assure Defendant's Appearance.

At the detention hearing, the defendant argued that electronic monitoring, a third-party custodian, and no computer access would suffice to prevent the defendant from fleeing. The Court stated in the subject Order that it was "unconvinced" by this argument. The cash bond proposed by the defendant should be equally unconvincing and rejected. The Court was aware

---

[3] The government finds noteworthy that the defendant frames her comments in the Signal messages as a reflection of a "prior" desire to leave the country based on a dissatisfaction with the state of politics at that time. Her participation in three dead drops in 2021 would seem divorced from the state of politics with which she had previously been dissatisfied. The $5 million dollars her husband requested from COUNTRY1 offers an alternative explanation of the defendant's motivation to participate in the alleged offenses without regard to politics.

10

that it could have required the defendant to post a cash bond. The Court did not do so because, as it held, "[n]o bond conditions can be set to reasonably ensure the appearance of Defendant . . .."

## IV.     CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the defendant's motion without the need for a hearing.

Respectfully submitted,

WILLIAM J. IHLENFELD, II
UNITED STATES ATTORNEY


By:     /s/
        Jarod J. Douglas, Assistant United States Attorney
        Jessica Lieber Smolar, Special Assistant United States Attorney
        United States Attorney's Office for the
        Northern District of West Virginia
        1125 Chapline Street, Suite 3000
        Wheeling, WV 26003


        /s/
        S. Derek Shugert and Matthew J. McKenzie
        Trial Attorneys
        Counterintelligence and Export Control Section
        National Security Division
        United States Department of Justice

**CERTIFICATE OF SERVICE**

I, Jarod J. Douglas, Assistant United States Attorney for the Northern District of West Virginia, hereby certify that on the 9th day of December 2021, the foregoing UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REOPEN DETENTION HEARING was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Nicholas J. Compton, Esq.
Assistant Federal Public Defender
MVB Bank Building
651 Foxcroft Avenue, Ste. 202
Martinsburg, WV 25401
*Counsel for Defendant Jonathan Toebbe*

Edward B. MacMahon, Jr., Esq.
107 E. Washington Street
Middleburg, VA 20117
*Counsel for Defendant Diana Toebbe*

Barry P. Beck, Esq.
Power, Beck & Matzureff
308 W. Burke Street
Martinsburg, WV 25401
*Counsel for Defendant Diana Toebbe*

          WILLIAM J. IHLENFELD, II
          UNITED STATES ATTORNEY

By:   /s/ Jarod J. Douglas
       Jarod J. Douglas
       Assistant United State Attorney