**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**UNITED STATES OF AMERICA,**

v.                                                                 **Criminal Action No. 3:21-CR-49-002
(GROH)**

**DIANA TOEBBE,**

                            Defendant.

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S APPEAL FROM MAGISTRATE JUDGE'S ORDER DENYING
MOTION TO REOPEN DETENTION HEARING**

      Comes now the United States of America and William J. Ihlenfeld, II, United States Attorney for the Northern District of West Virginia, by Jarod J. Douglas, Assistant United States Attorney for said District, Jessica Lieber Smolar, Special Assistant United States Attorney for said District, and S. Derek Shugert and Matthew J. McKenzie, Trial Attorneys, U.S. Department of Justice, National Security Division, and respond in opposition to the defendant's Appeal from Magistrate Judge's Order Denying Motion to Reopen Detention Hearing [Doc. 83], filed January 10, 2022, which this Court should construe as a motion under 18 U.S.C. § 3142(b) to revoke or amend the Detention Order [Doc. 57], entered October 21, 2021.

                                      **I.**       **BACKGROUND**

      On October 19, 2021, a Federal grand jury sitting in Elkins returned the instant Indictment [Doc. 37], charging the defendant with one count of Conspiracy to Communicate Restricted Data and two counts of Communication of Restricted Data, in violation of 42 U.S.C. §§ 2274(a) and 2014 and 18 U.S.C. § 2(a). As relevant here, the Indictment alleges that the defendant assisted her husband in a potentially multi-million-dollar scheme to communicate militarily sensitive

1

design elements, operating parameters, and performance characteristics of U.S. Navy nuclear warships to a foreign government ("COUNTRY1") by, among other things, acting as a lookout during three of the four dead drops involved in the FBI's undercover operation.  Id. at p. 7, ¶ 29; p. 8, ¶ 34, and p. 9, ¶ 41.

On October 20, 2021, this Court conducted an approximately two-hour-long detention hearing [Doc. 51].  The Court heard testimony from one of the FBI case agents, who presented video clips and photographs documenting the dead drops and a summary of Signal messages between the defendants, among other exhibits.  The Court heard testimony from the pretrial services officer, who recommended that the defendant be detained.  The defendant did not call a witness on her behalf.  Instead, as particularly relevant here, counsel for the defendant proffered and argued that the Signal messages between the defendants, which discussed moving away from the United States, were politically motivated and not related to the charged offenses.

On October 21, 2021, this Court entered the subject Detention Order [Doc. 57], directing that the defendant be detained pending trial.  The Court based its decision on a finding that the government had established by a preponderance of the evidence that the defendant is a flight risk and clear and convincing evidence had been presented that the defendant is a danger to the community.  Furthermore, the court found that no bond conditions could be set to reasonably assure the appearance of the defendant and the safety of the community.  The Court provided a thorough and detailed explanation of the not fewer than **six** reasons in support of this decision.

First, the Court determined that the nature and circumstances of the offense weighed in favor of detention.  In this regard, the Court first summarized the allegations of the Indictment:

> Defendant's husband, co-Defendant Jonathan Toebbe, held an active "Top Secret" security clearance through the United States Department of Defense and an active

"Q" clearance through the United States Department of Energy, which granted him access to information involving or incorporating "Restricted Data" within the meaning of the Atomic Energy Act of 1954, 42 U.S.C.§ 2011 et seq. ECF No. 37. From on or about April 1, 2020, through October 9, 2021, Defendants Jonathan and Diana Toebbe allegedly conspired to sell this restricted information to a foreign nation with the intent to injure the United States and secure advantage to a foreign nation. Id. After the foreign government, hereinafter COUNTRY1, received the sample of Restricted Data and instructions for establishing a covert relationship to purchase additional Restricted Data, COUNTRY1 informed the FBI and the FBI contacted the supplier to establish an undercover covert relationship. During this undercover operation, the FBI arranged four dead drops with Defendants. Defendant Diana Toebbe was present at three of the four dead drops.

([Doc. 57] at pp. 2-3, ¶ 2).   Next, the Court referenced items of evidence presented at the detention hearing:

- Video from the dead drops show that Diana Toebbe is a willing participant in the activity.
- Additionally, messages between the Defendants from as early as March 2019 through October 5, 2020, demonstrate that Defendants were contemplating an activity that may require them to leave the country quickly.  Specifically, on March 4, 2019, Jonathan Toebbe wrote: "I am also thinking about Plan A…it's not morally defensible either. We convinced ourselves it was fine, but it really isn't either, is it?"  Diana Toebbe wrote in response to Jonathan on the same date. "I have no problems at all with it.  I feel no loyalty to abstractions."  On March 7, 2019, Jonathan Toebbe wrote, "We've got passports, and some savings. In a real pinch we can flee quickly.  Diana responded on the same date, "Right. Let's go sooner than later."
- The FBI has not recovered the thousands of "Top Secret" documents that Defendant offered to sell to the FBI and the money paid to Defendants prior to their arrests on October 9, 2021.

Id. at pp. 3-4, ¶ 2 (bullet points added) (internal citations omitted).

Second, the Court found that "[t]he weight of the evidence against Defendant Diana Toebbe is strong."  ([Doc. 57] at p. 4, ¶ 3).  In this regard, the Court found of particular significance the defendant's "participation at three of the four dead drops" and Jonathan Toebbe's message to an individual whom he believed to be a representative of COUNTRY1, in which he stated that "[t]here is only one other person I know is aware of our special relationship, and I trust

3

that person absolutely . . . ."  Id.

Third, the Court noted that "[i]f convicted, Defendant is subject to a lengthy sentence, a maximum of life in prison."  Id. at p. 4, ¶ 4.

Fourth, the Court determined, by clear and convincing evidence, that, "[a]lthough Defendant has no prior criminal history, the nature and circumstances of the charges against her and her actions demonstrate that Defendant is a danger to every community and to our national security . . . ."  Id. at p. 4, ¶ 5.

Fifth, the Court determined, by a preponderance of the evidence, that the defendant is a flight risk "and should be detained on those grounds alone."  Id. at p. 4, ¶ 6.

Sixth, the Court found that "[n]o conditions can be set to reasonably ensure the appearance of Defendant and the safety of the community."  Id. at p. 5, ¶ 8.  In this regard, the Court was "unconvinced" that "electronic monitoring, a third-party custodian, and no computer or internet access would suffice to prevent Defendant from fleeing."  Id. at p. 5, ¶ 7.

On December 8, 2021, the defendant filed a Motion to Reopen Detention Hearing [Doc. 75], asking the Court to reconsider its decision based on "new evidence."  The defendant offered three grounds for reconsideration.  The first two grounds were based on a theory of "new evidence," namely:  (1) Signal messages, which the defense claimed show that the defendant's desire to leave the country was not related to a scheme to sell classified information to a foreign government; and (2) a letter dated November 9, 2021 from Mr. Toebbe to the defendant's father, stating his hope that the defendant "will ultimately be exonerated."  The third ground was the willingness and ability of the defendant's father to post a $100,000 cash bond to secure her release.

4

On December 9, 2021, the government filed a response in opposition to the defendant's motion [Doc. 79]. As an initial matter, the government challenged the defendant's characterization of the Signal messages, which the defendant claimed reflect a prior dissatisfaction with politics that underpinned the comments about leaving the country, as "new evidence." In this regard, the government noted that (1) the defendant had already proffered at the detention hearing that the messages between the defendant and her husband discussing leaving the United States were politically motivated and not related to the charged offenses, and (2) the Signal messages were not "new" to the defendant because she was a party to the conversations.

In any event, the government noted that the following facts remained unchanged by the additional Signal messages and the Jonathan Toebbe letter:

- The defendant "participated," as the Court found, in three of the four dead drops, on June 26, 2021, July 31, 2021, and October 9, 2021. Video evidence shows the defendant acting as a lookout while her husband, within arm's reach, knelt and placed an item inside a container and removed an item from the container, which was secreted in the middle of a wooded area hours away from the defendants' residence.

- The defendant attempted to conceal her participation in the dead drops. During two of these three dead drops, the defendant disabled her phone by either turning it off or placing it in Airplane Mode. Because the defendant's husband left his phone at home, nearly a two-hour drive away on each occasion, her two minor children were unable to contact her or their father for an extended period. On one of these occasions, the defendant's 11-year-old child was left home alone without the ability to reach either parent by phone. From

this, the Court can reasonably conclude that the defendant placed great importance in both her personal participation in these trips and her concealment thereof.

- The defendant did not attend the dead drop on August 28, 2021, because she was at home nursing an injury. Apparently having no one he trusted as absolutely as his wife to act as a lookout, the defendant's husband serviced this dead drop alone. Video evidence shows that he was noticeably more nervous servicing the dead drop without the assistance of the defendant. In addition, as with the other dead drops, he had left his cell phone at home, where the defendant had stayed behind.

- At the August 28, 2021, dead drop, Mr. Toebbe left behind a written message to an individual whom he believed was a representative of COUNTRY1. The message included the statements: "You asked if I am working alone. There is only one other person I know is aware of our special relationship, and I trust that person absolutely." The Court cited these statements as a reason the weight of the evidence against the defendant is "strong." This demonstrates the Court's conclusion that Mr. Toebbe was referring to the defendant as the "only other person" who was "aware" of the "special relationship" with COUNTRY1.

- In the same message left behind on August 28, 2021, Mr. Toebbe also talked about the possibility that he and his "family" might need to leave the country "on short notice." The Court cited this statement as a reason the defendant is a flight risk. This shows the Court's conclusion that Mr. Toebbe's reference to his "family" included the defendant. As relevant here, a post-arrest search of the defendants' residence found approximately $11,300 in U.S. currency located in a box in the defendants' shared bedroom.

- On March 4, 2019, Mr. Toebbe and the defendant exchanged the following messages on an end-to-end encrypted application called Signal:
    - Mr. Toebbe: I'm also thinking about Plan A…it's not morally defensible either. We convinced ourselves it was fine, but it really isn't either, is it?
    - Defendant: I have no problems at all with it. I feel no loyalty to abstractions.
    - Defendant: This was totally and completely different.
    - Mr. Toebbe: Let's forget entirely about Plan B. Wrong to have even considered it. I'm checking on A now.
- In November 2018, a debit for the purchase of a high-level subscription to ProtonMail appears on the monthly statement for a bank account jointly held by Mr. Toebbe and the defendant. In November 2020, a similar debit appears on a monthly statement for the same account for a renewal of the subscription.
- In other messages to a putative representative of COUNTRY1, Mr. Toebbe stated that he had been removing the Restricted Data from his place of employment over an extended period.

Next, the government explained why the additional Signal messages and the Jonathan Toebbe letter did not warrant reconsideration of the detention decision. The government argued that the additional Signal messages did not discount, for weight of the evidence purposes, the messages in which the defendants discussed Plan A and Plan B, particularly how they described those plans using terms and phrases such as "not morally defensible," "loyalty," and "wrong." In any event, the government argued that the defendant remained a flight risk for the many other reasons articulated by the Court, without regard to the additional Signal messages. As for the

letter, the government argued that the statement of the defendant's husband that he had "high hopes" that she "will ultimately be exonerated" was merely evidence that her husband of 18 years and the father of their two minor children "hopes" that she will not be convicted of the charges and does not affect the weight of the evidence against her.

Finally, the government argued that the Court was aware that it could have required the defendant to post a cash bond but did not do so because it held that no bond conditions could be set to reasonably assure the appearance of the defendant.

On December 16, 2021, the defendant filed a reply in support of her motion to reopen the detention hearing [Doc. 81]. The defendant argued that the additional Signal messages constituted "new evidence." The defendant also argued that the Court should reopen the detention hearing to determine whether the government had exculpatory evidence, specifically evidence that her husband had recently informed the government that she is innocent.

On December 20, 2021, the Court entered an Order Denying Defendant's Motion to Reopen Detention Hearing [Doc. 82]. The Court found that the additional Signal messages were not "new evidence" because "the same alternative reasons were addressed at the detention hearing and considered by the Court in rending its decision." Id. at 2. Even assuming the messages were "new evidence," the Court concluded that the messages nevertheless "demonstrate[d] that Defendant previously contemplated leaving the country." Id. The Court rejected the argument that it should reopen the detention hearing to determine whether the government had received exculpatory evidence because the "alleged exculpatory evidence has no material bearing on the issue of risk of flight or safety of the community." Id.

On January 10, 2022, the defendant filed the instant Appeal from Magistrate Judge's Order Denying Motion to Reopen Detention Hearing [Doc. 83], which this Court should construe as a motion under 18 U.S.C. § 3142(b) to revoke or amend the Detention Order.

## II.     APPLICABLE STANDARD

Title 18, United States Code, § 3142(g) provides the specific factors that are to be considered to determine whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. Those factors are:

1. The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

2. The weight of the evidence against the person;

3. The history and characteristics of the person, including but not limited to community ties, employment, criminal history, record of court appearance or whether the person was on probation or parole at the time the current offense was committed; and

4. The seriousness of the danger to any person or the community that would be posed by the person's release.

Title 18, United States Code, § 3142(b) authorizes the "a court having original jurisdiction over the offense" to revoke or amend a detention order based on a de novo review. United States v. Clark, 865 F.2d 1433, 1436 (4th Cir. 1989). However, the Court need not hold a second detention hearing. See United States v. Toler, 684 F. Supp. 436, 437 (S.D.W.Va. 1988) (Haden, C.J.).

### III.     ARGUMENT

The defendant presents three primary grounds for revocation and amendment of the Detention Order. First, she reasserts her argument regarding the additional Signal messages. Second, she claims to have obtained exculpatory statements from her husband declaring that she is innocent. Third, she argues that the Magistrate Judge failed to address why the $100,000 cash bond that the defendant's father offered to post would not reasonably assure her appearance. For the reasons outlined below, none of these bases alone, nor in combination, warrant revocation or amendment of the Detention Order.

### A.    Signal Messages

The defendant reasserts that she is not a risk of flight because the prior statements about leaving the country were based on a political dissatisfaction that she no longer holds.

As previously noted, this argument ignores that the Magistrate Judge found her to be a flight risk for several other reasons, namely the seriousness of the offense and the "strong" weight of the evidence against her, as outlined in the bullet points above.

Moreover, in denying the request to reopen detention, the Magistrate Judge noted that it had considered the defendant's proffer at the hearing that her statements about leaving the country were based on a no-longer-held dissatisfaction of politics. However, the Magistrate Judge explained that the fact the defendant had contemplated leaving the country remained relevant to flight risk without regard to motivation. This explanation shows that the Magistrate Judge did not rely solely on the messages to find that the defendant is a flight risk and, instead, relied also on other factors such as the seriousness of the offense and the weight of the evidence. In other words, that the defendant has shown a previous comfort level with living abroad was only a small factor

in the risk-of-flight analysis compared to the seriousness of the charged offenses and the weight of the evidence. The defendant is a flight risk and should remain in pretrial detention.

**B.      Husband's Statements**

The defendant argues that statements her husband made in jail calls with family members in November 2021 exculpate her and, thus, that the detention hearing should be reopened to reevaluate whether the weight-of-evidence factor now supports her release.

The weight of the evidence remains strong despite these conveniently timed and clearly biased statements. The defendant cites calls ranging from November 3, 2021 to November 11, 2021. Mr. Toebbe had been in jail with access to a telephone since at least October 9, 2021. Thus, the defendant expects the Court to accept that Mr. Toebbe believed he had a wrongly imprisoned wife for nearly a month before telling someone that she is innocent. Instead, Mr. Toebbe only began to make such statements about two weeks after the Court ordered the defendant's pretrial detention. Of course, any such statements by Mr. Toebbe should be considered along with the fact that he is the defendant's husband of 18 years and the father of their two minor children and that he made these statements to family members, including one of the children. These statements do not tip the weight-of-the-evidence scale whatsoever, let alone enough to outweigh the plain video evidence of the defendant participating as a lookout at the dead drops, the evidence that the defendant attempted to conceal her whereabouts during the dead drops by turning off or placing her phone on Airplane Mode, and the email in which Mr. Toebbe told the person he believed was a representative of COUNTRY1 that "[t]here is only one other person I know is aware of our special relationship, and I trust that person absolutely . . . ." Accordingly, the strong weight of the evidence still favors detaining the defendant because of the flight risk she

11

presents despite the self-serving statements of Mr. Toebbe.

C.     **$100,000 Cash Bond**

The defendant is correct that the Magistrate Judge did not specifically address her argument that she should be released on a $100,000 cash bond in the Order Denying Defendant's Motion to Reopen Detention Hearing.  However, this is not a basis to "reopen" the detention hearing.  The government does not dispute the fact that the defendant's father is willing and able to post a $100,000 cash bond.  The government simply does not believe that the cash bond will reasonably assure that the defendant's appearance considering the seriousness of the charged offenses and the weight of the evidence against her.  The Magistrate Judge expressly rejected this argument in the Detention Order, implicitly rejected it in the Order Denying Defendant's Motion to Reopen Detention Hearing, and the defendant offers no persuasive reason to reopen the detention hearing based on this argument.  For the same reasons outlined in the Detention Order, this Court should reject the cash bond as insufficient.[1]

V.     **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court affirm the Magistrate Judge's decision that no condition or combination of conditions of release would assure the appearance of the defendant or the safety of the community pending trial, without the need for a hearing.

---

[1] The government notes that, to date, the FBI has not been able to locate and recover the $100,000 in cryptocurrency it paid to the Toebbes in exchange for the Restricted Data.

12

Respectfully submitted,

WILLIAM J. IHLENFELD, II
UNITED STATES ATTORNEY


By:      /s/
	Jarod J. Douglas, Assistant United States Attorney
	Jessica Lieber Smolar, Special Assistant United States Attorney
	United States Attorney's Office for the
	Northern District of West Virginia
	1125 Chapline Street, Suite 3000
	Wheeling, WV 26003


	         /s/
	S. Derek Shugert and Matthew J. McKenzie
	Trial Attorneys
	Counterintelligence and Export Control Section
	National Security Division
	United States Department of Justice

13

## CERTIFICATE OF SERVICE

I, Jarod J. Douglas, Assistant United States Attorney for the Northern District of West Virginia, hereby certify that on the 14th day of January 2022, the foregoing UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S APPEAL FROM MAGISTRATE JUDGE'S ORDER DENYING MOTION TO REOPEN DETENTION HEARING was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Nicholas J. Compton, Esq.
Assistant Federal Public Defender
MVB Bank Building
651 Foxcroft Avenue, Ste. 202
Martinsburg, WV 25401
*Counsel for Defendant Jonathan Toebbe*

Edward B. MacMahon, Jr., Esq.
107 E. Washington Street
Middleburg, VA 20117
*Counsel for Defendant Diana Toebbe*

Barry P. Beck, Esq.
Power, Beck & Matzureff
308 W. Burke Street
Martinsburg, WV   25401
*Counsel for Defendant Diana Toebbe*

        WILLIAM J. IHLENFELD, II
        UNITED STATES ATTORNEY

By:   /s/Jarod J. Douglas
      Jarod J. Douglas
      Assistant U. S. Attorney