**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 22-4689**

———————————

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee

      v.

DIANA TOEBBE,

                    Defendant - Appellant.

———————————

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg.  Gina M. Groh, District Judge.  (3:21-cr-00049-GMG-RWT-2)

———————————

Argued:  September 19, 2023                Decided:  October 25, 2023

———————————

Before NIEMEYER, RICHARDSON, and RUSHING, Circuit Judges.

———————————

Dismissed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Richardson and Judge Rushing joined.

———————————

**ARGUED:**  Jessica Nicole Carmichael, CARMICHAEL ELLIS & BROCK, PLLC, Alexandria, Virginia, for Appellant.  Danielle Tarin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Barry P. Beck, POWER, BECK & MATZUREFF, Martinsburg, West Virginia, for Appellant.  Matthew G. Olsen, Assistant Attorney General, National Security Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William J. Ihlenfeld, II, United States Attorney, Jarod J. Douglas, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

NIEMEYER, Circuit Judge:

Diana Toebbe pleaded guilty pursuant to a plea agreement to conspiracy to communicate, transmit, or disclose Restricted Data of the United States Navy relating to Virginia-class nuclear-powered submarines with the intent to injure the United States or to secure an advantage to a foreign nation, in violation of 42 U.S.C. § 2274(a). At sentencing, the district court calculated her Sentencing Guidelines range and sentenced Toebbe to 262 months' imprisonment, which was at the bottom of that range.

Although Toebbe acknowledges that in her plea agreement, she voluntarily and intelligently waived all rights to appeal "whatever sentence [was] imposed . . . for any reason," she now seeks relief from that waiver, arguing that the district court committed errors during sentencing that she "could not have reasonably contemplated" when she executed the plea agreement. She claims in particular that, during sentencing, the district court "violated the principle of party presentation" in failing to accommodate the parties' agreements; that the court-imposed sentence was "roughly 13 years above the binding [G]uidelines as outlined in the plea agreement"; that the district court enhanced her sentence for obstruction of justice, which was not contemplated in the plea agreement and thus was an "unfounded enhancement"; and that "the district judge . . . abandon[ed] her role as [a] neutral arbiter, refusing to credit even the most basic factual premises universally accepted by all parties, and developing and relying on a theoretical 'plan C,' a notion that the *prosecutor* vehemently tried to dispel." Pointing to this and other similar alleged conduct, Toebbe contends that "the district court so severely infected the sentencing [and] the sentencing process that [her] due process rights were violated during the course of the

2

sentencing hearing to an extent that could not have been contemplated by, and transcends, the appeal waiver." She also contends that the government, in its appellate brief, breached the plea agreement and therefore that the agreement "is now void" and the "waiver in it is invalid."

The government has filed a motion to dismiss the appeal based on the appeal waiver in Toebbe's plea agreement.

After carefully reviewing the entire record and considering all the arguments, we conclude that Toebbe has failed to make a sufficient showing to avoid the clear terms of her plea agreement, which she acknowledges she entered into knowingly and intelligently. We also conclude that the government did not breach the plea agreement. Accordingly, we grant the government's motion to dismiss.

I

Diana Toebbe and her husband, Jonathan Toebbe, are highly educated professionals who, during the relevant period, were living in Annapolis, Maryland. Diana Toebbe holds a Ph.D. and worked in Annapolis as a high-school humanities teacher. Jonathan Toebbe worked in Washington, D.C., for the U.S. Navy as a nuclear engineer assigned to the Reactor Engineering Division of the Naval Nuclear Propulsion Program. In connection with this job, Jonathan Toebbe held an active Top Secret security clearance through the Department of Defense, as well as an active "Q clearance" through the Department of Energy, which granted him access to information involving or incorporating "Restricted Data," as that term is used in the Atomic Energy Act of 1954. *See* 42 U.S.C. § 2014(y)

(defining "Restricted Data" to include data concerning "the use of special nuclear material in the production of energy").  In particular, he had access to classified information concerning the nuclear reactors used to power Virginia-class submarines, which are state-of-the-art warships costing approximately $3 billion each.

Over a period of several years, Jonathan Toebbe smuggled classified, Restricted Data that related to Virginia-class submarines from his workplace so that he could sell the data to a foreign nation.  His wife, Diana Toebbe, knowingly and voluntarily joined the scheme, actively participating in its planning and execution.

Specifically, in April 2020, Jonathan Toebbe sent a package to a foreign government that contained a sample of Restricted Data and instructions for establishing a clandestine relationship to purchase additional material.  That foreign government, however, provided the package to the FBI, which initiated a covert operation to identify the sender.  Purporting to act on behalf of the foreign government, undercover FBI agents then began exchanging encrypted email messages with Jonathan Toebbe.  After the FBI sent $10,000 in cryptocurrency to a payment address provided by him, the undercover agents arranged for him to conduct a "dead drop" of additional Restricted Data.

Thereafter, on June 26, 2021, Jonathan and Diana Toebbe traveled together from Maryland to a park in Jefferson County, West Virginia, where the FBI was conducting surveillance.  The Toebbes hiked to the location in the woods that had been selected for the dead drop, and Diana Toebbe provided cover and acted as a lookout while Jonathan Toebbe hid a Ziplock bag that contained one half of a peanut butter sandwich.  Inside the sandwich was an SD card (a secure digital memory card) wrapped in plastic wrap, and after

the FBI paid an additional $20,000 in cryptocurrency, Jonathan Toebbe sent the agents a decryption code that allowed them to see that the data saved on the SD card was "Restricted Data relating to militarily sensitive design elements, operating parameters, and performance characteristics of Virginia-class submarine reactors." There was also a typed message that included statements such as "I hope your experts are very happy with the sample provided" and "I want our relationship to be very successful for us both."

Subsequently, Jonathan Toebbe conducted three additional dead drops, with Diana Toebbe accompanying him and serving as a lookout during two of the three. Specifically, on July 31, 2021, the Toebbes left behind, at a prearranged location in south-central Pennsylvania, a typed message that proposed that Jonathan Toebbe would provide 51 packages of information over time in exchange for $5 million in cryptocurrency. The message also stated that the material "was slowly and carefully collected over several years" and "smuggled past security checkpoints a few pages at a time" and that one set of information "reflects decades of U.S. Navy 'lessons learned' that will help keep your sailors safe." Then, about a month later, Jonathan Toebbe alone conducted a drop in eastern Virginia, leaving behind an SD card hidden in a chewing-gum package that contained additional Restricted Data relating to Virginia-class submarine nuclear reactors, as well as a typed message indicating that he had told "only one other person . . . of our special relationship" — *i.e.*, Diana Toebbe — and that he "trust[ed] that person absolutely." The message stated further, "We have cash and passports set aside for th[e] purpose" of fleeing the United States. Finally, on October 9, 2021, both Jonathan and Diana Toebbe returned

to Jefferson County, West Virginia, to conduct a drop, which was the fourth dead drop. Immediately after completing it, however, they were arrested by FBI agents.

During the course of the undercover investigation, the FBI transferred a total of $100,000 in cryptocurrency to "wallets" created by Jonathan Toebbe. Later investigation revealed that Diana Toebbe knew the "pass phrase" to at least one such wallet and thus had access at least to it.

Following the Toebbes' arrest, a federal grand jury returned an indictment charging each with one count of conspiracy to communicate Restricted Data, in violation of 42 U.S.C. § 2274(a), and two counts of aiding and abetting the communication of Restricted Data, in violation of § 2274(a) and 18 U.S.C. § 2.

A few months later, in February 2022, Diana Toebbe entered into a written plea agreement with the government by which she agreed to plead guilty to the conspiracy count, a crime that carried a statutory maximum of life imprisonment. The agreement, which was proffered to the district court under Federal Rule of Criminal Procedure 11(c)(1)(C), would, if accepted, bind the court to impose a term of imprisonment "of not more than 36 months." If the court were not to accept that sentence, however, Toebbe would "have the right to withdraw her plea of guilty." In the agreement, Toebbe also agreed that if the court were to accept the proffered sentence, she would waive her right "to appeal whatever sentence is imposed . . . for any reason," except with respect to "claims of ineffective assistance of counsel or prosecutorial misconduct."

The magistrate judge who conducted the initial hearing on the proposed plea agreement confirmed that Toebbe, who was highly educated, understood the terms of her

6

plea agreement, including the appeal-waiver provision, and he found that Toebbe's guilty plea was knowingly and voluntarily made. He deferred, however, to the district judge to determine whether to accept the plea agreement under Rule 11(c)(1)(C) and thus impose the agreed-to sentence.

At the hearing before the district judge, both the government and Diana Toebbe urged the court to accept the plea agreement. The government argued that a 36-month sentence would be appropriate for Diana Toebbe because she had "played [a] limited passive role[] in [a] scheme[] led by [her] husband[]," as to whom a similar plea agreement proffered a sentence of 151 to 210 months' imprisonment. The government stated to the court, "Really her offense boils down to acting as a cover and a lookout on three occasions in a three-month period. Nothing more than that. Nothing less." The government did note that Diana Toebbe had also known the pass phrase to one of the cryptocurrency wallets — which Jonathan Toebbe had forgotten — but it emphasized that she had provided it to authorities when asked, allowing the government "to corroborate Mr. Toebbe's claim that no payments have been received [in] that wallet."

At the end of the extended hearing, however, the district court concluded that "a sentence of no more than 36 months" would be "strikingly deficient" "for an active participant in a conspiracy to communicate Restricted Data." The court explained that Diana Toebbe's participation in the conspiracy "was apparently done for selfish and greedy reasons but that [it] could have easily caused great harm to the Navy, the United States, servicemen, and even the world." The court relied in this regard on a victim impact statement prepared by the U.S. Navy, in which a vice admiral stated, among other things,

that the information compromised by the conspiracy "could be used by an adversary to harm or disable currently operating U.S. nuclear submarines," thus increasing the risk faced by "nearly 25,000 active duty submarine sailors," and that the conspiracy had threatened "one of [the United States'] prized strategic advantages."  In addition to reading the Navy's statement into the record, the court also noted that the probation officer had calculated Diana Toebbe's Sentencing Guidelines range as 151 to 188 months' imprisonment — a range based on a base offense level of 37 with a 3-level reduction for acceptance of responsibility.  In light of all the circumstances, the court found no "justifiable reasons for accepting" a plea agreement that would bind it to impose a sentence so far below that range.

As a consequence of the district court's ruling, Toebbe withdrew her guilty plea. But about a month later, on September 20, 2022, she and the government executed a second plea agreement by which Toebbe would again plead guilty to Count I charging conspiracy to communicate Restricted Data, and the agreement would again be proffered under Rule 11(c)(1)(C).  But rather than proffer a sentence of no more than 36 months' imprisonment, the revised agreement would require the court to impose "a sentence of imprisonment of not more than the low end of the applicable Guidelines range," with the "low end" defined as "the lowest number of months of imprisonment available in the applicable Guidelines range."  The agreement also provided that the district court would calculate the applicable Guidelines range.  Indeed, Toebbe expressly "consent[ed] to . . . a determination of any and all facts and a resolution of the application of any and all Guidelines factors *by the United States District Judge*."  (Emphasis added).  Again, this second agreement provided that if the court did not accept the proffered sentence — a sentence at the lowest end of the

court-determined Guidelines range — Toebbe would have the right to withdraw her guilty plea.  This agreement also included agreements between Toebbe and the government that were not binding on the court, such as (1) that the proper base offense level for Toebbe's offense was 37; (2) that the government would "move the Court" for a 3-level downward departure "from the otherwise applicable Guidelines range"; and (3) that the government would recommend a 3-level reduction under U.S.S.G. § 3E1.1 for timely acceptance of responsibility.  Accordingly, based on the parties' agreements, Toebbe would have a total offense level of 31 if the district court agreed with their recommendations, resulting in a Guidelines range of 108 to 135 months' imprisonment.

Like Toebbe's first plea agreement, the second plea agreement contained a waiver of her appellate rights.  Specifically, the agreement provided that "if the Court sentence[d] her pursuant to Paragraph 3 of this agreement" — providing for a sentence at the lowest end of the Guidelines range calculated by the district court — she would "knowingly and expressly waive[] all rights . . . to appeal whatever sentence [was] imposed . . . for any reason (including the establishment of the advisory sentencing guidelines range, . . . the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment . . .)."  The agreement excepted from the appeal waiver only "claims of ineffective assistance of counsel [and] prosecutorial misconduct." But Toebbe also agreed "that there is currently no known evidence of [either]."

At the initial hearing on the second plea agreement before the magistrate judge, Toebbe again affirmed that she understood the agreement and knowingly and voluntarily agreed to its terms, including that the district court would determine her advisory

9

Guidelines range and that she was waiving her right to appeal any sentence that was consistent with the plea agreement. Again, the magistrate judge deferred to the district judge to determine whether to accept the proffered plea agreement under Rule 11(c)(1)(C).

Before the hearing before the district judge, the government filed a motion for a 3-level downward departure for Toebbe's cooperation, as it had agreed to do in the plea agreement. In the motion, the government noted that, in addition to providing the pass phrase to the cryptocurrency wallet, Toebbe had also met with FBI agents for approximately five hours, "provid[ing] details about the offense that captured her perspective and involvement," including "her knowledge of and planned involvement in reconnaissance actions taken by Mr. Toebbe to decide how best to contact a foreign nation to offer the Restricted Data for sale." The government noted that she also "answered all questions posed to her by agents from the FBI's Behavioral Analysis Unit," providing information relating to "the psychological dynamics between Mr. Toebbe and her, including how those dynamics related to the planning and commission of the underlying offense." That Unit had not "had the opportunity . . . to interview both [spouses] in a husband-and-wife espionage scheme" in at least 10 years, and a member of the Unit had noted "the importance of those types of interviews in profiling criminal subjects and solving future espionage cases." The government advised the court that it considered Diana Toebbe's assistance in these respects to be "highly significant and useful" and that its assessment was that she had "provided truthful, complete, and reliable information." It therefore urged the court to grant its motion for a 3-level downward departure.

10

The district court, however, denied the motion following a hearing.  It found that other than the pass phrase, "Mrs. Toebbe largely provided information generally already known to the government."   And it ultimately concluded that there was "nothing remarkable about the information she provided or anything that she [had] done for the government," finding that she had provided only "the sort of cooperation that is commonly seen in debriefings after a guilty plea."

Before preparing a revised presentence report for the court to consider when sentencing Diana Toebbe under the second plea agreement, the probation officer, pursuant to his "effort to provide supplemental information" for the report, reached out to the regional jail where the Toebbes had been detained following their arrest in October 2021. As a result, the probation officer received information in early October 2022 that Diana Toebbe had attempted to send two letters to Jonathan Toebbe, one in December 2021 and another in January 2022, both of which had been intercepted by jail staff.  The probation officer indicated in his presentence report that, in the letters, Diana Toebbe had made "several attempts to induce her husband to . . . provide statements to authorities affirming her ignorance of his criminal scheme," including by "repeated[ly] referenc[ing] . . . [their] children and the potential for her to care for them."  The probation officer further reported that Jonathan Toebbe had informed authorities that, prior to their arrest, "he and his wife had . . . pre-arranged [a] 'cover story' relating to a bitcoin algorithm . . . in an . . . attempt to shield her from consequences should the conspiracy be disrupted by authorities."  Diana Toebbe then invoked this bitcoin algorithm cover story in the letters in an apparent attempt

11

to signal to her husband that she was sticking to that story and to implore him to do the same.

In the presentence report, the probation officer calculated Diana Toebbe's advisory Guidelines range, finding first that the base offense level for her violation of § 2274(a) was 37.  Based on the two letters, he then recommended applying an upward adjustment under U.S.S.G. § 3C1.1 of two levels for obstruction of justice, while still applying a downward adjustment under § 3E1.1 of three levels for acceptance of responsibility, resulting in a total offense level of 36.  Based on that offense level and a Criminal History Category I (reflecting no prior convictions), the presentence report calculated the advisory Guidelines range to be 181 to 235 months' imprisonment.  Toebbe objected to the application of the obstruction of justice enhancement.

The district court conducted a joint hearing for both Diana and Jonathan Toebbe on November 9, 2022, to determine whether to accept their respective Rule 11(c)(1)(C) plea agreements and, if so, to impose sentences consistent with those agreements.  In calculating Diana Toebbe's Guidelines range, the court first addressed her objection to the obstruction of justice enhancement and overruled it.  It found that in the letters, Diana Toebbe had "pressure[d]" and "encourage[d]" her husband "to lie" and "perjure [himself]," which was "obstruction plain and simple."  The court concluded next that based on her obstructive conduct, Diana Toebbe should lose the recommended 3-level reduction for acceptance of responsibility, noting that the Guidelines Manual instructed that conduct resulting in an obstruction enhancement "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct."  (Quoting U.S.S.G. § 3E1.1 cmt. n.4).  Thus, to

calculate the advisory Guidelines range, the court began with the agreed-upon base offense level of 37 and then applied the 2-level obstruction enhancement. With no reductions to be made, the court determined that Diana Toebbe's total offense level was 39, resulting in an advisory Guidelines range of 262 to 327 months' imprisonment. After making those calculations, the court concluded that "acceptance of [Diana Toebbe's] plea agreement [would] not undermine the statutory purposes of sentencing," and accordingly it accepted her Rule 11(c)(1)(C) plea agreement. As a result, the maximum sentence the court could impose became 262 months' imprisonment, the lowest in the calculated Guidelines range.

Diana Toebbe, with the affirmative support of the government, then argued for a downward variant sentence based on the 18 U.S.C. § 3553(a) factors. She proposed a sentence "in the range of 3 to 4.9 years." In arguing for this substantial variance, Diana Toebbe's counsel argued that "[h]er husband was the principal actor" who had "come up with the idea to do this," while Diana Toebbe had a long, documented history of struggling with anxiety and depression, including suicidal ideation, which had clouded her judgment. Her counsel also maintained that a sentence at the bottom of the calculated Guidelines range would result in an unwarranted disparity when compared to the sentences imposed on other defendants convicted of espionage offenses, citing statistics from a Defense Department study indicating that from 1990 to 2015, 42% of such defendants had "received a sentence of below 5 years" and 66% had "received less than 10 years."

Diana Toebbe's counsel argued further that the "risk of recidivism" was exceedingly low. In response to that argument the court asked, "How do we know that if they had the Plan B cover story [involving the bitcoin algorithm], there [was] not a Plan C where

13

something else [was] secreted [away] for when they get out that they can share and make money from?"   Diana Toebbe's counsel responded that the government had "done everything [it] know[s] how to do to confirm that there is no further information out there" and that it had a "high degree of confidence [that] there's not."   And the government subsequently confirmed this statement, providing a fulsome summary of the extensive steps that the FBI had taken to confirm the scope of the conspiracy and representing that not only was there "no evidence [of] some type of Plan C," but that "all of the evidence goes against such a conclusion."

Joining Toebbe's request for substantial downward variance, the government continued to maintain that the three-year sentence proposed in the original plea agreement was the appropriate sentence.  It maintained that "[i]t's universally accepted that the person with access [to classified information] . . . who is trusted [and] who has the specialized knowledge . . . should be punished more severely than someone who might have helped in some way."  And it also argued that in applying the § 3553(a) factors, the court should ensure that it was not giving too much weight to the two letters Diana Toebbe had attempted to pass to her husband, as they "did not make it to the recipient and had no effect on the case."  Finally, the government repeated its request that the court consider Diana Toebbe's cooperation, emphasizing that "[t]he FBI and the Department of Navy [were] uniquely positioned to assess" its value and that both considered it significant.

After considering the parties' arguments, the district court rejected the request for a downward variant sentence and thus sentenced Diana Toebbe to 262 months' imprisonment, the bottom of the advisory Guidelines range.  The court stated that "while

the factors listed in mitigation by the government and the defendant [did] impact the Court's sentencing and . . . [its decision] to accept . . . the binding plea agreement in the first place," it had concluded that those factors did "not support a variance sentence."  The district court explained that it considered the Toebbes' crime to be one of the most serious it had ever seen, emphasizing that the conspiracy "posed a legitimate concern for the national security interests of this country," as it "had the potential to undermine countless hours of effort made by an untold number of individuals . . . and could have endangered military service personnel."  The court stated further that while it had considered the information provided by defense counsel pertaining to the sentencing outcomes in other espionage cases, "the facts of each of those cases [were] very different, and the defendants [were] very different as well."  The court also rejected the premise that Diana Toebbe was "a minor participant."  Indeed, based upon certain intercepted communications between the Toebbes that were presented as evidence at her detention hearing, as well as the two letters that Diana Toebbe had attempted to send to Jonathan Toebbe, the court found that "it was most probably Mrs. Toebbe that was driving the bus."  Finally, the court stated that, "given likely technological and military advances," its chosen sentence would help ensure that "by the time this defendant is released from imprisonment, any information" that "she or her husband held onto" "would most certainly be outdated, stale, and worthless to any nation [that] would want to cause us harm."

After sentencing Diana Toebbe to 262 months' imprisonment, the court sentenced Jonathan Toebbe to 232 months' imprisonment.  It did so based on the same base offense level of 37, plus an enhancement for his role in the offense.  But it also applied a reduction

to his offense level for his acceptance of responsibility.  His offense level was accordingly 36, resulting in an advisory Guidelines range of 188 to 235 months' imprisonment.  His 232-month sentence was thus at "the higher end of the binding term of imprisonment contained in [his] plea agreement."

From the judgment entered on November 17, 2022, Diana Toebbe filed this appeal challenging her sentence.  The government filed a motion to dismiss the appeal based on the appeal-waiver provision in her plea agreement, and Toebbe has advanced several arguments that her appeal waiver does not bar her appeal, including a claim that the government, in making its arguments on appeal, has breached the plea agreement.

## II

We address at the outset the government's motion to dismiss this appeal on the ground that Toebbe waived her right to appeal whatever sentence was imposed for any reason.  The government contends that "[a]ll the sentencing issues Toebbe seeks to raise on appeal fall within the broad scope of her appeal waiver."  It argues further that while Toebbe has couched her arguments in constitutional terms, her claims actually "amount to a simple disagreement with the district court's factual findings and Guidelines calculation at sentencing," which are clearly unreviewable under the parties' agreement.  Finally, the government asserts that Toebbe has provided no authority holding that her issues "fall[] within the narrow class of claims that would render her appeal waiver unenforceable."

Toebbe does not dispute the validity of her waiver.  Rather, she mounts a multi-faceted challenge to the fairness and adequacy of her sentencing process, contending that

16

during the process the district court relied on "unfounded speculation"; that the court failed to adhere "to the principle of party presentation" by ignoring the parties' agreements and recommendations; that the court violated required judicial neutrality when it denied positions that had been recommended by both parties and instead made its own findings; and that the court imposed a sentence that was "so far beyond the anticipated range" that it was fundamentally unfair.  She argues that her appeal waiver cannot bar her from challenging the cumulative effect of such conduct by the district judge, as it could not have been anticipated by the parties when they negotiated the plea agreement.

Before addressing this issue, we lay out the relevant language of the plea agreement, which demonstrates the negotiated expectations of the parties.

The agreement, which was executed on September 20, 2022, provides that Toebbe would plead guilty to Count I of the indictment, the conspiracy count, which provides for a maximum sentence of life imprisonment, and the government would dismiss Counts II and III.

The agreement was executed and proffered to the district court as a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C), by which parties can agree to a specific sentence, a sentencing range, or the application of a particular Sentencing Guidelines provision or factor that then becomes *binding* on the district court if it accepts the agreement.  Paragraph 3 of the plea agreement in this case thus included as a core term the following:

> Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties agree to the following binding term:  a *sentence of imprisonment of not more than the low end of the applicable Guidelines range*.  The parties'

> reference to "low end" means the lowest number of months of imprisonment
> available in the applicable Guidelines range. . . .  The parties understand that
> if the Court does not accept the binding provisions of this paragraph, then
> Ms. Toebbe will have the right to withdraw her plea of guilty.

(Emphasis added).  The agreement also included stipulations by the parties, an agreement

by the government to file a motion for a downward departure, and recommendations by

the government, but none of these was *binding* on the court.  Thus, in Paragraph 4, the

parties "stipulate[d] and agree[d] that the base offense level [for Toebbe's conviction]

[was] . . . 37," but they also agreed that "the Court is *not bound* by the stipulations in this

paragraph." (Emphasis added).  The government also agreed to make recommendations

that were similarly *not binding* on the court.  Paragraph 15 provided:

> Although this agreement contains a binding term regarding imprisonment,
> the United States will make the following *nonbinding* recommendations:  1)
> if Ms. Toebbe accepts responsibility, and if the probation office recommends
> a two-level reduction for "acceptance of responsibility," . . . the United States
> will concur in the recommendation; and 2) should Ms. Toebbe give timely
> and complete information [as required by U.S.S.G. § 3E1.1(b)], the United
> States will recommend . . . an additional one-level reduction for this "timely
> acceptance" of responsibility.

(Emphasis in original).  Finally, the government agreed, as a response to Toebbe's

cooperation, that "[p]rior to sentencing," it would "move the Court to depart downward"

and grant her a 3-level reduction of her offense level.

The nonbinding aspect of these stipulations and recommendations was again

confirmed in Paragraph 7.  In that paragraph, Toebbe

> consent[ed] to the application of the Guidelines, in conformity with *United
> States v. Booker*, 543 U.S. 220 (2005), and to a determination of any and all
> facts and a resolution of the application of any and all Guidelines factors *by
> the United States District Judge*.  Ms. Toebbe further agree[d] that *the
> District Judge* should make any sentencing determinations, including, but

not limited to, Guidelines determinations, using the preponderance of the evidence standard.

(Emphasis added). Thus, the agreement provided for a binding sentence no higher than the bottom of the Guidelines range and that the Guidelines range would be determined by the district court based on its findings.

Finally, the parties agreed to waive appeals if the court sentenced Toebbe consistent with the plea agreement's binding provision. The waiver by Toebbe provided:

> [I]f the Court sentences her pursuant to Paragraph 3 of this agreement . . . [t]he defendant knowingly and expressly waives all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed . . . for any reason (including the establishment of the advisory sentencing guidelines range, . . . the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment . . .).
>
> *      *      *
>
> Nothing in this paragraph, however, will act as a bar to the defendant perfecting any legal remedies she may otherwise have on appeal or collateral attack respecting claims of ineffective assistance of counsel or prosecutorial misconduct. The defendant agrees that there is currently no known evidence of ineffective assistance of counsel or prosecutorial misconduct.

And the waiver by the government provided:

> The United States waives its right to appeal any sentence within [the] range specified in Paragraph 3.

It is well established that a criminal defendant may waive the statutory right to appeal her sentence as part of a plea agreement and that we will ordinarily enforce that waiver should the defendant nonetheless appeal the sentence imposed by the district court. *See United States v. Archie*, 771 F.3d 217, 221 (4th Cir. 2014). More specifically, "[w]here, as here, the Government seeks enforcement of an appeal waiver," we will

generally enforce the waiver "to preclude a defendant from appealing a specific issue if the record establishes that the waiver is valid and the issue being appealed is within the scope of the waiver." *Id.* Moreover, "[a]n appellate waiver is valid if the defendant's agreement to the waiver was knowing and intelligent." *United States v. Thornsbury*, 670 F.3d 532, 537 (4th Cir. 2012).

Toebbe does not contest the validity of her appeal waiver, and the record confirms that she knowingly and intelligently waived her right to appeal. *See Thornsbury*, 670 F.3d at 537 ("Generally, if a district court questions a defendant regarding the waiver of appellate rights during the Rule 11 colloquy and the record indicates that the defendant understood the full significance of the waiver, the waiver is valid"). Moreover, the scope of her appeal waiver on its face is quite broad, barring, with two limited exceptions not applicable here, Toebbe's "appeal [of] whatever sentence [was] imposed . . . *for any reason*," "including [1] the establishment of the advisory sentencing guidelines range, . . . [2] the weighing of the sentencing factors, and [3] any constitutional challenges to the calculation and imposition of any term of imprisonment." (Emphasis added). Thus, unless some other exception based in the law and the facts in this case can be demonstrated, Toebbe's challenge to her 262-month sentence would appear to fall squarely within the scope of her valid appeal waiver. Nonetheless, she seeks relief from her waiver.

To obtain such relief, Toebbe advances the premise that, given the terms of her plea agreement, she could not have reasonably anticipated the sentence that she received and that this discordance between the anticipated sentence and the actual sentence was attributable to bias by the district judge, who unfairly refused to accommodate the parties'

20

agreements in favor of her personal views of the circumstances.  Moreover, Toebbe argues that the district judge, in doing so, hypothesized facts that were unsupported.  She contends that, in this manner, the sentencing process was so egregious and unfair as to violate her due process rights and that she cannot legally waive her right to appeal a sentence based on such a violation.

Toebbe's argument relies generally on our jurisprudence recognizing that "a defendant who waives the right to appeal nevertheless 'retains the right to obtain appellate review of his sentence on certain limited grounds,' even if those grounds are *not* specified in the plea agreement." *United States v. Marsh*, 944 F.3d 524, 528 (4th Cir. 2019) (quoting *United States v. Attar*, 38 F.3d 727, 732 (4th Cir. 1994)).  For example, "[n]o appeal waiver . . . can bar a defendant's right to challenge his sentence as outside a statutorily prescribed maximum 'or based on a constitutionally impermissible factor such as race.'" *Id.* (quoting *United States v. Marin*, 961 F.2d 493, 496 (4th Cir. 1992)).  And it is similarly well established that a defendant's claim that he was denied the effective assistance of counsel following the entry of his guilty plea cannot be barred by an appeal waiver.  *See Attar*, 38 F.3d at 732–33.  In such circumstances, we have explained, "the errors allegedly committed by the district courts were errors that the defendants could not have reasonably contemplated when the plea agreements were executed." *United States v. Blick*, 408 F.3d 162, 172 (4th Cir. 2005).  Moreover, as we have observed, the "only" circumstance in which we have "declined to enforce a valid appeal waiver [is] where the sentencing court violated a fundamental constitutional or statutory right that was firmly established at the time of sentencing." *Archie*, 771 F.3d at 223.

21

In her effort to make a case for relief from the waiver, Toebbe points to the government's position in her case as supporting her expectation of a lower sentence. She notes that throughout the entire sentencing process, the government favored a 36-month sentence and so stated to the court. In the plea agreement, the government also agreed to move for a 3-level reduction of her offense level for her cooperation and to recommend a 3-level reduction for acceptance of responsibility. And, while not part of the plea agreement, the government supported and argued for a substantial downward variant sentence in Toebbe's favor. Thus, both the government and Toebbe requested — and accordingly expected — a lower sentence than would have otherwise been indicated by the Sentencing Guidelines. Yet, while Toebbe insists that she expected that the court would accommodate the parties' positions, she knew that the court was not bound by the parties' positions, as explicitly stated in her plea agreement. She also knew that the district court had rejected the 36-month sentence included in her first plea agreement as "strikingly deficient."

Moreover, Toebbe's argument fails to take account of the critical fact that clearly influenced the district court. Namely, after the execution of the second plea agreement, the probation officer uncovered two letters that Diana Toebbe had attempted to send to Jonathan Toebbe, in which she urged him to fabricate facts and falsely tell authorities that she was innocent and should be released. Accordingly, the probation officer recommended a 2-level increase in Toebbe's offense level for obstruction of justice.

At sentencing, the district court expressed dismay that the letters had not been provided to the court earlier. Toebbe's counsel acknowledged that "it was disappointing"

that Toebbe had attempted to send the letters.  After reading the text of the letters into the record, the court found that Diana Toebbe was attempting to encourage Jonathan Toebbe to perjure himself about her role in the offense.  The court explained that with the letters, Diana Toebbe was conveying that "it's time to deploy the cover plan [that the two had formulated before their arrest].  So you go forth, and you plead guilty, and you perjure yourself and tell them I had nothing to do with this."  The court added that the letters also suggested that Diana Toebbe was "driving the bus"; she was, according to the court, "making sure he deployed the cover story for her."

The district court was entitled to give weight to these letters.  They undermined the forthrightness that the government had reported to the court and undermined her arguments for a lower sentence.  And while the government apparently concluded that Toebbe should still receive credit for having accepted responsibility and cooperated after her attempt to convince her husband to perjure himself had failed, the district court was not bound by the government's conclusion in this regard — indeed, it had a *duty* to make its own assessments.

We conclude that Diana Toebbe had no reasonable basis to believe that the district court would provide her all of the benefits derivable from the stipulations and recommendations that the government had made in the plea agreement.  As important, Toebbe has also been unable to present any authority to support her claim for relief from her waiver based on her unrealized expectations as to the sentence she would receive.  Instead, our jurisprudence clearly indicates that a defendant's mere expectation of a lower

sentence, even if reasonable, is not a ground for us to fail to enforce the defendant's valid appeal waiver. *See, e.g.*, *Archie*, 771 F.3d at 223.

Finally, her argument that her due process rights were violated, based on the totality of the district court's conduct, is also unsupported. While Toebbe's plea agreement did waive her right to appeal her sentence even on constitutional grounds, a defendant in her position might nonetheless be able to argue persuasively that holding her to such an agreement would be fundamentally unfair if the district court's process for accepting the plea agreement and conducting the sentencing was grossly imbued with arbitrariness. *See Marin*, 961 F.2d at 496 ("[A] defendant who waives his right to appeal does not subject himself to being sentenced entirely at the whim of the district court"). But any such argument would have to be based on demonstrated facts that the process became unhinged from the rules and principles established for defendants' protection and that it clearly exceeded the bounds of commonsense and reason. But we have no such circumstances here.

In this case, the district court's rulings relating to Toebbe's offense level, which supported the sentence the district court ultimately imposed, were made by applying the applicable Sentencing Guidelines provisions and making findings of fact. As a result of those rulings, the court determined that Toebbe's total offense level was 39, as compared to the offense level of 36 recommended in the presentence report. These rulings by the court cannot be characterized as conduct without regard to applicable rules and principles and outside the bounds of commonsense and reason.

At bottom, we conclude that Toebbe's arguments for relief from her appeal waiver are insufficient.

III

Apart from her claim for relief from the waiver, Toebbe also relies on the language of her plea agreement and Rule 11(c)(1)(C) to expand the scope of that which bound the district court.  Specifically, she argues that because her plea agreement was proffered to the court under Rule 11(c)(1)(C), "the district court was *bound* to apply the government's recommendations as to the applicability of" the 3-level downward departure for cooperation and the 3-level reduction for acceptance of responsibility.  (Emphasis added). Accordingly, she maintains that we must remand this case for specific performance and order that the district court adhere to the government's recommendations in connection with the determination of her total offense level.

Neither the agreement nor Rule 11 supports her argument.  Rule 11(c)(1)(C) authorizes plea agreements in which "an attorney for the government will . . . agree that a *specific sentence* or *sentencing range* is the appropriate disposition of the case, *or that a particular provision* of the Sentencing Guidelines, or *policy statement*, or *sentencing factor* does or does not apply," with that "recommendation or request [becoming] bind[ing] [on] the court once the court accepts the plea agreement."  Fed. R. Crim. P. 11(c)(1)(C) (emphasis added).  Thus, as relevant here, the Rule authorizes a plea agreement in which the parties agree *to a specific sentencing range — e.g.*, one not more than the bottom of

25

the applicable Guidelines range — and bind the court to imposing a sentence within that range without also binding the court in its calculation of the applicable Guidelines range.

This is precisely the structure of the parties' plea agreement in this case. Specifically, Paragraph 3 provides:

> Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties agree *to the following binding term*:  a sentence of imprisonment of not more than the low end of the applicable Guidelines range. . . .  The parties understand that if the Court does not accept *the binding provisions of this paragraph*, then Ms. Toebbe will have the right to withdraw her plea of guilty.

(Emphasis added).  Thus, the sole "binding term" of the plea agreement was the parties' agreement that Toebbe would receive "a sentence of imprisonment of not more than the low end of the applicable Guidelines range."  She agreed, moreover, that her "applicable Guidelines range" was to be determined *by the district court*, expressly agreeing to "a resolution of the application of any and all Guidelines factors by the *United States District Judge*."  (Emphasis added).  And while the plea agreement reflects the two parties' agreements with each other as to how certain Guidelines factors would apply — obligating the government to file a motion asking the district court to apply a 3-level downward departure for cooperation and to make a "nonbinding recommendation[]" that Toebbe receive another 3-level reduction for acceptance of responsibility — those provisions of the plea agreement, by their own terms, were *not* binding on the district court.  Thus, we find no merit to Toebbe's argument that "the district court . . . violated Rule 11(c)(1)(C)" by denying the government's motion for a downward departure and declining to follow its

"nonbinding recommendation" that Toebbe receive a 3-level reduction for acceptance of responsibility.

IV

Additionally, Toebbe contends that her "21.5-year sentence is so grossly disproportionate to her conduct of standing lookout at a drop of confidential information three times" that the sentence violated her Eighth Amendment right against cruel and unusual punishments. She argues that "[i]t is grossly above the 3-year sentence that the prosecutor recommended, and it is grossly above the sentences of other similarly situated defendants."

While her appeal waiver appears also to cover this argument, we conclude that were it appropriate for us to consider it, it would nonetheless have no merit. Toebbe pleaded guilty to a violation of 42 U.S.C. § 2274(a), for which Congress provided a maximum sentence of life imprisonment. And in assessing such a violation in the context of all other violations of federal crimes, the Sentencing Commission assigned it a base offense level of 37. Without adjusting that offense level for other factors, the resulting advisory sentencing range established by the Commission for one without a criminal history would be imprisonment from 210 to 262 months. And in this case, because Toebbe was found to have obstructed justice, her advisory sentencing range was increased to 262 to 327 months' imprisonment. The district court sentenced her to 262 months, a sentence within the range prescribed not only by the statute but also by the Sentencing Guidelines. Yet, she has made no effort to challenge either. In these circumstances, there simply can be no Eighth

27

Amendment argument.  *Cf. United States v. Cobler*, 748 F.3d 570, 580 (4th Cir. 2014) (recognizing that a defendant challenging her sentence under the Eighth Amendment must first establish a "threshold inference of gross disproportionality").

Toebbe relies on the facts that the government recommended a 36-month sentence and that others in similar circumstances have received lower sentences.  But these facts hardly establish that the district court violated the Eighth Amendment's prohibition of cruel and unusual punishments when it imposed a sentence that was authorized by Congress and consistent with the Sentencing Commission's assessment of the seriousness of the offense relative to other federal crimes.  And while Toebbe attempts to minimize her role in the conspiracy, the district court reasonably rejected that characterization.  The court concluded, based on the record before it, including the Navy's victim impact statement, that the conspiracy was one of the most serious crimes it had ever seen.

At bottom, Toebbe has failed to demonstrate an acceptable reason why her appeal waiver should not be enforced against her Eighth Amendment claim.

V

Finally, Toebbe contends that her plea agreement, together with its waiver, is invalid and cannot be enforced because the government breached the plea agreement by what it argued in its appellate brief.  Specifically, she notes that the plea agreement required the government to seek a 3-level downward departure "from the otherwise applicable Guidelines range" and to recommend a 3-level reduction in her offense level for acceptance of responsibility.  Yet, the government now argues on appeal *in support of* the sentence

imposed by the district court.  While Toebbe acknowledges that the government did honor its obligations before the district court, she maintains that its "new assertions" in its brief on appeal "directly contravenes [its] obligations in the plea agreement," with the result being that the agreement's appeal waiver can no longer be enforced against her.

To make the argument, however, Toebbe relies on a misreading of her plea agreement.  Again, Paragraph 5 of the agreement provided that "[p]rior to sentencing . . . , the United States will move the Court to depart downward from the otherwise applicable Guidelines range" by three levels.  And in Paragraph 15, the government agreed that "if the probation office recommends a two-level reduction for 'acceptance of responsibility,'" it would "concur in [that] recommendation" and also "recommend . . . an additional one-level reduction for . . . 'timely acceptance' of responsibility" if Toebbe satisfied specified conditions.  The government fulfilled both of these obligations, arguing fervently to the district court throughout the sentencing proceeding that Toebbe should receive those benefits.  The court, however, rejected both arguments and applied neither reduction, ultimately imposing a Guidelines sentence of 262 months' imprisonment.

Critically, the plea agreement provided further that once the district court exercised its authority to sentence Toebbe, the government was authorized *to advance arguments on appeal in support of that sentence*.  Specifically, it provided, "Both parties have the right during any appeal to argue in support of the sentence."  And that is all the government has done.  We understand the central thrust of its position to be that, although the district court certainly could have agreed with it and Toebbe below when calculating Toebbe's offense level, the court nonetheless acted "reasonably and within [its] discretion" when it rejected

29

the government's reduction and downward-departure requests.  Taking all of the plea agreements' provisions into account, we readily conclude that the government's arguments on appeal do not amount to a breach of its obligations under the agreement.

VI

While Toebbe finds her sentence to be a heavy one — indeed too heavy for the conduct as she assesses it — her violation of law was a most serious one.  She actively participated, for personal financial gain, in a conspiracy to communicate important Restricted Data about the U.S. Navy's Virginia-class submarines, with actual harmful consequences and potentially catastrophic ones.  The U.S. Navy advised the district court that the betrayal by the Toebbes had far-reaching ramifications for the United States and the sailors and the families that serve the United States Navy, enhancing the risk faced by nearly 25,000 active-duty submarine sailors.  And as the district court noted, "the damage here has already been done."  In addition, as the Navy stated, her conduct threatened "one of the [United States'] prized strategic advantages."  The gravity of Toebbe's conduct must not be diminished on the ground that it was not as extensive in the overall scheme as was her husband's.  She knowingly engaged in the full scope of the conspiracy — not only providing cover and lookout but also engaging in planning and strategy — recognizing the significant damage that it could cause to the United States.  Indeed, her understanding of the damage is reflected by the millions of dollars that she and her husband demanded and expected from their betrayal.

30

For the reasons that we have given, we enforce Toebbe's appeal waiver and dismiss her appeal.

DISMISSED